Page 1

```
 1        IN THE COMMON PLEAS COURT OF PERRY COUNTY, OHIO

 2                       - - -

 3     COMMODORE BANK,              )

 4          PLAINTIFF,             )

 5        -vs-                     )   CASE NO. 07-CV-00395

 6     GEORGE M. RILEY,            )

 7          DEFENDANT.             )

 8                       - - -

 9

10        VIDEOTAPED DEPOSITION of GEORGE M. RILEY, a

11   Defendant herein, called by the Plaintiff for examination

12   under the statute, taken before me, Debbie M. Bobo,

13   Registered Professional Reporter, Notary Public in and

14   for the State of Ohio, pursuant to the stipulations of

15   counsel hereinafter set forth at the Perry County Public

16   Library, 117 South Jackson Street, New Lexington, Ohio,

17   on Friday, January 25, 2008, beginning at 1:00 p.m.

18                       - - -

19          TAHYI VIDEO & COURT REPORTING, LTD.
                  334 Main Street
20                P.O. Box 935
            Zanesville, Ohio 43702-0935
21               (800) 526-6508

22

23

24

25
```

Page 2

```
 1   APPEARANCES:

 2        ON BEHALF OF THE PLAINTIFF:

 3

 4          Gary E. Becker, Esq.
            DINSMORE & SHOHL, LLP
 5          1900 Chemed Center
            255 East Fifth Street
 6          Cincinnati, Ohio 45202

 7        ON BEHALF OF THE DEFENDANT:

 8

 9          Steven P. Schnittke, Esq.
            SCHNITTKE & SMITH
10          114 South High Street
            P.O. Box 542
11          New Lexington, Ohio 43764

12   ALSO PRESENT:

13          Mr. Jeffrey L. Danford, and
            Mr. Terry Tahyi, Videographer.

14                      - - -

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1              S T I P U L A T I O N S

 2        It is stipulated by and between counsel for the

 3   respective parties that the videotaped deposition of

 4   GEORGE M. RILEY, a Defendant herein, called for examination

 5   by the Plaintiff under statute, may be taken at this time

 6   by the Notary and by agreement of counsel without notice or

 7   other legal formality; that said deposition may be reduced

 8   to writing in stenotype by the Notary whose notes may

 9   thereafter be transcribed out of the presence of the

10   witness; that proof of the official character and

11   qualification of the Notary is waived.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1              INDEX OF EXAMINATION

 2   BY MR. BECKER:.........................   5

 3              INDEX OF EXHIBITS

 4   Exhibit 1:.............................   6
     Court order to appear.
 5
     Exhibit 2:.............................   6
 6   Plaintiff's motion.

 7   Exhibit 3:.............................   6
     Court order signed for examination to proceed.
 8
     Exhibit 4:............................. 157
 9   Handwritten note.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

GEORGE M. RILEY Case: 2:13-bk-02094-PO Doc 51-1 Filed 11/26/13 Entered 11/26/13 11:34:55 Desc vs.
FRIDAY, JANUARY 25, 2008 Deposition Transcript of George Michael Riley Sr. 1-25-08 Page 2 of 52 COMMODORE BANK
GEORGE M. RILEY

Page 5

1        - - -
2        (Plaintiff's Exhibits 1 - 3 marked.)
3        - - -
4        VIDEOGRAPHER: Mr. Riley, would you raise
5  your right hand for me, please.
6
7        GEORGE M. RILEY
8  being by the videographer first duly sworn, as
9  hereinafter certified, deposes and says as follows:
10        VIDEOGRAPHER: Thank you very much. Go
11  right ahead.
12
13        EXAMINATION
14  BY MR. BECKER:
15  Q.    Good afternoon, Mr. Riley. We've previously
16  met. My name is Gary Becker and I represent Commodore
17  Bank. You've been sworn under oath here today;
18  correct?
19  A.    Yes.
20  Q.    All right. And you've given depositions
21  before, so you know generally how this goes. I'll be
22  asking you questions. If you don't understand my
23  question you tell me and I'll try to rephrase it,
24  because I -- I don't want to trick you. That's not my
25  purpose. But I will be relying on what you tell me.

Page 6

1  All right?
2        You need to say yes or no --
3  A.    Yes.
4  Q.    -- or audibly answer, because the court
5  reporter's taking down everything that we say.
6        As I ask a question sometimes you may know
7  where I'm going to go with the question, but let me
8  finish it before you start answering because, again,
9  it's hard for her to type if both of us talk at the
10  same time. All right?
11  A.    Okay.
12  Q.    All right. We're here today pursuant to an
13  order signed by Judge Lewis in Perry County, Case
14  07CV00395, a copy of which order I've marked as
15  Plaintiff's Exhibit 1. And in that order Judge Lewis
16  has directed you to not only appear today, to fully --
17  and answer my questions, but to also produce documents
18  that we requested in our motion for this judgment
19  debtor exam.
20        I've marked a copy of our motion as Exhibit 3,
21  and the order signed by Judge Lewis, directing that
22  that examination proceed, as Exhibit 2.
23        Do you have the documents that we requested,
24  sir?
25  A.    I don't have any documents.

Page 7

1  Q.    Where are your documents, sir?
2        MR. SCHNITTKE: Before you answer that,
3  I'd like to make a little statement --
4        MR. BECKER: Sure.
5        MR. SCHNITTKE: -- on the record. I've been
6        My name's Steve Schnittke. I've been
7  involved in this case now for approximately one month.
8  This case has been -- resulted out of a civil suit
9  against Mr. Riley and numerous of his corporate
10  entities in Licking County. It's Case No. 05CV562. I
11  was not involved in that case. And that resulted in
12  this action of judgment being taken against Mr. Riley
13  and many of his entities that he had there.
14        The deposition had been taken of him back
15  in October of -- or, excuse me, September 18th -- 19,
16  2006 in that case. At this time he was being
17  represented by Ben Zacks and Eric Wittenberg of
18  Columbus, Ohio. I don't believe he had any records at
19  that time that were produced and hasn't changed
20  anything since then. I asked him beforehand whether he
21  had any records or not.
22        And Mr. Riley's also charged with a
23  criminal complaint in Licking County Common Pleas
24  Court, Case No. 2007-CR0043. He's being represented by
25  Sam Shamansky. And Mr. Shamansky's advised me, as well

Page 8

1  as his client, Mr. Riley, not to answer any questions
2  and claim the fifth amendment upon anything that may
3  have to do with that case. Understand?
4        MR. BECKER: Yep.
5        MR. SCHNITTKE: Okay.
6  Q.    Sir, the -- the documents that you were
7  compelled by Judge Lewis to bring with you here today
8  are about two pages worth of descriptive items. Did
9  you search for these documents before you came here
10  today?
11  A.    I don't have any documents at all.
12  Q.    Well, sir, for example, where are your tax
13  returns for the last three years?
14  A.    It's in a criminal situation and they was --
15  Q.    Where are your tax returns?
16  A.    I don't know.
17  Q.    Who does your taxes?
18  A.    I went to Ben to get my taxes straightened up.
19  Q.    Ben who?
20  A.    Zacks.
21  Q.    No, I'm talking about for the last -- since
22  your last exam. I took your deposition on September
23  the 18th, 2006 and at that time you didn't have any
24  documents. But now I'm talking about documents that
25  have been generated since that time, September 18th,

| Page 9 | Page 11 |

**Page 9**

1  2006, which it includes your tax returns, whatever
2  states that you filed your tax -- what states did you
3  file taxes in -- tax returns?
4  A.   Again, under criminal thing in Licking County
5  and I'd rather not answer that at this time.
6  Q.   That's not your choice, sir. You don't get to
7  take the fifth amendment as to whether or not you filed
8  your taxes. You're not charged with tax evasion, sir.
9       Where did you file your taxes?
10 A.   I --
11 Q.   What states?
12 A.   I plead the fifth.
13 Q.   Did you file tax -- federal tax returns?
14 A.   The same; I plead the fifth.
15 Q.   All right. What about your bank statements?
16 Where are your bank statements?
17 A.   I don't have them.
18 Q.   Where are they?
19 A.   They'd be in the -- again, Sam Shamansky could
20 answer that.
21 Q.   Is Sam Shamansky in control of your bank
22 statements?
23 A.   No.
24 Q.   Well, who has them?
25 A.   I -- I don't know where they are.

**Page 10**

1  Q.   Where do you bank?
2  A.   I bank nowhere now.
3  Q.   Where's the last bank you banked at?
4  A.   Personally?
5  Q.   Yes.
6  A.   Personally, nowhere.
7  Q.   Where's the last time you had a business
8  account for any business you operated?
9  A.   I don't know the name of the bank.
10 Q.   Where's it at? What state?
11 A.   Ohio.
12 Q.   What city?
13 A.   I honestly don't know the city. You have to
14 call Sue Schnitz. She would know.
15 Q.   Sue Schnitz no longer does your books.
16 When's --
17 A.   Correct.
18 Q.   -- the last time you did any work with Sue
19 Schnitz?
20 A.   It's been a while, but she had others -- she's
21 the one that had it.
22 Q.   So what you're telling me then is you haven't
23 had any banking transactions, either personally or
24 through any business that you've operated, since I took
25 your deposition on September the 18th, 2006? Over two

**Page 11**

1  years ago.
2  A.   It hasn't been two years ago.
3  Q.   Well, you're right. Almost two. It's coming
4  up. Year and a half.
5  A.   The bank of -- that Sue was in control was in
6  Ohio. That's all I know.
7  Q.   That's not what I asked you. I'm asking you
8  what banks have you transaction business with since
9  September 18th, 2006? What states? What cities?
10 A.   I personally, zero; and the company, I plead
11 the fifth.
12 Q.   You can't plead the fifth on that, sir.
13 You're not charged with anything about where your bank
14 accounts are.
15      Where are your bank accounts?
16 A.   I don't have any bank accounts right now.
17 Q.   Where have you transacted any banking since
18 September 18th of '06, either in your personal capacity
19 or in any capacity in any businesses that you've
20 operated?
21 A.   Bank of America.
22 Q.   Where?
23 A.   Tampa, Florida.
24 Q.   All right. Whose account was it?
25 A.   Continental Industries.

**Page 12**

1  Q.   All right. Any others?
2  A.   Not that I'm aware of.
3  Q.   When's the last time you did any bank
4  transaction with Continental Industries at the Bank of
5  America in Tampa, Florida?
6  A.   I don't know that answer.
7  Q.   Within the last week? Within the last month?
8  Within the last year?
9  A.   I don't know that answer.
10 Q.   Well, did you do one last week?
11 A.   No.
12 Q.   Did you do one last month?
13 A.   No.
14 Q.   Did you do one last year?
15 A.   Possibly.
16 Q.   All right. Who was signatory on that account?
17 Who had the ability to take money in -- I'm sorry, take
18 money out of that account, either by check or
19 withdrawal?
20 A.   Sue.
21 Q.   Anybody else?
22 A.   I don't know.
23 Q.   Did you have the ability to do that? Could
24 you go --
25 A.   Yeah.

| Page 13 | Page 15 |
|---|---|

**Page 13**

1  Q. -- into that bank?
2  A. I could.
3  Q. All right. Anybody else?
4  A. I don't know. I don't know.
5  Q. Well, who set up the account?
6  A. I believe Sue did.
7  Q. Who signed it? Who signed the card at the
8  bank to say I authorize these people to take money out
9  of this account? Did you do that?
10  A. I must of.
11  Q. Where at in Tampa is that bank?
12  A. On Kennedy Avenue, I believe.
13  Q. All right. And where are the bank records for
14  that account?
15  A. I -- I don't know. I don't have them.
16  Q. Where do they go? The bank sends you a
17  monthly statement if you've got an account with them.
18  Where do they send it?
19  A. It was getting sent to Sue.
20  Q. Well, where's it sent now?
21  A. I don't know. I didn't -- I didn't change the
22  address.
23  Q. So it should still be going to Sue; right?
24  A. I would assume.
25  Q. But Sue doesn't work for you anymore; right?

**Page 14**

1  A. That's correct.
2  Q. Because you owe her money; right?
3  A. Yes, I do.
4  Q. All right. Has she sent you anything back?
5  A. Anything back?
6  Q. Any of your records.
7  A. No, sir.
8  Q. All right. Another thing that we ask for are
9  any accounts receivable owed to you?
10  A. I do have accounts receivable.
11  Q. And what documents do you have for that?
12  A. I don't know where they are, but -- and I'm
13  still trying to locate them as we speak -- that would
14  help eliminate some of my debt.
15  Q. Well, who owes you money?
16  A. Quite a bit of people. It was from Belmont
17  Oil.
18  Q. What's Belmont Oil?
19  A. It was a company that I had a while ago.
20  Q. Where were the records?
21  A. I'm sorry?
22  Q. Where are the records?
23  A. They was in a building and when the flood come
24  through some of them got -- from the flood, and I've
25  been doing everything. I've called a hundred --

**Page 15**

1  everybody that I could possibly think of. But there --
2  I don't know how much money -- there's still -- I mean,
3  there's still money out there that I haven't collected
4  or anything since that transacted.
5  Q. What flood are you talking about? I don't
6  know what you're talking about.
7  A. There was a flood that come through Barton
8  where my parents live.
9  Q. When was that?
10  A. I don't know the exact date.
11  Q. Well, in '90s? '80s? '70s?
12  A. It was in -- it was in the 2000's, I think.
13  Q. So all your records were at your parent's
14  house?
15  A. They was in a -- you know them red barns that
16  you buy?
17  Q. Uh-huh.
18  A. One of those.
19  Q. But at your parent's location?
20  A. Yes.
21  Q. What was the address there?
22  A. It's T11 -- T11 -- it's T111 Riley Road,
23  Barton.
24  Q. Riley Road?
25  A. Barton.

**Page 16**

1  Q. Barton, Ohio?
2  A. Yes.
3  Q. Okay. And that's your parent's residence?
4  A. Yes.
5  Q. And that's been your parent's residence for
6  several years?
7  A. That's right. Yes.
8  Q. Okay. Anybody else owe you money?
9  A. Southern -- I -- I don't know their exact
10  name. Southern Concrete, I believe it is.
11  Q. Why do they owe you money?
12  A. Because they didn't pay me.
13  Q. For which business?
14  A. What do you mean?
15  Q. What business does Southern Concrete owe? Do
16  they owe George Riley personally, or do they owe some
17  company of yours?
18  A. They owe -- they owe Continental Industries.
19  Q. Continental. All right.
20  And what did you do for Southern Concrete
21  through Continental Industries?
22  A. I operated their machinery and crushed a bunch
23  of equip -- a bunch of concrete.
24  Q. When and where?
25  A. Just six months -- five months ago or so.

Page 17

1  Q.  Where at?
2  A.  Louisiana.
3  Q.  What city?
4  A.  I don't know the city.  It's Louisiana.
5  Q.  It's a big state.
6  A.  There's parishes down here.
7  Q.  Well, give me a parish.
8  A.  Can I call you back with that?
9  Q.  No.
10 A.  I -- I don't know the name at this time.
11 Q.  Well, where are they at?  Where is Southern
12 Concrete based?
13 A.  In Louisiana.
14 Q.  Where at in Louisiana?
15 A.  That's what I'm telling you I forgot.  I will
16 give you the -- my attorney could give you the name.
17 They owe me like a hundred-and-some thousand dollars.
18 Q.  How long did you work for them?
19 A.  Three months.  Two months, three months.
20 Q.  All in the same location?
21 A.  Yes, sir.
22 Q.  Who else did the work besides yourself
23 personally?
24 A.  What do you mean who else did the work?
25 Q.  Well, did you -- did you do all of the work

Page 18

1  yourself that they owe you the $100,000 for, or did --
2  A.  I got --
3  Q.  -- someone else --
4  A.  -- I got paid so much a ton for what was
5  crushed.
6  Q.  All right.  But who did the work with you?
7  Did you do it all yourself or --
8  A.  It was their equipment.  I -- I went in,
9  showed them how to maximize their product.
10 Q.  Uh-huh.
11 A.  Do everything I was supposed to do, and I did
12 it and I didn't get paid.
13 Q.  My question was, was anybody else working for
14 you or with you, or did you do all the work yourself?
15 Did you have any employees?
16 A.  I guess I'm confused.
17 Q.  Did you have any employees?
18 A.  No.  They was -- they covered the fuel.  They
19 covered that -- that was -- I got -- it was like $6 a
20 ton to make sure that everything ran the way it was
21 supposed to be ran.
22 Q.  Do you have a written agreement with them?
23 A.  I have a -- I -- I -- and I -- I'm look -- I'm
24 still looking for a piece of paper where they owe me
25 the money.

Page 19

1  Q.  What would that piece of paper be?
2  A.  Their letterhead to me of -- it -- it's like
3  $106,000 or something.
4  Q.  Did you have a contract with them before you
5  started doing the work?
6  A.  No.
7  Q.  Just a handshake?
8  A.  Yes.
9  Q.  So they promised to pay you $6 a ton with a
10 handshake, you did all the work and then they stiffed
11 you?
12 A.  That's correct.
13 Q.  Who at Southern Concrete were you working
14 with?  Who's the person?
15 A.  His name is -- I'm trying to find a phone
16 number, too, because he's got -- he's got -- he's got
17 an office in Texas, too.
18 Q.  Somebody owes you $100,000 and you don't know
19 his name?
20 A.  I can't think of his name.  One of the guys is
21 Arnold.
22 Q.  Arnold what?
23 A.  I don't know.  But the main guy's name is --
24 I -- I don't know the main guy's name.  But again, I --
25 I -- I'll give it to the attorney by Tuesday and give

Page 20

1  you a address and their phone number.
2  Q.  All right.  Who else owes you money?
3  A.  That's it.
4  Q.  That's it?
5      All right.  We asked for any documentation of
6  the transfer of any business assets, including -- not
7  limited to -- contracts for the purchase of a sale of
8  any business or any other assets.  Where are those
9  documents?
10 A.  I don't understand what you're -- what you
11 mean.
12 Q.  Well, since September of 2006 have you sold
13 any property?
14 A.  No.
15 Q.  Have you bought any property?
16 A.  No.
17 Q.  Have you rented any property?
18 A.  I don't know.  What do you mean did I rent any
19 property?
20 Q.  Yeah, did you rent anything?
21 A.  I -- the house.
22 Q.  Where's that at?
23 A.  I no longer live there.
24 Q.  Where'd you rent the house at?
25 A.  It's at -- I don't know the exact -- it's in

## Page 21

1    Palm Harbor.

2   Q.   Palm Harbor, Florida?

3   A.   Right.

4   Q.   What period of time did you rent a house?

5   A.   I don't know the dates.

6   Q.   When did you leave Palm Harbor, Florida?

7   A.   I -- I don't know the date.

8   Q.   Last week? Last month?

9   A.   No. I mean, I -- it's been longer than a

10 month.

11   Q.   How long?

12   A.   It's been months.

13   Q.   Was it sometime in 2007, or was it in 2006? I

14 took your deposition in September of '06 and at that

15 time you told me you were living in Palm Harbor -- Palm

16 of -- Palm Harbor, Florida.

17   A.   Okay.

18   Q.   So sometime after September of '06 --

19   A.   I moved.

20   Q.   But when was it? Was it still in '06, or was

21 it in '07?

22   A.   I'm not for sure.

23   Q.   You were renting the house, though?

24   A.   That's correct.

25   Q.   All right. Where did you go after you left

## Page 22

1 that house? Where'd you live?

2   A.   Pretty much on the road.

3   Q.   Where?

4   A.   Oh, I mean --

5   Q.   One at a time. Where's the first place you

6 went after Palm Harbor, Florida?

7   A.   Well, I was staying at -- which is my wife

8 now -- Kate's.

9   Q.   Where?

10   A.   Meadowhill Drive.

11   Q.   What's the address?

12   A.   2956 Meadowhill Drive.

13   Q.   What's Kate's name?

14   A.   Kate Hettig.

15   Q.   How do you spell the last name; H-e-t-t-i-g?

16   A.   Yeah, probably.

17   Q.   When did you first start living with Kate

18 Hettig?

19   A.   (Witness shrugs his shoulders.) Well, I

20 stayed there off and on. I mean, I -- I don't know the

21 date. I don't have the exact dates.

22   Q.   Did you ever stay with Kate Hettig before you

23 left the Palm Harbor address that you were renting?

24   A.   Did I stay with Kate?

25   Q.   Before -- before you ever left Palm Harbor did

## Page 23

1 you ever stay with Kate?

2   A.   I spent the night there.

3   Q.   When did you first start seeing Kate Hettig?

4   A.   I don't know the exact date.

5   Q.   I didn't ask for an exact date. When did you

6 first start seeing her? Before or after September of

7 '06?

8   A.   I don't know. I don't -- I don't know the

9 dates.

10   Q.   Where'd you meet her?

11   A.   I met her at a store.

12   Q.   Where?

13   A.   In Clearwater.

14   Q.   Was she married at the time?

15   A.   No.

16   Q.   Was she divorced? Was she widowed?

17   A.   Widow.

18   Q.   How long had she been widowed?

19   A.   I -- I don't know.

20   Q.   How did you get introduced to her?

21   A.   We met.

22   Q.   So nobody introduced you?

23   A.   No.

24   Q.   You just ran into her?

25   A.   Right.

## Page 24

1   Q.   Struck up a conversation?

2   A.   Right.

3   Q.   And then you moved in with her?

4   A.   No, I just didn't move in -- in with her.

5   Q.   Uh-huh.

6   A.   Well, we went out a few times and --

7   Q.   But then you --

8   A.   -- things worked out.

9   Q.   All right.

10   A.   That's good.

11   Q.   So when did you -- was this in 2006, or 2007?

12   A.   I don't know the dates.

13   Q.   When did you -- well, strike that.

14 When you moved in with Kate Hettig you weren't

15 married to her at the time; right?

16   A.   Correct.

17   Q.   Who was living with you at that house?

18   A.   Her two children.

19   Q.   What are their names?

20   A.   Mark and Brooke.

21   Q.   How old are they?

22   A.   Fifteen, 14 -- I don't know, 14 and 16.

23   Q.   All right. Thereabouts.

24   A.   Yeah.

25   Q.   Are they still living there?

Page 25

1    A.   Oh, yeah.
2    Q.   All right.  Anybody else?
3    A.   No.
4    Q.   All right.  So when you move into -- in with
5    her in the Meadowhill Drive address, it's Kate Hettig
6    and her two children, Mark and Brooke --
7    A.   Correct.
8    Q.   -- and then you?
9         And you don't know when that was?
10   A.   I do not.
11   Q.   Well, were the kids in school?  Were they in
12   summer break?
13   A.   It might have been -- it may have been summer
14   break.
15   Q.   So summer of 2007?
16   A.   Could be, could not be.  I'm not -- I'm not --
17   I don't know.
18   Q.   Well, let's try to figure that out.
19        All right.  So you move in with her.  Where
20   were you working at the time?
21   A.   I was never at a point in projects --
22   Q.   Had you already finished with Southern
23   Concrete, or had you started --
24   A.   No, I didn't --
25   Q.   -- with Southern Concrete?

Page 26

1    A.   -- even start on that yet.
2    Q.   All right.  So where were you working before
3    Southern Concrete?
4    A.   I'm not for sure.
5    Q.   Were you still working for Continental, or did
6    you have another company?
7    A.   What do you mean?  No, I -- I was Continental.
8    Q.   Continental.  All right.
9         So when you moved in with Kate you were still
10   working for Continental.  You can't remember which job
11   it was.
12   A.   I don't work for Continental.  I own
13   Continental.
14   Q.   All right.  So you were running Continental
15   when you moved in with Kate, but you don't remember
16   what job you were doing?
17   A.   That's correct.
18   Q.   All right.  So you're living with Kate for a
19   while.  What's -- what's the next job that you did
20   while you started living with Kate?
21   A.   I don't know where I was working at that time.
22   You got to remember, I fell 17 feet, and you -- you're
23   aware of that.
24   Q.   No, I'm not aware of that.
25   A.   Yes.

Page 27

1    Q.   When did you fall 17 feet?
2    A.   In 2000 something.  And I had microscopic
3    bleeding in my -- in my head.  And I have my medical
4    records.  And we went through that the last time.  So
5    my memory doesn't -- my dates and things doesn't work,
6    or I may say something, or my numbers go backwards
7    sometimes, or alphabets as well.
8    Q.   You're --
9    A.   So my reading and spelling is not --
10   Q.   Where --
11   A.   -- the same, either.
12   Q.   Where are your medical records?
13   A.   My medical records?
14   Q.   Yes, to establish that.
15        MR. SCHNITTKE:  You have them with you.
16   A.   I carry -- I carry my medical records with me.
17   Q.   Well, do you have those?
18   A.   I do.
19   Q.   Let's see the records.
20   A.   All right.  Can I go outside?
21   Q.   Sure.
22   A.   Okay.
23        MR. BECKER:  Go off the record.
24        VIDEOGRAPHER:  We're going off the record
25   at 1:43:28.

Page 28

1              - - -
2         Off the record.
3              - - -
4         VIDEOGRAPHER:  We're going back on the
5    record at 1:25:09.  Go right ahead.
6    BY MR. BECKER:
7    Q.   Thank you, sir.
8         You've brought a package of what you claim are
9    medical records and some prescriptions?
10   A.   Claim?
11   Q.   That's what's in an envelope there?
12   A.   Yeah.  It's my medical records, yes.
13   Q.   Fine.  Just set them off to the side.  We'll
14   deal with that shortly.
15        All right.  So at some point you move in with
16   Katie Hettig.  You don't remember exactly when that was
17   and you don't remember what job you were doing for
18   Continental at that time.  I assume you did another job
19   at some point while you were living with Katie Hettig,
20   and that was my question.  What's the next job you
21   can -- that you did once you moved in with Katie
22   Hettig?
23   A.   I don't know what job location I was at or
24   what I was doing at that time.
25   Q.   All right.  Was it in Florida?

| Page 29 | Page 31 |
|---|---|

**Page 29**

1   A.   It would have been -- it could have been in
2   Florida.
3   Q.   Well, where else?
4   A.   Or Ohio.
5   Q.   All right. Where in Ohio did you work after
6   September of '06?
7   A.   I don't know what the dates are, that's what
8   I'm telling you. My dates are not good. So it could
9   have been --
10   Q.   After the last time I took your deposition
11   where have you worked?
12   A.   But I -- I don't know the dates and I don't
13   know the times. I -- I was working for Shelly & Sands.
14   Q.   Okay. Anybody else?
15   A.   Crushing stone. And I don't know what dates
16   is what dates, that's why I don't know.
17   Q.   What company did you -- were you using to
18   crush stone while you worked at Shelly & Sands? Was it
19   Continental?
20   A.   I don't know. I -- I -- I would have to call
21   them and ask them.
22   Q.   Where are your records?
23   A.   I don't have them.
24   Q.   Where are they?
25   A.   I don't know.

**Page 30**

1   Q.   What happened to them?
2   A.   I don't -- I -- I never -- when you keep
3   asking me where my records are, I don't know what
4   records you -- you're talking about.
5   Q.   Well, sir, if you were doing work for Shelly &
6   Sands, they weren't going to just pay you with no
7   records of that. They would pay you and they would
8   give you documentation of that. And I want the
9   documentation.
10   A.   That's not true. They only gave me a check.
11   Q.   What'd you do with the check?
12   A.   I put it in the bank and I --
13   Q.   Which bank?
14   A.   Some went to Commodore.
15   Q.   After September of '06. Sir, you haven't done
16   any business with Commodore Bank after September of
17   '06.
18   A.   Okay, I don't know then. That's what I'm
19   telling you. I -- I would have to see. I mean, I can
20   call and ask them.
21   Q.   Well, we're back to, again, where are your tax
22   returns that you would have filed for the work that you
23   did after September --
24   A.   On tax returns --
25   Q.   -- of '06?

**Page 31**

1   A.   -- I plead the fifth.
2   Q.   Where are your receipts for any of the
3   expenses that you would have incurred working for
4   Shelly & Sands?
5   A.   I don't have them. I don't know.
6   Q.   What'd you do with them?
7   A.   I don't know.
8   Q.   How'd you get here today?
9   A.   Vern Murphy.
10   Q.   I'm sorry?
11   A.   Vern.
12   Q.   Murphy?
13   A.   Uh-huh.
14   Q.   Did he drive you?
15   A.   I rode over, yes.
16   Q.   Did he drive you, or did you drive?
17   A.   I drove.
18   Q.   What'd you drive?
19   A.   A pickup truck.
20   Q.   Whose is it?
21   A.   It belongs to Kate.
22   Q.   How did it get up here?
23   A.   How'd it get up here?
24   Q.   Yes, sir.
25   A.   It was driven up here.

**Page 32**

1   Q.   Who drove it up here?
2   A.   Vern Murphy.
3   Q.   When?
4   A.   I don't have that -- I don't know the exact
5   date.
6   Q.   Well, how long's it been in Ohio?
7   A.   Five months or more.
8   Q.   Where's it been stored?
9   A.   It's not being stored.
10   Q.   Well, where does it stay when it's in Ohio?
11   A.   With my son.
12   Q.   Where's that?
13   A.   Columbus.
14   Q.   What's the address?
15   A.   I don't know his address.
16   Q.   Last time I took your deposition you told me
17   your son is your life.
18   A.   He is my life.
19   Q.   And you don't know his address?
20   A.   I do not know his address. Don't make fun of
21   me.
22   Q.   Where does he live?
23   A.   He lives in Columbus, Ohio.
24   Q.   Where?
25   A.   I don't know the address, but --

Page 33

1  Q.  What's his phone number?
2  A.  I'm not -- I'm not interfering with -- my son
3  with this. I plead the fifth.
4  Q.  I want his phone number. You don't get to
5  plead the fifth on your phone -- on your son's phone
6  number.
7  A.  I plead -- my son is not -- irrelevant to this
8  case.
9       MR. SCHNITTKE: You want to contact his
10 son?
11      MR. BECKER: No. I want to verify what
12 he's telling me is accurate.
13      MR. SCHNITTKE: That his son is attending
14 school at Ohio State?
15      MR. BECKER: I want to know where his son
16 lives and if there's been assets stored at that
17 address, yes.
18 A.  That is not an asset. It has nothing to do
19 with this case.
20 Q.  Sir, where's your son?
21 A.  My son is irrelevant to this case.
22 Q.  That's your point.
23      Where's your son live?
24 A.  In Columbus, Ohio.
25 Q.  Where?

Page 34

1  A.  I don't know his address.
2       MR. SCHNITTKE: Do you know what street he
3  lives on?
4       THE WITNESS: I don't.
5       MR. SCHNITTKE: Does he live up by campus?
6       THE WITNESS: Yeah.
7  Q.  What school does he go to?
8  A.  The Columbus State.
9       MR. SCHNITTKE: Columbus State, or Ohio
10 State?
11      THE WITNESS: Ohio State.
12 Q.  Ohio State or Columbus?
13 A.  It's in Columbus.
14 Q.  It's two different schools.
15      Does he go to Ohio State or does he go to
16 Columbus State? They're not the same schools. Which
17 one does he go to?
18 A.  I -- I don't know. I'd -- I'd say Columbus
19 and he goes to school -- he goes to college there.
20 Q.  Who pays the bills?
21 A.  His --
22 Q.  Who pays his tuition?
23 A.  My wife.
24 Q.  Well, who paid the tuition before you were --
25 A.  I did.

Page 35

1  Q.  -- married to Kate Hettig?
2       All right. Where did you get the money to pay
3  his tuition?
4  A.  Wherever I was working at the time.
5  Q.  And did you write checks to that school to pay
6  his tuition?
7  A.  I -- I would of wrote checks.
8  Q.  And what bank did you write the checks out of?
9  A.  I don't know.
10 Q.  How long's he been in school?
11 A.  This is his second year.
12 Q.  And you've been writing checks on behalf of
13 the tuition of your son, at least until Katie started
14 paying it, and you don't know what bank account you
15 were using?
16 A.  I do not.
17 Q.  You're under oath. You understand that?
18 A.  Absolutely.
19 Q.  You're sworn to tell the truth here today.
20 A.  Absolutely.
21 Q.  Okay. Well, do you have any of your checks
22 with you?
23 A.  No, I don't have no checks with me.
24 Q.  Where are they?
25 A.  I don't have no more checks. I haven't had

Page 36

1  checks for a while.
2  Q.  How long's a while?
3  A.  I don't know. It's been quite some time.
4  Q.  Well, how long's Kate been writing checks for
5  tuition?
6  A.  Probably a year.
7  Q.  A year. You've been married to her for a
8  year?
9  A.  I didn't say I was married for a year.
10 Q.  So she started writing checks for your son's
11 education before you got married to her?
12 A.  Could of.
13 Q.  Did she, or --
14 A.  I don't know. She could of. I -- I'm not for
15 sure.
16 Q.  Has anybody else paid for your son's
17 education?
18 A.  His grandmother gives him money.
19 Q.  On which side? Which grandmother?
20 A.  I'm sorry?
21 Q.  Which side of the family? Which grandmother?
22 A.  Actually, both.
23 Q.  What are their names?
24 A.  Nancy Riley and Bernadine.
25 Q.  What's Bernadine's last name?

## Page 37

| | |
|---|---|
| 1 | A. Heartline. |
| 2 | Q. Where do they live? |
| 3 | A. My mom lives in Barton. |
| 4 | Q. Yeah. |
| 5 | A. And Bernadine lives in Shadyside. |
| 6 | Q. Address? |
| 7 | A. I don't know the address. |
| 8 | Q. All right. Let's go back to the pickup truck |
| 9 | of Katie's that you drove here today that's kept at |
| 10 | your son's address, which you don't know what it is in |
| 11 | Columbus. |
| 12 | A. Correct. |
| 13 | Q. How did you get to the car? |
| 14 | A. How did I get to the -- you mean the truck? |
| 15 | Q. Yes. |
| 16 | A. Mike picked me up. |
| 17 | Q. Mike, your son, picked you up at the airport? |
| 18 | A. Correct. |
| 19 | Q. When? |
| 20 | A. Last night. |
| 21 | Q. So you stayed with your son last night? |
| 22 | A. No, I did not. |
| 23 | Q. Where'd you stay? |
| 24 | A. I stayed at a motel. |
| 25 | Q. Which one? |

## Page 38

| | |
|---|---|
| 1 | A. In Pickerington. |
| 2 | Q. What's the name of it? |
| 3 | A. The -- The Country Inn, I believe. |
| 4 | Q. Where? |
| 5 | A. In Pickering -- in -- |
| 6 | Q. But where in Pickerington? What street? |
| 7 | A. I don't know the address. |
| 8 | Q. You have the receipt with you? |
| 9 | A. I do not. |
| 10 | Q. Did you check out? |
| 11 | A. Yes. |
| 12 | Q. Well, where's your receipt? You just checked |
| 13 | out this morning. |
| 14 | A. I -- |
| 15 | Q. Is it in your car? |
| 16 | A. It could be in the car. |
| 17 | MR. BECKER: Let's take a break. |
| 18 | VIDEOGRAPHER: We're going off the record |
| 19 | at 1:33:26. |
| 20 | - - - |
| 21 | Off the record. |
| 22 | - - - |
| 23 | VIDEOGRAPHER: We're going back on the |
| 24 | record at 1:33:53. Go right ahead. |
| 25 | BY MR. BECKER: |

## Page 39

| | |
|---|---|
| 1 | Q. All right. So we're back on the record. You |
| 2 | were going to get your receipt that you think might be |
| 3 | in the truck but you've told me that the truck is |
| 4 | parked -- |
| 5 | A. I don't know if I even have the receipt in the |
| 6 | truck. |
| 7 | Q. You told me the truck is parked at your |
| 8 | counsel's office -- |
| 9 | A. Correct. |
| 10 | Q. -- correct? |
| 11 | So we'll keep going to -- to conserve time. |
| 12 | We'll get that at a break. |
| 13 | MR. BECKER: Will you make a note of that, |
| 14 | that we need to get that at the break. |
| 15 | Q. So how'd -- what airline did you fly in on |
| 16 | last night? |
| 17 | A. Southwest. |
| 18 | Q. All right. Who paid for the plane ticket? |
| 19 | A. Kate. |
| 20 | Q. Do you have the receipt? |
| 21 | A. I do not. |
| 22 | Q. Do you have your boarding pass? |
| 23 | A. I do not. |
| 24 | Q. What'd you do with it? |
| 25 | A. They keep it when you get on the plane. |

## Page 40

| | |
|---|---|
| 1 | Q. No, they give you a receipt, sir. |
| 2 | A. No, they didn't. |
| 3 | Q. You have no documents to indicate how you got |
| 4 | here? |
| 5 | A. Yeah, I got one by the airplane. |
| 6 | Q. Do you have any documents to indicate how you |
| 7 | got here? |
| 8 | A. No. |
| 9 | Q. Who paid for the hotel last night? |
| 10 | A. Kate. |
| 11 | Q. Was she with you? |
| 12 | A. No. |
| 13 | Q. Well, how did she pay for it if you -- if |
| 14 | she's not with you? |
| 15 | A. Because she gave me her credit card to -- |
| 16 | Q. Do you have that with you? |
| 17 | A. I do not have it with me at this time. |
| 18 | Q. Do you have a wallet with you? |
| 19 | A. I do. |
| 20 | Q. Can you open your wallet for us and show us |
| 21 | what you got in there. |
| 22 | A. (Witness complies.) |
| 23 | Q. Do you have a driver's license? |
| 24 | A. I do. |
| 25 | Q. What state? |

## Page 41

1  A.  Ohio.
2  Q.  See that, please.
3      Was issued on 12-6-07. So you were in Ohio in
4  order to get that accomplished; correct?
5  A.  Yes.
6  Q.  Why were you in Ohio in December of '07?
7  A.  I don't know.
8  Q.  Where were you staying?
9  A.  I could of stayed at my mom's.
10 Q.  I didn't ask you where you could of stayed. I
11 said where --
12 A.  I don't know --
13 Q.  -- did you stay?
14 A.  -- at that date.
15 Q.  Sir, that's only been a month and a half ago.
16 A.  Okay. My memory doesn't work that well.
17 Q.  Where did you stay the last time you were in
18 Ohio?
19 A.  I stayed at my mom's.
20 Q.  All right. You have an address listed here as
21 being T111 Riley Road, Barton, Ohio 43905. That's your
22 parent's address; correct?
23 A.  That's correct.
24 Q.  And your license number is RS281748; correct?
25     If that's what it says.

## Page 42

1  Q.  All right. But do you have -- what else do
2  you have in your wallet? Do you have any credit cards?
3  A.  I do not have the credit card with me, no.
4  Q.  I didn't ask if you had her credit. I said do
5  you have any credit card --
6  A.  No.
7  Q.  -- in your wallet?
8      Can I see the wallet, please?
9  A.  That's my personal --
10     MR. SCHNITTKE: He can.
11     MR. BECKER: Thank you.
12 Q.  You have a republican presidential task force
13 card.
14     THE WITNESS: Why does -- can't you stop
15 that? This is not --
16     MR. SCHNITTKE: I told you he'd -- he'd
17 probably be asking for that, so.
18 Q.  Member ID 01171067-G874, republican
19 presidential task force, George Michael Riley, 2001.
20     You have a Sam's Club card by the name of
21 George Riley, Eagle Industries, 10159130244412003.
22 Member since 7-2003.
23     You have a -- well, first of all, who pays for
24 the membership to Sam's?
25 A.  I don't even know if it's still good.

## Page 43

1  Q.  Who paid for it last?
2  A.  I -- I probably did.
3  Q.  When's the last time you paid your Sam's Club
4  membership?
5  A.  I have no idea.
6  Q.  You have a Blue Cross Blue Shield medical card
7  in the name of George M. Riley, Sr. Member -- Member
8  No. XJWH42759541. Group No. is 999999Z6.
9      Who pays for the medical insurance?
10 A.  Kate.
11 Q.  Under what business?
12 A.  I have no idea. I don't handle her affairs.
13 Q.  She just gives you medical?
14 A.  Excuse me?
15 Q.  She just gives you a medical card --
16 A.  Yes.
17 Q.  -- in your name?
18 A.  Yes.
19 Q.  How long have you had this?
20 A.  I just got it.
21 Q.  What's Black Ink Marketing?
22 A.  That's my wife's.
23 Q.  That's her business?
24 A.  Uh-huh.
25 Q.  It's Black Ink Marketing, Inc., 2956 Meadow

## Page 44

1  Hill Drive, Clearwater, Florida 33761.
2      What does that business do?
3  A.  That's her business.
4  Q.  I know. What do they do?
5  A.  That's -- I -- I can't answer for her.
6  Q.  You don't know what your wife does?
7  A.  I can't answer for her.
8  Q.  I'm not asking you to answer for her. I'm
9  wanting to know whether you here -- sitting here today,
10 under oath, know what your wife does for -- for a
11 living?
12 A.  She does a lot of things.
13 Q.  What does she do?
14 A.  Well, she does advertising; Black Ink
15 Marketing.
16 Q.  What kind of advertising?
17 A.  I don't get into that business.
18 Q.  So you don't work for her?
19 A.  On occasion.
20 Q.  What do you do for her?
21 A.  Whatever needs to be done.
22 Q.  What?
23 A.  Maintenance.
24 Q.  So you draw a check?
25 A.  I do not.

---

**Page 45**

1 Q. Do you get wages?

2 A. No.

3 Q. She just gives you money?

4 A. I -- I -- any way you want to answer it. I

5 don't know.

6 Q. Well, I'm asking you the question. You told

7 me you work for your wife on occasion. Do you -- are

8 you an employee of Black Ink Marketing, Inc.?

9 A. No.

10 Q. Are you employee of any of her other

11 companies?

12 A. She pays bills for me in return. I help her.

13 Q. That wasn't my question. I asked you if you

14 were an employee of either Black Ink Marketing, Inc.,

15 or any other company that your wife runs?

16 A. I don't know if she has me listed as an

17 employee or not.

18 Q. What other companies does she run or own?

19 A. I -- I'm -- plead the fifth.

20 Q. Okay. Sir, you don't get to plead the fifth

21 on what businesses --

22 A. Kate Hettig --

23 Q. -- she might own.

24 A. -- has nothing to do with my prior life.

25 That's my wife.

---

**Page 46**

1 Q. That's your opinion, sir. What other

2 businesses does Kate Hettig own or control?

3 A. I plead the fifth.

4 Q. You don't get to --

5 MR. SCHNITTKE: You have to answer that

6 question if you know it.

7 THE WITNESS: Excuse me?

8 MR. SCHNITTKE: You have to answer that

9 question if you know what businesses she has.

10 A. She has Black Ink. She has Brook Mark.

11 Q. What's Brook Mark?

12 A. It's a -- Brook Mark is a corporation.

13 Q. What does it do?

14 A. It owns -- I -- I don't know what all it owns.

15 It --

16 Q. What does it do?

17 A. She has hair salons, landscaping.

18 Q. Are you an employee of Brook Mark?

19 A. I am not.

20 Q. What other companies does she own or control?

21 A. Tristar Holds.

22 Q. What's that?

23 A. I believe that's her holding company.

24 Q. What is it?

25 A. I don't know what it is.

---

**Page 47**

1 Q. What do they do?

2 A. I don't know what Tristar Holdings does.

3 Q. Don't know anything about Tristar Holding?

4 A. I don't get into her -- no.

5 Q. Are you an employee?

6 A. I don't believe so.

7 Q. Any other companies that she owns or controls?

8 A. I think that's all.

9 Q. You swore in an affidavit to the Colorado

10 court system that you were an employee of your wife's

11 business; correct?

12 A. I don't know which -- I swore an affidavit?

13 Q. Uh-huh.

14 A. In Colorado?

15 Q. Uh-huh.

16 A. No, Kate wrote an affidavit.

17 Q. Kate wrote an affidavit. What did Kate say in

18 her affidavit?

19 A. That she pays my -- my restitution.

20 Q. Does she say you're an employee of hers?

21 A. That's what I said, I don't know how she has

22 me listed, if I'm an employee or if I'm not an

23 employee. I think that's what I said before.

24 Q. Did you give an affidavit to the Colorado

25 court system as well?

---

**Page 48**

1 A. I may have.

2 Q. What did you say in it?

3 A. I don't know.

4 Q. Did you say you were an employee of Kate's?

5 A. I -- again, I don't know.

6 Q. Do you have a copy of it?

7 A. I don't.

8 Q. They didn't give you have a copy of the

9 affidavit that you --

10 A. I don't have a copy of it, no.

11 Q. What'd you do with it?

12 A. I -- Eric Wittenberg may have a copy of it.

13 Q. Eric Wittenberg. Does he still represent you?

14 A. Or Eric Knouse.

15 Q. Eric Knouse.

16 Let's go back to what's in the wallet. Who's

17 Paul Miller at Regions?

18 A. (Witness shrugs his shoulders.) I don't know.

19 Q. Why do you have his card?

20 A. I probably wrote a number on the back of it

21 for somebody else.

22 Q. So you don't know who that is?

23 A. I know Paul.

24 Q. Well, who is he?

25 A. That's Kate's banker.

---

Page 49

1  Q.   He is senior financial services specialist for
2  Regions, 3021 Enterprise Road East, Clearwater, Florida
3  33759.  Phone number is 727-669-6250.
4       You have a State of West Virginia office of
5  miners' health and safety training, Class III license
6  coal truck driver, issued in your name on 11-02-2000,
7  Certificate No. 13390.  Social Security listed is
8  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.  What's this for?
9  A.   That's a card to get into mines and do work at
10  a mine.
11  Q.   Have you used it since 11-2-2000?
12  A.   Probably.
13  Q.   What mining work have you done in West
14  Virginia since November of 2000?
15  A.   I -- I can't really remember.
16       That's personal.  That needs to stay in my
17  wallet, please.
18  Q.   I'll put it all back.  I'm just seeing what it
19  is.
20  A.   Well, let me have it.
21  Q.   It's Belmont Oil Ink card for Riley Industrial
22  Park, P.O. Box 472, Blaine, B-l-a-i-n-e, Ohio 43909,
23  with mike Riley at the top.  What is this?
24  A.   It's a card that my son wrote me when he was
25  young.

Page 50

1  Q.   Okay.
2  A.   If you just turn it around on the back you
3  would see that.
4  Q.   That's fine.
5  A.   So if you could, for -- for the record, read
6  what it says.
7  Q.   Can't read it.
8       Dad, finish -- the something.  Don't forget to
9  get my four-wheeler.  I love you.  Don't forget about
10  my breakfast today.  Friday, November 20th, 1991.
11       Did you remove anything from this wallet
12  before you came in here?
13  A.   Why would I need to remove anything?
14  Q.   I didn't ask you why.  I said did you?
15  A.   I plead the fifth.
16       MR. BECKER: Counsel, would you instruct
17  your client to answer the question.
18       MR. SCHNITTKE: Answer the question.  Tell
19  him we -- we went through at my office, so.
20  Q.   What'd you remove?
21  A.   A credit card.
22  Q.   What credit card?
23  A.   A credit card that Kate gave me.  U.S. Bank in
24  her name.  It's her credit card.
25  Q.   Is that what you used to pay for the hotel

Page 51

1  last night?
2  A.   Yes.
3  Q.   Is that what you used to pay for the plane
4  ticket?
5  A.   I don't know what card she used to pay for the
6  plane ticket.
7  Q.   Where's she at?
8  A.   She's in Florida.
9  Q.   How long she been there?
10  A.   I assume all her life.
11  Q.   Was she in Colorado with you in the last two
12  weeks?
13  A.   Yes.
14  Q.   When did she go back to Florida?
15  A.   On a Friday.
16  Q.   Which Friday?
17  A.   I believe Friday.
18  Q.   Today's Friday.
19  A.   No, not today.
20  Q.   Last week?
21  A.   Yeah, probably.
22  Q.   What other pieces of property do you have here
23  in Ohio other than Kate's pickup truck?
24  A.   I don't have no property in Ohio.
25  Q.   What other property up here do you use other

Page 52

1  than Kate's pickup truck?
2  A.   Oh.  That's all.
3  Q.   When did you get married to Kate?
4  A.   I don't know the exact date.  You know the
5  exact date.  Eric said you typed him a letter saying I
6  wasn't married.
7  Q.   I don't know anything about it, sir.  I'm just
8  asking the question.  When did you get married to your
9  wife?
10  A.   I don't know that exact date.
11  Q.   Was it in 2006?  2007?
12  A.   Seven.
13  Q.   What month?
14  A.   I don't know.  July.  June.  I -- I'm not for
15  sure.
16  Q.   Summer?
17  A.   I'm -- I'm not gonna -- I'm under oath,
18  under -- and I can't make a mistake, so I'm not for
19  sure.
20  Q.   Well, how long have you been married?
21  A.   A while.
22  Q.   How long?
23  A.   I don't know the exact date.
24  Q.   Where did you get married?
25  A.   In Florida.

| Page 53 | Page 55 |
|---|---|
| 1 Q. Where? | 1 Q. Is that her business, or her cell phone |
| 2 A. In Florida at the church. | 2 number? |
| 3 Q. What city? | 3 A. Cell. |
| 4 A. I'll have to get it to the attorney and have | 4 Q. What church did you get married in? |
| 5 him give it to you. | 5 A. I'll have to ask her that as well. |
| 6 Q. Tell me -- | 6 Q. Sir, she went out to Colorado and talked |
| 7 A. I don't -- | 7 about -- to the judge out there at your sentencing -- |
| 8 Q. -- what city you got married in, sir. | 8 how you've been active in the church for the last five |
| 9 A. I don't know the city. I don't know -- I | 9 years. And you don't know what church it is? |
| 10 as soon as I -- I -- I'll have him give it to you. | 10 A. That's my church. |
| 11 Q. I want to know what city. We're sitting right | 11 Q. Which church is that? |
| 12 here today. You're under oath. I want to know what -- | 12 A. That's in Columbus. |
| 13 A. I don't know the city, until I'm ask -- I'm | 13 Q. Columbus, Ohio? |
| 14 going to ask. | 14 A. Yes. |
| 15 Q. Who do you need to ask? | 15 Q. What church is it? |
| 16 A. Well, I'm going to ask somebody. | 16 A. That is Strong Tower International. |
| 17 Q. Who? | 17 Q. Strong Tower International, in Columbus, Ohio? |
| 18 A. Excuse me? | 18 A. Correct. Bishop Jerry Pierce. |
| 19 Q. Who? Who do you need to ask where you got | 19 Q. Bishop -- Jerry with a J? |
| 20 married? | 20 A. I don't know. |
| 21 A. You asked me for a city. | 21 Q. And how long have you been a member of that |
| 22 Q. Yes, sir. | 22 church? |
| 23 A. Okay. I said I'll get back with you with | 23 A. A while. I don't know. I'm not going to give |
| 24 that. | 24 any exact dates. I'm under oath and I'm not -- if it's |
| 25 Q. No. I want to know who you need to ask where | 25 one day off or something I'm not going to get in |

| Page 54 | Page 56 |
|---|---|
| 1 you got married. | 1 trouble. |
| 2 A. I'm going to ask my wife. | 2 Q. One year? Five years? Ten years? |
| 3 Q. Why don't you call her right now? | 3 A. I don't know. |
| 4 A. I can do that. | 4 Q. But you're very active in that church? |
| 5 MR. BECKER: Let's take a break. | 5 A. I -- I am active with the church, yes. |
| 6 VIDEOGRAPHER: We're going off the record | 6 Q. What do you do with them? |
| 7 at 1:49:26. | 7 A. Whatever they ask me to do. |
| 8 | 8 Q. When's the last time you were at Strong Tower |
| 9 Off the record. | 9 International Church in Columbus, Ohio? |
| 10 - - - | 10 A. The last time I was up here. |
| 11 VIDEOGRAPHER: We're going back on the | 11 Q. When was that? |
| 12 record at 1:50:10. Go right ahead. | 12 A. Whatever day you said I was here. |
| 13 BY MR. BECKER: | 13 Q. You got your license in December of '07. |
| 14 Q. While you were we were off the record you attempted | 14 A. Okay, then I was there. |
| 15 to call your wife to determine what date you were | 15 Q. What'd you do? |
| 16 married and what city you were married in; correct? | 16 A. I went to the church. |
| 17 A. Yes. | 17 Q. You just went to a service? |
| 18 Q. And she didn't answer the phone? | 18 A. Right. And I'll go this Sunday, too. |
| 19 A. I left her a message. | 19 Q. Did you do anything for the church while you |
| 20 Q. I know. What number did you dial? | 20 were here the last time, December of '07, other than |
| 21 A. It's -- | 21 just go to the service? |
| 22 Q. What number did you dial, sir? | 22 A. I -- I go to the service. |
| 23 A. I'm not giving that -- | 23 Q. Did you do anything else? |
| 24 MR. SCHNITTKE: Give him the number. | 24 A. No. |
| 25 A. 727-631-3313. | 25 Q. Do they pay you anything? |

Page 57

| | |
|---|---|
| 1 | A. Pay me? |
| 2 | Q. Yes, sir. |
| 3 | A. No. |
| 4 | Q. You don't do any work for them? |
| 5 | A. No. |
| 6 | Q. Okay. Who was in -- who were the witnesses at |
| 7 | your wedding? |
| 8 | A. I didn't have a witness. |
| 9 | Q. Sir, you can't get married without somebody |
| 10 | witnessing your wedding. |
| 11 | A. Okay. Okay. That's not true. |
| 12 | Q. Nobody else was in the room but you -- |
| 13 | A. Yeah -- |
| 14 | Q. -- and your wife? |
| 15 | A. -- my son. |
| 16 | Q. All right. |
| 17 | A. Her two children. |
| 18 | Q. Anybody else? |
| 19 | A. Her dad. |
| 20 | Q. Where's he live? |
| 21 | A. Florida. |
| 22 | Q. What's his name? |
| 23 | A. Mark. |
| 24 | Q. Mark? What's his last name? |
| 25 | A. German. |

Page 58

| | |
|---|---|
| 1 | Q. Where in Florida does he live? |
| 2 | A. I think that's -- when she calls I'll get that |
| 3 | information, too. |
| 4 | Q. Does she live -- does he live in Clearwater? |
| 5 | A. It's around the -- Clearwater but there's |
| 6 | different -- I mean, you got Clearwater and you got |
| 7 | like Palm Harbor. You got these little towns that |
| 8 | surround it. |
| 9 | Q. Who else was at the wedding? |
| 10 | A. The priest. |
| 11 | Q. What's his name? |
| 12 | A. Father Joe. |
| 13 | Q. So it's in Clearwater? |
| 14 | A. What's that? |
| 15 | Q. Is it in Clearwater? |
| 16 | A. I don't know if that side of this set is -- |
| 17 | over there is Clearwater or not. |
| 18 | Q. What county? |
| 19 | A. That I don't know. |
| 20 | Q. Did you get a marriage license in that county? |
| 21 | A. I -- I didn't. |
| 22 | Q. You can't get married without a marriage |
| 23 | license. Where did you get your marriage license? |
| 24 | A. You're confusing me. I -- I guess I don't |
| 25 | understand what you're saying. |

Page 59

| | |
|---|---|
| 1 | Q. You cannot get married in the United States, |
| 2 | in any state, without a marriage license. |
| 3 | A. That's where you fill out the paperwork and |
| 4 | stuff? |
| 5 | Q. Yes, sir. |
| 6 | A. We did that at the courthouse. |
| 7 | Q. Which courthouse? |
| 8 | A. Or whatever that -- annex building I think it |
| 9 | was called. |
| 10 | Q. Where? |
| 11 | A. That is Clearwater, I believe. It -- it could |
| 12 | be -- I could be wrong, but I'm -- I'm guessing |
| 13 | Clearwater. |
| 14 | Q. In 2007 sometime? |
| 15 | A. I think. |
| 16 | Q. Have you continued to live with Katie since |
| 17 | you moved in with her sometime after September of '06? |
| 18 | A. Yes, I stayed there. |
| 19 | Q. Have you lived anyplace else? |
| 20 | A. I lived in Tarpon Springs. |
| 21 | Q. Before or after you moved in with Katie? |
| 22 | A. Before, too. |
| 23 | Q. Where did you live in Tarpon Springs? |
| 24 | A. I don't know the address. It's Tarpon |
| 25 | Springs. |

Page 60

| | |
|---|---|
| 1 | Q. Did you rent a house? |
| 2 | A. Yes, I rented. |
| 3 | Q. Did you own a house? |
| 4 | Was it a house? |
| 5 | A. Yes. |
| 6 | Q. Who with? |
| 7 | A. What do you mean who with? |
| 8 | Q. Who'd you live with? |
| 9 | A. I lived with myself. On occasion Mike come |
| 10 | down and stayed. |
| 11 | Q. Anybody else? |
| 12 | What was the name of the woman you were living |
| 13 | with in Tarpon Springs? |
| 14 | A. That I was living with -- |
| 15 | Q. Yes. |
| 16 | A. -- in Tarpon Springs? |
| 17 | Q. Yes. |
| 18 | A. I didn't live with her in Tarpon Springs. |
| 19 | Q. Not at all? |
| 20 | A. Are you talking about Palm Harbor? |
| 21 | Q. You told me you were living in Tarpon Springs. |
| 22 | I want to know who you were living with. |
| 23 | A. I just told you. Myself and Michael. |
| 24 | Q. Anybody else? |
| 25 | A. Not to my knowledge. |

| Page 61 | Page 63 |
|---|---|
| 1   Q.   Okay. How long did you stay there? | 1   Katie. Where else have you lived? |
| 2   A.   Four months maybe, three months. I don't | 2   A.   Let's see, Palm Harbor, Tarpon, Clearwater. I |
| 3   know. Maybe five months. | 3   think that's it. |
| 4   Q.   And that was before you moved in with Kate; | 4   Q.   No place else? |
| 5   right? | 5   A.   I don't believe so. |
| 6   A.   Yes. | 6   Q.   What other names have you gone by since |
| 7   Q.   Before you met her; right? | 7   September of 2006? |
| 8   A.   Not before I met her, no. | 8   A.   Mike Riley or George Riley. |
| 9   Q.   So after you left Palm Harbor and before you | 9   Q.   Others? |
| 10   moved in with Kate you were living in Tarpon Springs? | 10   A.   No. George Michael Riley. |
| 11   A.   I had a house up there, yes. But I stayed at | 11   Q.   Any others? |
| 12   Kate's, too. | 12   A.   No. |
| 13   Q.   What happened to the house that you were | 13   Q.   You've never introduced yourself to anyone by |
| 14   renting in Tarpon Springs? | 14   any other name than those you just gave me? |
| 15   A.   What do you mean? | 15   A.   No. |
| 16   Q.   What happened to it? | 16   Q.   Okay. What other companies have you worked |
| 17   A.   Couldn't pay the rent. | 17   for since the last time I took your deposition, other |
| 18   Q.   So you left? | 18   than Continental? |
| 19   A.   Yes. | 19   A.   Well, if Kate has me on payroll Black Ink it'd |
| 20   Q.   Who were you paying the rent to; a real estate | 20   be Black Ink, or Tristar. |
| 21   agent, or to an individual? | 21   Q.   Anyplace else? |
| 22   A.   That was an individual in New York. | 22   A.   At South -- at Southern Concrete. Them people |
| 23   Q.   What was his name? | 23   didn't pay me. |
| 24   A.   I don't know. | 24   Q.   But you were doing that under your own |
| 25   Q.   Well -- | 25   company. You weren't an employee of theirs; right? |

| Page 62 | Page 64 |
|---|---|
| 1   A.   It was a company name, I think. | 1   A.   That's correct. |
| 2   Q.   Who was paying the rent? | 2   Q.   And what company were you using the name of |
| 3   A.   I did. | 3   when you were working at Southern Concrete? |
| 4   Q.   Out of what money? | 4   Continental, or some other company? |
| 5   A.   Wherever I was working at the time. | 5   A.   Probably Continental. |
| 6   Q.   For Continental? | 6   Q.   All right. What other companies have you |
| 7   A.   It would have been Continental. | 7   worked for or operated as or owned since the last time |
| 8   Q.   And where were you banking? | 8   I took your deposition? |
| 9   A.   I think it was Continental. I don't know what | 9   A.   Either Black Ink, Tristar, or Continental, to |
| 10   other -- I don't know what other one. I don't know. | 10   the best of my knowledge. |
| 11   Q.   Where are the records from any rent that | 11   Q.   What about Rock Concrete, LLC? |
| 12   you -- | 12   A.   That's not mine. |
| 13   A.   I -- | 13   Q.   Whose is it? |
| 14   Q.   -- paid while you lived at Tarpon Springs? | 14   A.   I have no idea. |
| 15   A.   I don't have it. | 15   Q.   What about APG, Inc.? |
| 16   Q.   Where are they? | 16   A.   That's not mine. |
| 17   A.   I don't know. | 17   Q.   Don't know anything about APG, Inc.? |
| 18   Q.   Where else have you lived other than in Tarpon | 18   A.   It's not -- I don't -- it's not mine. |
| 19   Springs and with your wife Katie? | 19   Q.   That's not what I asked you. Whose it -- what |
| 20   A.   From when to when? | 20   do you know about APG, Inc.? |
| 21   Q.   Any time after September of 2006 when I last | 21   A.   It's an oil company. |
| 22   took your deposition. You told me you started out in | 22   Q.   What about it? What do you know about it? |
| 23   Palm Harbor, Florida, which is where you were living | 23   A.   It's a bulk plant in Mississippi. |
| 24   then. Now you've told me about living in Tarpon | 24   Q.   It's a what plant? |
| 25   Springs, and then from Tarpon Springs you moved in with | 25   A.   A bulk plant. |

COMMODORE BANK -VS- GEORGE M. RILEY VIDEO DEPO
GEORGE M. RILEY
Multi-Page™
Deposition Transcript of George Michael Riley   Sr. 1-25-08
FRIDAY, JANUARY 25, 2008
Page 17 of 52

| Page 65 | | Page 67 | |
|---|---|---|---|
| 1 Q. Bulk? | | 1 A. I don't know when he bought it. | |
| 2 A. Uh-huh. | | 2 Q. How do you know that Vince Promuto bought APG, | |
| 3 Q. Bulk oil? | | 3 Inc.? | |
| 4 A. Right. | | 4 A. Vince is a friend of mine. | |
| 5 Q. In Mississippi. What about it? What do you | | 5 Q. How long have you known him? | |
| 6 know about it? | | 6 A. He's known my family for a long time. I -- I | |
| 7 A. I guess it's a pretty big, broad question. I | | 7 mean, I don't know. | |
| 8 don't know. What do you mean what do I know about it? | | 8 Q. What do you mean he's been in your family? | |
| 9 Q. Well, what do you know about APG, Inc., which | | 9 A. I said he -- he -- he's known my family for a | |
| 10 is a bulk oil company in Mississippi? Did you ever | | 10 while. | |
| 11 work for them? | | 11 Q. Where did you meet him? | |
| 12 A. Nope. | | 12 A. Vince? | |
| 13 Q. Did you ever own them? | | 13 Q. Yes. | |
| 14 A. Nope. | | 14 A. I -- I don't even remember. I mean -- | |
| 15 Q. Did you ever tell anybody that you owned them? | | 15 Q. Twenty years ago? Thirty years ago? Five | |
| 16 A. Did I ever tell anybody I owned it? | | 16 years ago? | |
| 17 Q. Uh-huh. | | 17 A. I'm 44. He's known my family for prob -- I | |
| 18 A. No, because I don't. I don't own it. | | 18 don't know how long he's known my family. | |
| 19 Q. Did you do any business with it? | | 19 Q. Where's he live? | |
| 20 A. I did not do business with it, no. | | 20 A. He lives in Florida, in Fort Lauderdale, and | |
| 21 Q. Have you ever? | | 21 in New York. | |
| 22 A. Have I ever did business with them? | | 22 Q. Is that who you were renting the house from? | |
| 23 Q. Uh-huh. | | 23 A. No. | |
| 24 A. When you say have I did business, what do you | | 24 Q. All right. What does he do? | |
| 25 mean? Can -- you're -- you're confusing me. | | 25 A. Vince? | |

| Page 66 | | Page 68 | |
|---|---|---|---|
| 1 Q. Have you ever done any business with APG, | | 1 Q. Yes. | |
| 2 Inc.? | | 2 A. He's a -- he is an entrepreneur. | |
| 3 A. What do you mean doing business? | | 3 Q. What's that mean? | |
| 4 Q. Have you ever bought anything from them? | | 4 A. What do you mean what's that mean? | |
| 5 A. No. | | 5 Q. Well, you told me he's an entrepreneur. What | |
| 6 Q. Ever sold anything to them? | | 6 does that mean? | |
| 7 A. No. | | 7 A. Very wealthy, very intelligent attorney. | |
| 8 Q. Ever said you were going to buy them? | | 8 Q. He's an attorney? | |
| 9 A. Did I ever say I was going to buy them? | | 9 A. He is. | |
| 10 Q. Yeah. | | 10 Q. Does he practice law, or does he run | |
| 11 A. No. | | 11 businesses, or what's he do? | |
| 12 Q. Well, what have you done with them? | | 12 A. I don't -- I -- I can't -- don't know. I | |
| 13 A. I know a guy that bought them. | | 13 can't speak for him. | |
| 14 Q. Who? | | 14 Q. You said you've known this guy. | |
| 15 A. Vince. | | 15 A. I mean I know him. I -- he -- I don't know if | |
| 16 Q. Vince who? | | 16 he still practices. I mean, yes, he was a -- actually, | |
| 17 A. Promuto. | | 17 a U.S. attorney in DC. | |
| 18 Q. And what do you know about Vince Promuto | | 18 Q. Okay. And you know he bought APG, Inc. how? | |
| 19 buying APG, Inc.? | | 19 How do you know that? | |
| 20 A. What do I know about it? | | 20 A. What do you mean how do I know that? | |
| 21 Q. Yeah. You said you know a guy that bought | | 21 Q. You told me you know -- that's how this whole | |
| 22 APG, Inc., named Vince Promuto. | | 22 conversation started. You told me that you know Vince | |
| 23 A. Right. | | 23 Promuto. | |
| 24 Q. What do you know about that? When did he buy | | 24 A. You asked me if I knew anything about APG | |
| 25 it? | | 25 and -- and at what -- how did I know. Because Vince | |

## Page 69

1    told me he bought it.
2    Q.   When did he tell you he bought it?
3    A.   I don't know the exact date.
4    Q.   This year? Last year? Five years ago?
5    A.   It was -- we're in a new year so it would have
6    been last year I believe.
7    Q.   So 2007?
8    A.   Yes.
9    Q.   All right. What did he tell you about his
10   purchase of APG, Inc.?
11   A.   That he bought an oil company.
12   Q.   What else?
13   A.   That's it.
14   Q.   Have you done any business with Vince Promuto?
15   A.   What do you mean have I done business with
16   Vince?
17   Q.   Have you done any business with Vince Promuto?
18   A.   No. We're friends.
19   Q.   So you've never worked with him?
20   A.   Have I worked for Vince?
21   Q.   Yep.
22   A.   What do you mean have I worked for Vince?
23   I've never worked for Vince.
24   Q.   Have you worked with him?
25   A.   Well, working with him would be working for

## Page 70

1    him; correct?
2    Q.   No.
3    A.   Okay, then I'm -- I don't know your answer.
4    Q.   What have you done with Vince Promuto other
5    than know him?
6    A.   Pretty much just -- that's it. I hung around
7    with him.
8    Q.   When's the last time you saw him?
9    A.   Month ago.
10   Q.   Where at?
11   A.   Florida.
12   Q.   Where in Florida?
13   A.   Tampa.
14   Q.   Where at in Tampa, Florida? Where were you?
15   A.   I don't remember. Some restaurant I'm sure.
16   Q.   Okay. Other than Tampa, Florida when's the
17   last time you saw him?
18   A.   That's it.
19   Q.   That's it in the last year?
20   A.   In the last year?
21   Q.   Yes.
22   A.   I believe so --
23   Q.   Last two years?
24   A.   -- to the best of my --
25   I'm sorry?

## Page 71

1    Q.   In the last two years when -- when have you
2    been with Vince Promuto?
3    A.   Multiple times.
4    Q.   Where?
5    A.   Multiple places.
6    Q.   Tell me.
7    A.   Florida, Louisiana.
8    Q.   Where in Louisiana?
9    A.   Multiple places in Louisiana.
10   Q.   Where?
11   A.   I don't know. I don't know all the places. I
12   mean, we've been a lot of places together.
13   Q.   It's a big state. Tell me where.
14   A.   I -- I don't know the name of the parishes.
15   Q.   You can't tell me a single parish that you
16   have been with Vince Promuto in in the last two years?
17   A.   Mississippi.
18   Q.   That's a different state.
19   A.   You asked all the states, didn't you?
20   Q.   Yeah, but I asked what parishes in Louisiana
21   first.
22   A.   I don't know where Phoenix -- wherever Phoenix
23   headquarters would be.
24   Q.   What's Phoenix?
25   A.   Excuse me?

## Page 72

1    Q.   What's Phoenix?
2    A.   What is Phoenix?
3    Q.   Yeah.
4    A.   Phoenix is a organization that does multiple
5    things.
6    Q.   Phoenix Associate -- Associates Land
7    Syndicate, is that what you're talking about?
8    A.   Yes.
9    Q.   And how do you know Phoenix Associates Land
10   Syndicate?
11   A.   John Zornes is his name that works for them.
12   Q.   What about him?
13   A.   Come to me and wanted me to meet their
14   president, and his name is Paul Alonzo.
15   Q.   When was this?
16   A.   In '07.
17   Q.   All right. So it was after, or before you got
18   married to Kate?
19   A.   We was married I believe.
20   Q.   All right. So after -- sometime after you
21   married Kate in '07 you get introduced to Paul Alonzo.
22   Who introduced you; John Zornes?
23   A.   Johnny Zornes.
24   Q.   How do you know Johnny Zornes?
25   A.   I never -- I didn't know him.

## Page 73

1    Q.    No?

2    A.    I've met him -- I went down there to look at

3 crush head stone that I never got paid on.

4    Q.    What stone are you talking about?

5    A.    There where I never got paid.

6    Q.    For Southern Concrete?

7    A.    Yes.

8    Q.    All right. So you're down there working

9 for -- working with Southern Concrete and somehow --

10    A.    I went down there to look at the project and

11 work with Southern Concrete.

12    Q.    All right. And how do you -- how does that

13 lead you to John Zornes?

14    A.    Johnny Zornes knows that -- that other guy

15 that I'm going to get you the name for, and he also

16 knows Arnold.

17    Q.    All right. So he introduces them to the owner

18 of Phoenix Associates Land Syndicate --

19    A.    Yes.

20    Q.    -- Paul Alonzo?

21    A.    Correct.

22    Q.    And what happens?

23    A.    When -- well, I met him. They flew me back

24 and forth a few times.

25    Q.    From where?

## Page 74

1    A.    Well, more than once. From Florida to

2 Louisiana.

3    Q.    Hold -- let me stop you there a second. When

4 you say they flew you back and forth, are you telling

5 me that Phoenix Associate Land Syndicates paid to fly

6 you from Florida to Louisiana and back?

7    A.    No, they did not pay. They used their own

8 plane.

9    Q.    Oh, they sent -- they sent a plane and picked

10 you up?

11    A.    Correct.

12    Q.    When?

13    A.    I don't know the dates.

14    Q.    Sometime in '07?

15    A.    Sometime in '07.

16    Q.    And why would they do that?

17    A.    They wanted me to come on board with them.

18 They were looking at some coal mines to buy. And then

19 they have a gravel pit. They had a gravel pit.

20    Q.    Where?

21    A.    I don't know the name of the place up there,

22 but they have a gravel pit. It's called Murphy.

23 Murphy's -- Murphy Stone I believe, or Murphy

24 something.

25    Q.    In Louisiana?

## Page 75

1    A.    It is in Louisiana, yes.

2    Q.    All right. So they fly you there. Why do

3 they want to talk to you about buying a coal mine or to

4 work at a gravel pit?

5    A.    Because they didn't know that industry.

6    Q.    Okay. And you did?

7    A.    I know that industry.

8    Q.    What did you tell them -- who did you tell

9 them you were working for at that time, for what

10 company?

11    A.    Who did I tell them I was working for?

12    Q.    Yes.

13    A.    I didn't tell them I was working for anybody.

14    Q.    Well, you had to have given them some

15 information to lead them to believe that you knew

16 something about buying coal mines or working gravel

17 pits.

18    A.    Well, they seen what we was doing over there,

19 and then Vince was doing the gravel pit and spent

20 millions of dollars in equipment for the gravel pit

21 that later we found out they did not own.

22    Q.    Vince who?

23    A.    Promuto.

24    Q.    I thought you just told me you never did any

25 business with Vince Promuto. So now you're telling me

## Page 76

1 you did a gravel pit business with Vince Promuto?

2    A.    I did not do a gravel pit with Vince Promuto.

3 Vince Promuto did a gravel pit with Phoenix.

4    Q.    When?

5    A.    I don't know when.

6    Q.    Before you started talk -- walk -- talking to

7 Phoenix?

8    A.    Vince was there before, yes.

9    Q.    All right. So sometime before you get

10 introduced to anybody at Phoenix Vince Promuto did some

11 gravel pit work?

12    A.    I don't know what all Vince has done for them,

13 so I -- I can't speak for Vince. I -- you're asking

14 for me.

15    Q.    I'm not asking that, sir. I'm just trying to

16 figure out how you got involved with these guys.

17    A.    With Phoenix?

18    Q.    Yes.

19    A.    Through Johnny Zornes.

20    Q.    All right. You -- as you told me that then

21 you started talking about Vince Promuto having done

22 business with Phoenix as well. And you never told me

23 that there was a relationship between you and Vince and

24 Phoenix. Has there ever been a relationship between

25 you and Vince Promuto and Phoenix?

## Page 77

1   A.   Vince has his relationship with them. I had
2 my relationship with them.
3   Q.   Did it occur at the same time?
4   A.   Vince was with Phoenix before me.
5   Q.   So when you started talking to Phoenix was
6 Vince already working with them?
7   A.   I don't know. I believe -- he was there
8 before me.
9   Q.   Was he still there when you started talking to
10 Phoenix?
11   A.   What do you mean?
12   Q.   Was he working with them when you started
13 talking to Phoenix?
14   A.   I would have -- I -- I can't -- I don't know.
15 Vince was there before me.
16   Q.   Uh-huh.
17   A.   That's for sure.
18   Q.   All right.
19   A.   His agreement with Phoenix I have no idea.
20   Q.   Okay. So that -- in any event, Phoenix flies
21 you back and forth on Phoenix's jet?
22   A.   Well, Phoenix -- really wasn't Phoenix's jet
23 because they didn't pay for it. They beat a guy up out
24 of Florida with it, as they did on every -- every job
25 that they went to. They didn't pay for nothing. They

## Page 78

1 didn't do nothing. They got -- they -- Vince brought
2 all that equipment. I mean, that -- that's a
3 nightmare. And actually, we have a federal lawsuit --
4 I have a federal lawsuit against them right now.
5   Q.   Was it a private jet, or was it a commercial
6 jet that picked you up?
7   A.   A small jet.
8   Q.   But it wasn't -- it's not Delta --
9   A.   No.
10   Q.   -- or American Airlines?
11   It's a private jet?
12   A.   Yes.
13   Q.   All right. And they picked you up in this
14 jet, flew you back and forth how many times?
15   A.   Multiple. I can't tell you how many times.
16   Q.   Two? Twelve?
17   A.   Quite a bit. I mean, they flew me from me
18 Clearwater one time to Miami. Paul, Ron and whatever
19 some other attorney's name they had with them.
20   Q.   All right. So you're talking to these guys
21 that are flying you around. What happened after that?
22   A.   What do you mean what happened after that?
23   Q.   What happened between you and Phoenix? You're
24 talking to them about --
25   A.   Phoenix stuck Kate for $89,000. They stuck --

## Page 79

1 they pay no bills. They -- they are a -- they're a
2 company owned by the people, you know, where you can
3 make an investment, or whatever that is.
4   Q.   In stock?
5   A.   No.
6   Q.   No?
7   A.   You -- it's a -- you know, like how I own my
8 own company? He doesn't have a company that -- like,
9 everybody can own it.
10   Q.   So I -- but I asked you what happened at --
11 they're flying you back and forth. I want to go step
12 by step --
13   A.   Okay.
14   Q.   -- in terms of your business relationship with
15 these people. They're flying you back and forth. You
16 told me because they were interested in getting into
17 the coal industry --
18   A.   That's correct.
19   Q.   -- and that they didn't know anything?
20   A.   No, they had a gravel pit way before me.
21   Q.   Okay. So the coal industry?
22   A.   Correct.
23   Q.   So they're flying you back and forth?
24   A.   Well, not this -- it -- break -- I can break
25 it down much easier if we go by steps.

## Page 80

1   Q.   That's fine.
2   A.   I met them while I was crushing the concrete.
3   Q.   Okay.
4   A.   We went over there. They took you to this
5 elaborate dinner. It was a beautiful place. They
6 do -- they buy -- they buy a lot of companies, is what
7 they do.
8   Q.   Uh-huh.
9   A.   And don't pay for them. They take the money
10 and let them go. That's what they do. So I went from
11 there. They had a -- a book, it was about this thick
12 (indicating), about a coal company that somebody
13 brought to them.
14   Q.   Okay. What was that?
15   A.   I can't read. Paul knows I can't read. So
16 Vince reviewed some of the paperwork -- or that --
17 read -- read the book. And I told them, I said, I got
18 to see the projects. I can't do a project unless I see
19 it.
20   Q.   Okay.
21   A.   So then we flew up to the coal mine.
22   Q.   Where was that?
23   A.   Up in Alabama, I think it was. Georgia or
24 Alabama.
25   Q.   All right. On their jet?

TAHYI VIDEO & COURT REPORTING, LTD.
(800) 526-6508 (740) 454-7157

Page 81

1    A.    Yes.
2    Q.    So they paid for it?
3    A.    They had a lot of jets.
4    Q.    All right. So what happened then?
5    A.    So we had a meeting.
6    Q.    Where was the meeting?
7    A.    At the coal company.
8    Q.    All right. What was the name of this coal
9    company?
10   A.    Something Energy. I -- I don't know. I don't
11   remember the name of the place, but I -- I don't -- I
12   don't know the name of the coal company. So we went
13   down and looked at the pit. The coal seemed --
14   didn't -- to me didn't look that thick, but the rock
15   there was phenomenal. So I told them it'd be a good
16   idea to put a -- a limestone quarry in multiple
17   locations at the -- at the coal company.
18   Q.    Okay.
19   A.    That was my advice to them.
20   Q.    All right. They pay you for that advice?
21   A.    I went up there. I don't think I got anything
22   at that time.
23   Q.    All right. Later?
24   A.    I did get some -- I -- Tristar Holdings -- I
25   was with Tristar Holdings. They hired Tristar

Page 82

1    Holdings.
2    Q.    Tristar Holdings is your wife's company?
3    A.    That's correct.
4    Q.    So you were an employee of them?
5    A.    If she has me on as an employee. I don't know
6    if's Black Ink or Tristar, whatever. Whatever company
7    she has, if she has me employee of her company, you --
8    that's --
9    Q.    You just told me you were with Tristar
10   Holdings and Phoenix went into a business relationship
11   with Tristar Holdings. And what's your relationship to
12   Tristar Holdings at that time?
13   A.    What was my relationship?
14   Q.    Yeah. Were you representing Tristar Holdings?
15   Did you own the company?
16   A.    No. I -- I don't -- I've never represented
17   I've owned any of them companies.
18   Q.    Well, obviously you told them you had
19   something to do with Tristar Holdings. What did you
20   tell them?
21   A.    Well, first let's finish the coal company then
22   we'll get back to that or do you want me -- we're --
23   you're -- you're confusing me. We're going from one
24   place to another.
25   Q.    No, I'm at the same place. You told me that

Page 83

1    you --
2    A.    You asked me --
3    Q.    -- you recommend -- let me finish.
4          You told me that you recommended that they put
5    a limestone quarry in, it was your idea, and you were
6    with Tristar Holdings.
7    A.    No. You asked me did they pay me anything.
8    Q.    Uh-huh.
9    A.    And I said, no, they didn't pay me.
10   Q.    Who'd they pay?
11   A.    They paid Tristar Holdings.
12   Q.    Why would they pay Tristar Holdings for advise
13   that -- or any work that you did?
14   A.    Because of money that I owe my wife.
15   Q.    How much do you owe your wife?
16   A.    Quite a bit.
17   Q.    How much?
18   A.    Way over $500,000.
19   Q.    Did you owe her that much when you were
20   dealing with Phoenix?
21   A.    I don't know what I owed her. I mean,
22   whatever -- I mean, she -- whatever I need or whatever
23   she always gave me.
24   Q.    So she's been supporting you since you moved
25   in with her; right?

Page 84

1    A.    Pretty much so.
2    Q.    All right.
3    A.    But I help her in return, too.
4    Q.    So, in any event, they -- they enter in --
5    after you talked to them about this limestone quarry
6    they enter into a business relationship with Tristar
7    Holdings and then --
8    A.    No. The -- contract was not signed.
9    Q.    Okay. So what happened?
10   A.    As time went by we learned how they was doing
11   people, and I had an attorney. They made false
12   accusations against me and did things that wasn't right
13   and I hired an attorney. His name is Mike Fowler.
14   Still represents me. And he filed a case in it, in
15   Louisiana, in federal court.
16   Q.    And in that lawsuit he says that you entered
17   into a business -- a series of business transactions
18   through a company called Phoenix Associates Land
19   Syndicate.
20   A.    Excuse me?
21   Q.    Your attorney, in the lawsuit you just told me
22   about --
23   A.    Okay.
24   Q.    -- he says, you and Defendant Alonzo entered
25   into a series of business transactions through a

**Page 85**

1    company called Phoenix Associates Land Syndicate.
2    A.   What does that mean?
3    Q.   That means that you were working with Phoenix
4   in a series of business transactions.
5    A.   I did go with Phoenix a -- a lot of places to
6   look at things, that is true.
7    Q.   Did you ever get employed by them?
8    A.   No.
9    Q.   They have a -- a press release. It says that
10   you assumed the position of executive vice president of
11   international operations.
12    A.   That is incorrect.
13    Q.   Did you represent to them that your name was
14   Mike O'Riley?
15    A.   Absolutely not.
16    Q.   Never told them that your name was Mike --
17    A.   Absolutely not.
18    Q.   -- O'Riley?
19      That's a flat lie?
20    A.   That is a flat lie.
21    Q.   And it was published in --
22    A.   There probably is a lot of things on there
23   that's a -- a flat lie.
24      MR. SCHNITTKE: Can I see that?
25      MR. BECKER: Not yet. I'm not marking it

**Page 86**

1   as an exhibit.
2    A.   I think we have -- Sam has a copy of that.
3    Q.   You represented also to these folks that you
4   had a mining engineering degree; correct?
5    A.   That is incorrect.
6    Q.   And that you've worked in the mining business
7   all around the globe?
8    A.   That is incorrect.
9    Q.   That you come from a background of five
10   generations of mining expertise?
11    A.   That's -- well, I've -- I've came a many of
12   years of mining experience that -- but that's -- that's
13   not what was said.
14    Q.   And at the same time they were bringing you on
15   they brought on Mr. Promuto; correct?
16    A.   Bringing on me on where?
17    Q.   To Phoenix.
18    A.   I -- I can't answer for Vince. They had a
19   lease with -- an agreement with Vince to do -- to strip
20   the pit, the sand pit.
21    Q.   Well, who owned the sand pit?
22    A.   We thought Phoenix did, but Phoenix didn't.
23   They was in a lawsuit down here and Vince bought all
24   that equipment prior to I getting there. Now, this is
25   only hearsay, what I'm being told, but I don't think

**Page 87**

1   Vince would mislead me. He bought all the equipment
2   that he took to do that place down there. They didn't
3   own it. The lease -- they didn't pay their royalties.
4   They didn't pay anything. Phoenix didn't pay any of
5   that.
6    Q.   So in this -- what other business transactions
7   did you -- did you become involved in with Phoenix?
8    A.   That's what I said. We flew down to Miami and
9   met with some people about a gypsum in -- I don't know
10   the name of that other country. And that book was all
11   in a whole different language than even American.
12    Q.   So you flew out of the country?
13    A.   I did not fly out of the country.
14    Q.   Where'd you go?
15    A.   To Miami. And we was in a meeting in Miami at
16   the airport.
17    Q.   To discuss what?
18    A.   They brought all this -- well, there was --
19   they was talking about all multiple things.
20    Q.   What?
21    A.   I don't know what all they was -- other things
22   they was -- my concern was was the mining that possibly
23   could have happened for Phoenix in another -- in
24   another small country.
25    Q.   What country?

**Page 88**

1    A.   I can't remember. It's not Belize. It's -- I
2   think it starts with a V. And -- oh, no, Santo
3   Domingo.
4    Q.   But you never went there?
5    A.   I did not go there.
6    Q.   All right. So you talked to them in Miami and
7   what happens?
8    A.   Well, the guy that had the project -- it
9   was -- it was -- again, it was in a book that did -- it
10   wasn't even in American language. Paul was supposed to
11   get the book transferred into American language and
12   never did.
13    Q.   Okay. So what happened?
14    A.   I don't know. I -- I don't know if they went
15   forward. I don't know what they would do with it.
16    Q.   What's the next thing you did then with your
17   business transaction, Phoenix?
18    A.   I -- he was into so much, I don't know. I
19   mean --
20    Q.   I just want to know what you did with them.
21   Your -- your lawyer filed a lawsuit and said that you
22   had a series of business transactions --
23      THE COURT REPORTER: Excuse me.
24      MR. BECKER: Want something to drink? You
25   need some water? Let's go -- two seconds later.

Page 89

1    VIDEOGRAPHER: We're going off the record
2  at 2:22 -- 2:23.
3
4         Off the record.
5
6    VIDEOGRAPHER: We're going back on the
7  record at 2:26:20. Go right ahead.
8  BY MR. BECKER:
9    Q.   All right. What I'm trying to get to the
10 bottom of is all of the series of business transactions
11 that your lawyer alleges, in the lawsuit that he filed
12 in Federal District Court in Eastern District of
13 Louisiana in Case 07-8379, he says you had with Phoenix
14 Associates Land Syndicate. That's what I want to talk
15 about. And you've told me about a trip to Miami and
16 that apparently didn't get anywhere. So what's the
17 next business transaction --
18 A.   The coal mine as well.
19 Q.   That didn't go anywhere, either?
20 A.   Nope.
21 Q.   So what's the next business transaction --
22 A.   They wanted -- the guy had three million
23 dollars in this checking.
24 Q.   Who's the guy?
25 A.   The coal company guy.

Page 90

1  Q.   Okay.
2  A.   Phoenix wanted to take the three million
3  dollars out of his account when they acquired it and
4  give him these -- give him a portion of whatever it
5  was, like they did with the airplanes, like they did
6  with all these other companies, and then didn't pay
7  nobody nothing. And it didn't -- and that's what took
8  place.
9  Q.   Well, what did you do with them, though? So
10 what do these business transactions --
11 A.   I went to the coal mine and looked of what I
12 thought could take place.
13 Q.   That's all you did?
14 A.   Right. And -- and I looked. And I said,
15 look, I think limestone worker. There's plenty of it.
16 Q.   We've covered that and you've --
17 A.   Okay.
18 Q.   Now you've told me about it being in Miami.
19 A.   Right.
20 Q.   What else? What other business transactions
21 that you're aware of and filed this lawsuit about?
22 A.   Let's see, coal mine, the -- the coal mine.
23 The best thing -- incentive to -- I gave them advice
24 how I would mined the -- that Murphy pit.
25 Q.   All right. Anything else?

Page 91

1  A.   There could have been some more or may not
2  have been no more. I -- I -- if you bring something to
3  my knowledge then I -- I could answer you yes or no.
4  Q.   Well, what money did they give to Tristar
5  Holdings for anything that you did?
6  A.   The checks bounced.
7  Q.   So they never paid anything to Tristar
8  Holdings?
9  A.   They paid -- I think maybe one or two checks
10 cleared. The rest of them bounced.
11 Q.   So how much did they pay you?
12 A.   I think a $7,000 check bounced. A $3500 check
13 bounced. I think one of the $7,000 or -- checks
14 clears. I'm not for sure.
15 Q.   What'd you do with the money?
16 A.   It wasn't my money.
17 Q.   So it went to Tristar Holdings?
18 A.   Correct.
19 Q.   So you're telling me that -- that we --
20 there's records somewhere of checks that Phoenix
21 wrote --
22 A.   Mike Fowler has the checks that bounced.
23 Q.   All right -- that Phoenix wrote, and those
24 checks would have been made payable to Tristar
25 Holdings?

Page 92

1  A.   I believe that's true.
2  Q.   And it wouldn't -- and those checks would have
3  been written to Tristar Holdings by Phoenix because of
4  work that you did on behalf of Phoenix and recommending
5  things or advising them?
6  A.   Sir, I -- I didn't understand that. Again,
7  please.
8  Q.   And the reason Phoenix would have been writing
9  those checks to Tristar Holdings is because of --
10 A.   Because I was with --
11 Q.   -- things that you were doing for Phoenix?
12 A.   Through Tristar Holdings.
13 Q.   Yes.
14 A.   Because I --
15 Q.   (Nods affirmatively.)
16 A.   It was Tristar Holdings.
17 Q.   Yes.
18 A.   That's correct.
19 Q.   Okay.
20 A.   If I could -- if I understand you right.
21 Q.   What about, why did you arrange for corporate
22 credit cards to be issued to Mr. Alonzo and his wife?
23 A.   Oh, yeah. I didn't recommend -- when we went
24 to the coal mine?
25 Q.   Uh-huh.

Page 93

1    A.    He couldn't rent a car. He didn't have a
2    credit card.
3    Q.    All right.
4    A.    So he asked me if I could get a credit card.
5    Q.    Okay.
6    A.    And I told him no.
7    Q.    All right.
8    A.    And he asked me why. And I told him the whole
9    situation about my Ohio situation. I told him my
10    situation here and --
11    Q.    Did you tell him about Colorado?
12    A.    I told him about Colorado.
13    Q.    Okay.
14    A.    He knew the whole thing. He told me that --
15    that he recommend -- he knew out of this and -- and
16    that he would file a RICO act or something against the
17    bank he owns, is what he told me, because of the way it
18    worked out. And you -- we can do a three-way. I told
19    him, I said, look, whatever I owe I want to make my
20    life clean and back to where I want to be again normal,
21    is what I told him.
22         Ron his partner said that he knows the banking
23    business. He knew the banking business. Does whatever
24    he does. And he said what was done to me was illegal
25    and he could help me find an attorney to do a multiple

Page 94

1    things, and I didn't go that route. And then -- where
2    was I at?
3    Q.    So you didn't arrange for any corporate credit
4    cards to be issued?
5    A.    I did. So I asked Kate -- because, you see --
6    if she would get him a credit card for Phoenix. And
7    she was -- was really opposed to it. She didn't want
8    to do it.
9    Q.    But she did it anyway because you asked --
10    A.    I'm sorry?
11    Q.    But she did it anyway because you asked her
12    to?
13    A.    I -- because they seemed like they was nice
14    people. We didn't -- I didn't know to the tune what
15    everything was -- it was about until later.
16    Q.    Bottom line is, at your request Kate arranged
17    for a credit card to be issued?
18    A.    Kate -- Kate got a credit card in her credit,
19    her name, for Phoenix.
20    Q.    When was that?
21    A.    I don't know the exact date, but Paul Alonzo's
22    wife put ninety-some thousand -- or I don't know the
23    exact amount of money; 10,000, 10,000, 10,000, 10,000
24    all in one day.
25    Q.    So they charged a bunch of $10,000 charges to

Page 95

1    that credit card?
2    A.    To a airplane company that they -- or another
3    company, a fuel company. I don't know what -- what
4    they did, how it was. But the attorney in Louisiana's
5    handling that.
6    Q.    All right. So, first of all, what -- what
7    type of credit card? What bank or what credit card?
8    A.    It was American Express.
9    Q.    All right. So Kate arranges for an American
10    Express card to be issued to Phoenix, but in her name,
11    and she's going to be responsible for the bill?
12    A.    That wasn't the agreement.
13    Q.    What was the agreement?
14    A.    Paul said that -- because she wouldn't -- she
15    didn't want the bills to go there. She wanted them to
16    go to her because it was her credit.
17    Q.    Okay.
18    A.    And they was to pay them and she wanted a copy
19    of it.
20    Q.    So how would the bill -- if the bills were
21    going to go to your wife Kate how was the bill supposed
22    to be paid by Phoenix? She was supposed to send them
23    to them?
24    A.    She would. She did. The first one they paid.
25    Q.    All right. How much was that?

Page 96

1    A.    Like $3,000 I think.
2    Q.    All right.
3    A.    Might have been a little bit more. But it was
4    in -- in that area.
5    Q.    All right.
6    A.    And the next one was ninety-some thousand.
7    Q.    All right.
8    A.    And they wrote a bad check.
9    Q.    And these were charges that were placed
10    against the card?
11    A.    On Paul's wife.
12    Q.    Not you?
13    A.    I had a few, yes.
14    Q.    What did you -- what charges did you have?
15    A.    He would cover my expenses. He said for
16    them -- whatever I wanted to -- you know, within
17    reason, for giving him a card.
18    Q.    So did you have a card to use as well?
19    A.    I did.
20    Q.    And it was a Phoenix card, but it was in your
21    wife's name, and the bills were going to your wife?
22    A.    It was a Phoenix card with her credit going to
23    her -- to her address, that's correct.
24    Q.    And Alonzo and his wife had one and you had
25    one?

| Page 97 | Page 99 |
|---|---|

**Page 97**

1  A.    That's correct. Well, Kate had -- had the
2  primary card.
3  Q.    So there's three cards?
4  A.    No. There was Kate, me, Johnny Zornes, my
5  son, myself. I -- I don't know. There was Paul, his
6  wife, me, Kate, and my boy. I think that's all of
7  them.
8  Q.    All right. So everybody's got a card and all
9  the bills are supposed to go to Kate and then --
10  A.    That's correct.
11  Q.    -- Kate's going to send the bills to Phoenix
12  and Phoenix is supposed to pay them all?
13  A.    That's correct.
14  Q.    Why would Phoenix be paying bills for your
15  son?
16  A.    Why would Phoenix pay bills for my son?
17  Q.    Yes.
18  A.    Why would they pay bills for my son.
19  Q.    Yeah. Why would they do that?
20  A.    Because that was Paul's agreement.
21  Q.    Paul agreed to pay your son's bills?
22  A.    Up to $1500 a month.
23  Q.    And how much per month was he going to pay of
24  yours?
25  A.    $3,000 I think it was.

**Page 98**

1  Q.    How much of Kate's?
2  A.    Kate never used it.
3  Q.    Okay.
4  A.    But he didn't -- he never specified. But he
5  told me he didn't want Michael to go over $1500.
6  Q.    Okay.
7  A.    And then he was wanting Mike, when he got out
8  of college, to do this, to do that. It was just --
9  Q.    So how long did that arrangement last?
10  A.    Not long.
11  Q.    A month? Two months? Six months? A year?
12  A.    She got the credit card. They paid the first
13  one. I resigned, told them not to use the card no
14  more. They have it -- we -- we have it on tape where
15  he -- he left me a message; Mike, let's work things
16  out, everything's okay, I'll get the money to them, and
17  da, da, da, da. Didn't work and he didn't pay it. And
18  then --
19  Q.    You said -- you -- well, let's stop.
20  A.    Okay.
21  Q.    You said you resigned. You resigned from
22  what?
23  A.    I resigned from anything that I had to do with
24  them people.
25  Q.    Why?

**Page 99**

1  A.    Because they wasn't paying anybody. They was
2  cheating everybody. And, you know, I got in trouble,
3  in a situation like this, and I wasn't getting in no
4  more trouble.
5  Q.    So even though you weren't working for them
6  you resigned?
7  A.    I'm sorry?
8  Q.    You told me earlier in the deposition that you
9  were not an employee of --
10  A.    I am not an -- I was not an employee of
11  Phoenix, no.
12  Q.    But you resigned?
13  A.    That's correct.
14  Q.    Okay. And then after you resigned they
15  refused to pay the second bills?
16  A.    No, they didn't refuse. They paid it, but the
17  check bounced.
18  Q.    So they paid -- how -- how much was the check;
19  $89,000?
20  A.    It was somewhere in that neighborhood, yes,
21  sir.
22  Q.    And then the check bounced?
23  A.    That's correct.
24  Q.    All right. So who paid the bill?
25  A.    Kate. It's on Kate -- Kate's responsibility

**Page 100**

1  they said.
2  Q.    So it's Kate's. Kate has paid that bill then
3  to American Express?
4  A.    Kate has made the payments to that card, yes,
5  I believe. I'm sure. I mean, she's -- she's -- her --
6  she's impeccable with that.
7  Q.    All right. Has the card been used since then?
8  A.    Absolutely not. No, I don't think so, because
9  she had them closed.
10  Q.    What'd you do with your card?
11  A.    What'd I do with it?
12  Q.    Yeah.
13  A.    It's tore up.
14  Q.    What'd your son do with his?
15  A.    I assume -- none of them are no good. No
16  cards are any good.
17  Q.    But what'd he do with the card?
18  A.    I'm sure he threw it away. I don't know what
19  Phoenix did with theirs.
20  Q.    Is that the last dealing you had with Phoenix?
21  A.    Was that the last dealing I had with Phoenix
22  after that? No. Paul wanted to try to work things
23  out.
24  Q.    So what else did you do?
25  A.    Work wise?

Page 101

1  Q.  With Phoenix.
2  A.  They -- they had a concrete deal come. I had
3  no idea how to -- it was billions of tons, or whatever,
4  I have no idea, that they -- everything was in the
5  billions with them.
6  Q.  What about it?
7  A.  They couldn't get a bond. They couldn't --
8  they couldn't get anything that it took to do the
9  project.
10  Q.  Uh-huh.
11  A.  And Vince wasn't going to co-sign or do
12  nothing for them.
13  Q.  What's Vince got to do with their concrete and
14  you?
15  A.  No, it's -- they -- it was -- they was going
16  to export material to another country or something,
17  they told me.
18  Q.  Okay. So what happened?
19  A.  They didn't have the means. When they called
20  to check on their banking status and stuff the people
21  that was doing the research on their company, their
22  banker, said that absolutely not, they wouldn't do no
23  business with them, that he was closing their account
24  for a hundred and some bad checks in less than whatever
25  days. I have no idea. But a guy named Peter was in

Page 102

1  charge of that. And he is from -- Peter is from New
2  Jersey, I think.
3  Q.  And what about Peter from New Jersey, what's
4  he got to do with this?
5  A.  Well, he was a broker that was working with
6  Phoenix.
7  Q.  So what happened? I mean, I -- what --
8  what's --
9  A.  They -- they -- their financing, none of their
10  stuff was what it was supposed to be.
11  Q.  So you didn't do any work with them on this?
12  A.  You couldn't.
13  Q.  Okay. So what -- what's the next thing you
14  did with Phoenix?
15  A.  To me, I think -- I think that was the last
16  thing, I think.
17  Q.  What about APG, Inc.?
18  A.  Phoenix has nothing to do with APG, Inc.
19  Q.  Really?
20  A.  Absolutely, 100 million percent.
21  Q.  So when the press release is issued --
22  A.  That's a lie again.
23  Q.  Oh. Let me finish. There's a press release
24  on August the 7th of 2007 saying that Phoenix Associate
25  Land Syndicates today announced the acquisition of APG,

Page 103

1  Inc.
2  A.  What is it?
3  Q.  All this is --
4  A.  That's not called that. It was APG, Inc.
5  Q.  Yes.
6  A.  And Vince owns APG, Inc. There was no
7  acquisition, or whatever that was.
8  Q.  So Vince never sold APG, Inc., to Phoenix?
9  A.  No. Well, I don't think so. He may have. If
10  he did I -- then -- then I'm wrong.
11  Q.  APG, Inc.'s located at 820 Highway 11 in
12  Picayune, P-i-c-a-y-u-n-e, Mississippi; right?
13  A.  It's in Mississippi. I don't know the exact
14  address.
15  Q.  What -- what business of any have you done
16  with that company?
17  A.  Such as what?
18  Q.  What have you done with them? Anything.
19  A.  Again, like --
20  Q.  Anything.
21  A.  I -- I don't understand what you're saying.
22  Q.  What business have you done with APG, Inc., of
23  any kind?
24  A.  Pretty much not too much. I mean --
25  Q.  What?

Page 104

1  A.  -- Vince is not -- I mean --
2  Q.  What business?
3  A.  The company was bought so Vince could have
4  oil, direct oil, to -- to the stone pit.
5  Q.  What business have you done with APG, Inc.?
6  A.  I don't -- I don't know what you mean by that.
7        MR. SCHNITTKE: Did you do any work for
8  them?
9        THE WITNESS: I helped Vince down there,
10  yes.
11        MR. SCHNITTKE: Well, that's what he's
12  trying to find out.
13        THE WITNESS: Okay. If you ask me if I
14  helped Vince, yeah, I helped Vince.
15        MR. SCHNITTKE: What'd you do?
16        THE WITNESS: Checked the tanks for him
17  and told him that he -- he needed to get some tank
18  trucks to go into the bulk industry, because that's
19  what it is. It's a bulk plant.
20  Q.  What else?
21  A.  That's pretty much about all I done.
22  Q.  Where were you living when you were doing all
23  this work?
24  A.  Where was I living?
25  Q.  Yeah, in Louisiana.

## Page 105

1  A.  I wasn't living in Louisiana.

2  Q.  Well, you're over there in Louisiana doing all

3  this stuff.

4  A.  Well, I'd stay --

5  Q.  Where'd you stay?

6  A.  I'd stay at a motel.

7  Q.  What motel?

8  A.  When I was with Phoenix they put us up in a

9  motel called -- I don't know what the name of the motel

10  was.  I know where it is over there.

11  Q.  Where?

12  A.  Go off the highway, make the loop.  It's in

13  the back.  It's not a very -- it's a pretty new motel.

14  Q.  Louisiana, or Mississippi?

15  A.  That's Louisiana.

16  Q.  What city?

17  A.  Louisiana and Mississippi's very close.

18  Q.  I understand that.  So where in Louisiana?

19  A.  About 15 minutes from their corporate office.

20  Q.  All right.  So you'd stay there when you were

21  with --

22  A.  Phoenix.

23  Q.  Phoenix.

24  A.  But as I'd -- I mean, I'd only be there like

25  one or two nights and then I would go back to Florida.

## Page 106

1  Q.  All right.

2  A.  Maybe three nights.  And then sometimes

3  longer, sometimes less.

4  Q.  And what paid those bills?

5  A.  It wasn't Phoenix bill.  I don't know if

6  anybody paid them then.

7  Q.  You didn't pay them?

8  A.  No, I did not.

9  Q.  No.

10  Where else did you stay?  After you'd left

11  Phoenix where'd you start -- when you were work --

12  working with Vince down there now where are you stay?

13  A.  Where did I stay?  Huh.  I don't know the name

14  of the motel.

15  Q.  What state?

16  A.  It'd of been in Louisiana.

17  Q.  Not the same one you stayed when you were with

18  Phoenix?

19  A.  I may have.  I'm trying to remember, because

20  that's -- that -- that wasn't the only motel.

21  Q.  Who's paying the bills?

22  A.  It'd of been Vince.

23  Q.  Does Vince also pay you a salary?

24  A.  No.

25  Q.  Why not?

## Page 107

1  A.  Why would he?

2  Q.  Because you're doing work for him.

3  A.  What do you mean I'm doing work for him?

4  Q.  You just told me you were checking tanks for

5  him, you were --

6  A.  Yeah, I checked the tanks over there.  They're

7  above ground tanks.  They're not below ground -- ground

8  tanks.

9  Q.  And he doesn't pay you for that?

10  A.  No, I didn't.

11  Q.  Why do you go do it?

12  A.  He's a friend of mine.

13  Q.  How do you get back and forth from Florida to

14  Louisiana to do this for him?

15  A.  Well, I flew.

16  Q.  Who paid for the flight?

17  A.  Kate.

18  Q.  Why would Kate pay for a flight for you to go

19  over to Louisiana to check some tanks for Vince if

20  Vince doesn't -- not going to pay you for that?

21  A.  Because, actually -- well, I had a crushing

22  opportunity to do there.

23  Q.  Uh-huh.

24  A.  Is what I was going to do.

25  Q.  What happened?

## Page 108

1  A.  It never went through.

2  Q.  Who was the opportunity with?

3  A.  It was with Saint -- no, it's -- it may have

4  been Plaquemines.  It may been called Plaquemines

5  Parish.

6  Q.  What --

7  A.  The president of the thing is -- I know his

8  name.  His name's Billy Nungesser.

9  Q.  Billy Nungesser.  And Billy had some crushing

10  work that he wanted you to do?

11  A.  Right.

12  Q.  For his company, you think?

13  A.  No, it's not a company.  He's -- he's like the

14  president of that area.

15  Q.  So it's a political entity, the -- the parish?

16  A.  That's correct.

17  Q.  Yeah.  So it's -- and Billy Nungesser somehow

18  is involved with that parish?

19  A.  He's the main man.

20  Q.  Okay.  And he wanted to do some crush -- he

21  wanted you to do some crushing work, so you came out

22  and looked at it?

23  A.  That's correct.

24  Q.  And what happened?

25  A.  Well, I didn't -- I didn't have all the

Page 109

1     equipment.

2    Q.   So you didn't get the job?

3    A.   The job's still available if I could get the

4    equipment, that is correct.

5         I have a job in Bellaire, Ohio to do right now

6    if I had the equipment.  I could start on it tomorrow.

7    I know I'm going back down Saturday to talk to Roger

8    Barrick.  That's how -- that's where the Jumbo Eagle

9    is.

10   Q.   All right.

11   A.   That's why I asked you on the telephone if --

12   if I could raise $50,000 and you let me use that

13   crusher, I'll have Roger make the payments directly to

14   you and I can get that done.

15   Q.   You never mentioned anything like that to me.

16   A.   No, I asked you if I -- if you'd take $50,000

17   and I could get the crusher.

18   Q.   All right.  In any event, so you -- you went

19   down to this parish that you can't remember the name

20   of --

21   A.   No, I told you the name.  I -- it's Billy

22   Nungesser.

23   Q.   That's the name of the guy but you don't

24   remember the name of parish.

25   A.   I don't.  It's --

Page 110

1    Q.   All right.

2    A.   It's at the end of -- it's way down at the

3    end.

4    Q.   All right.  And because you don't have the

5    equipment you didn't do -- can't get the job yet?

6    A.   That's correct.

7    Q.   And your wife paid for that flight?

8    A.   That's correct.

9    Q.   You flew commercial that time?

10   A.   Yes, sir.

11   Q.   All right.  What other business have you done

12   in that Louisiana/Mississippi area?

13   A.   I don't know of any of them.

14   Q.   Well, what business did you do with Retif Oil?

15   A.   What did I do with Retif Oil?

16   Q.   Yes.

17   A.   I don't do anything.  Vince did the work for

18   Retif Oil.

19   Q.   What did Vince do with Retif Oil?

20   A.   That's where he bought his oil from.

21   Q.   What kind of oil does he buy?  Wholesale, you

22   mean?

23   A.   Oil where he was at the pit and oil for the

24   bulk plant.

25   Q.   All right.  So that's who he buys from.

Page 111

1    A.   Uh-huh.

2    Q.   What about ATP Gas, what business have you

3    done with them?

4    A.   Who is it?

5    Q.   ATP Gas.

6    A.   I never heard of ATP Gas.

7    Q.   Mr. Guizerix, G-u-i-z-e-r-i-x.

8    A.   That's APG you mean.

9    Q.   APG.  Sorry.

10   A.   Yeah.  It's not ATG.

11   Q.   Sorry.  APG.  What about them?

12   A.   That's -- that is APG.  That's the bulk plant.

13   Q.   That Vince buys his oil from?

14   A.   No.  That's who -- that's who he bought the

15   company from.

16   Q.   Oh, he bought it from them.  So Vince bought

17   it from them?

18   A.   Right.

19   Q.   And what did you have to do with that?

20   Anything?

21   A.   What do you mean what did I have to do with

22   it?

23   Q.   What involvement did you have in Vince's

24   purchase of APG Gas?

25   A.   Just went over everything with him when he was

Page 112

1    buying it.

2    Q.   What do you mean by that?

3    A.   Just what I said.  I mean --

4    Q.   What do you -- what did you go over?

5    A.   I used to have an oil company.

6    Q.   Yes.

7    A.   I used to own Belmont Oil.

8    Q.   Yes.

9    A.   Okay.

10   Q.   So what'd you go over?

11   A.   Well --

12   Q.   Books?

13   A.   No.

14   Q.   Records?

15   A.   We went over the tanks to make sure -- I'm

16   not -- I'm not a book kind of guy.

17   Q.   All right.

18   A.   I'm a hands-on kind of guy.

19   Q.   I'm still trying to figure out what you went

20   over with him.

21   A.   Chair -- you're trying to make it look like

22   I'm --

23   Q.   No, I'm trying --

24   A.   Yeah, you --

25   Q.   -- to say what did you do when you say you

TAHYI VIDEO & COURT REPORTING, LTD.
(800) 526-6508   (740) 454-7157

| Page 113 | Page 115 |
|---|---|
| 1   went over things? | 1   A.   In Mississippi. |
| 2   A.   Well, I mean, made sure that the tanks was | 2   Q.   On? |
| 3   okay, the electrical, what he was going to need, and | 3   A.   Everything -- all is at that address you said. |
| 4   things like that. | 4   Q.   In Picayune, Mississippi? |
| 5   Q.   Who signed the deal to buy APG Gas? Who was | 5   A.   That's correct. |
| 6   going to buy it? | 6   Q.   Off of Highway 59? |
| 7   A.   What do you mean who signs the deal? | 7   A.   That's correct. |
| 8   Q.   Well, Vince is going to buy APG Gas, according | 8   Q.   Exit 4? |
| 9   to you. | 9   A.   I don't know. |
| 10   A.   It is APG. | 10   Q.   That's where you were storing the Hazemag |
| 11   Q.   All right. And he's going to buy it? | 11   crusher; right? |
| 12   A.   He bought it. | 12   A.   That's where the Hazemag crusher was at, |
| 13   Q.   And he bought it from who? | 13   getting painted and cleaned. |
| 14   A.   APG. He bought everything from APG. | 14   Q.   Why were you storing the Hazemag crusher |
| 15   Q.   Who was APG? Who was the individual; | 15   there? |
| 16   Mr. Guizerix? | 16   A.   Because I was going to do that job down on the |
| 17   A.   Yes. | 17   parish. |
| 18   Q.   All right. | 18   Q.   Okay. How long had it been there? |
| 19   A.   If that's his name. | 19   A.   We just pulled it there. It wasn't there -- |
| 20   Q.   All right. So Vince is going to buy it from | 20   Q.   Days? Weeks? |
| 21   Guizerix? | 21   A.   No, it was longer than that, because I had |
| 22   A.   Vince did buy it. | 22   them scrape it, clean it, paint it. |
| 23   Q.   All right. Is there a written document that | 23   Q.   How'd you get it there? |
| 24   exists? | 24   A.   Pulled it. |
| 25   A.   I don't know. | 25   Q.   With what? |

| Page 114 | Page 116 |
|---|---|
| 1   Q.   You don't know anything about that? | 1   A.   Tractor/trailer. |
| 2   A.   The written -- what -- what Vince has? | 2   Q.   Whose? |
| 3   Q.   Correct. | 3   A.   Continental's. |
| 4   A.   I don't know what Vince has. | 4   Q.   Where's that tractor/trailer now? |
| 5   Q.   All right. So how long ago did he buy this? | 5   A.   Picayune, Mississippi. |
| 6   A.   Maybe three months ago. | 6   Q.   Where at in Picayune? |
| 7   Q.   Okay. And -- | 7   A.   Somebody broke all the glass out of it. It is |
| 8   A.   I could be wrong. It could have been four. | 8   in the Picayune, Mississippi auto place. |
| 9   Q.   All right, that range. Couple, three, four | 9   Q.   What auto place? |
| 10   months ago? | 10   A.   It's like six buildings up. |
| 11   A.   Or six. I -- I'm not for sure. | 11   Q.   From the gas station? |
| 12   Q.   All right. Was there a gas station associated | 12   A.   Yes. It's a 1996 Freightliner. |
| 13   with that as well? | 13   Q.   Where'd you get it? |
| 14   A.   That is the bulk plant. | 14   A.   Oh, where did that come from? I've had it. |
| 15   Q.   No. I'm mean a place where people can pull up | 15   Q.   How long? |
| 16   and buy gas. | 16   A.   Couple years. |
| 17   A.   Yeah, that's the bulk plant. | 17   Q.   Well, it's not something you told me about on |
| 18   Q.   All right. So people can buy -- can come up | 18   September 18th, 2006, when I took your deposition so. |
| 19   to the bulk plant and they can buy gas for their car? | 19   A.   Okay, then it'd of been after that. |
| 20   A.   That's correct. | 20   Q.   Where'd you get it? |
| 21   Q.   All right. And -- | 21   A.   I got it from -- I don't know. I -- I -- you |
| 22   A.   And a car wash there, too. | 22   have to look on the title. |
| 23   Q.   All right. | 23   Q.   Where's the title? |
| 24   A.   The car wash is broke. | 24   A.   The title's in the glove box. |
| 25   Q.   Where's it located? | 25   Q.   Whose name is it in? |

Page 117

1  A.  Continental Industries.
2  Q.  Does Continental Industries own anything else?
3  A.  Continental Industries owns the -- the truck.
4  There's a conveyor.
5  Q.  Where's that at?
6  A.  In Mississippi.
7  Q.  Where at?
8  A.  Or no, it's -- it's Louisiana, over there.
9  Q.  Where at?
10 A.  It's in a field.  I -- I --
11 Q.  Where?
12 A.  I don't know the name of the place over there.
13 Q.  Louisiana is a big state, sir.
14 A.  I know it's -- but it's close to around there.
15 It's all in that area.
16 Q.  What kind of conveyer is it?
17 A.  It's a 50-30 stacker.
18 Q.  Where'd you get it?
19 A.  Some fab -- fabrication, and we -- we built a
20 lot of it on it.
21 Q.  Where did you get it?
22 A.  Well, we got it -- I got it in Florida.
23 Q.  Where?
24 A.  I don't know the name of the place.  It's --
25 it's called Metal Fabrication or something stamped on

Page 118

1  the side of it.
2  Q.  Who'd you buy it from?
3  A.  That company, but it's at -- you got to
4  remember, this is a conveyer that -- it's just a piece
5  and then we built it to our needs.  You know, like I go
6  to the scrap yard and get metal and things like that.
7  That's what it is.
8  Q.  Where did you buy the original piece from?
9  A.  I don't know the name of that guy.
10 Q.  How'd you get it to Louisiana?
11 A.  We hauled it.
12 Q.  With what?
13 A.  The Freightliner.
14 Q.  You got a trailer for the Freightliner?
15 A.  I do not have a trailer for the Freightliner.
16 Q.  Well, then how'd you get the conveyor on?
17 A.  I used Steve's trailer.
18 Q.  Steve who?
19 A.  Pastor.
20 Q.  Who's that?
21 A.  He's a friend of mine that has the property in
22 Bridgeport.
23 Q.  Bridgeport?
24 A.  Ohio.
25 Q.  What -- what -- what -- where in Bridgeport,

Page 119

1  Ohio does Steve Pastor have anything?  A company there?
2  A.  National Road.  He's like 9 -- 89 years old.
3  Q.  But he's got equipment that you use?
4  A.  I use -- yeah, I use his -- I used his
5  equipment a lot.
6  Q.  What else does Continental own?
7  A.  Continental -- Continental don't own anything.
8  United Waste still has stuff.
9  Q.  Well, we were talking about Continental
10 Industries and you told me they own a 1996 Freightliner
11 and this 50-30 stacker.  What else do they have?
12 A.  I -- I think that's all.
13 Q.  So we were talking about ATP Gas -- or, I'm
14 sorry, APG Gas in this purchase that was made by Vince.
15 Did Vince pay the individual that he bought it from for
16 the APG Gas?
17 A.  I don't know what Vince would of paid.
18 Q.  You didn't have anything to do with that?
19 A.  For the money transaction between them and
20 Vince, no.
21 Q.  Did you have anything to do with operating the
22 gas station?
23 A.  No.  I told him what to do.
24 Q.  Did you tell him to cut the gas by 10 -- 10
25 cents a gallon?

Page 120

1  A.  I told him to charge what -- whatever they
2  paid for it to get customers in there.
3  Q.  Uh-huh.  And then you told him to charge it
4  cash only; right?
5  A.  Excuse me?
6  Q.  You told -- you told that the customers had to
7  pay cash only; right?
8  A.  Well, no, that's not true.  Vince wasn't setup
9  to do credit cards.
10 Q.  Oh, so that's why you did cash only?
11 A.  It's always been cash only, I believe.
12 Q.  So --
13 A.  But there was other people like charge card.
14 There were charge accounts there Vince let charge.  For
15 example, Phoenix.
16 Q.  So these -- Vince buys the gas station, takes
17 cash only from the customers.  What happened to the
18 cash?
19 A.  Everything went to the bank, I would assume.
20 Q.  What bank?
21 A.  Right there in Picayune, Mississippi.
22 Q.  Which bank?
23 A.  If you're at the -- if you're at the oil
24 company --
25 Q.  Uh-huh.

Page 121

1　A.　-- if you was standing right in front of the
2　oil company and go straight up that road, it's on the
3　left-hand side.
4　Q.　What's the name of it?
5　A.　I don't know the name of it.
6　Q.　How do you know that he -- he banks there?
7　A.　I'm sorry?
8　Q.　How do you know that Vince banks at that place
9　in Picayune, Mississippi that you just described?
10　A.　How do I know that?
11　Q.　Yeah.
12　A.　Because I rode over there with him.
13　Q.　How long did he operate, --
14　　　MR. BECKER:　We need to go off the record
15　because he needs to change the tape.
16　　　THE WITNESS:　Okay.
17　　　VIDEOGRAPHER:　We're going off the record
18　at 2:48:49.
19　　　　- - -
20　　　Off the record.
21　　　　- - -
22　　　VIDEOGRAPHER:　We're going back on the
23　record at 3:06:27.　Go right ahead.
24　BY MR. BECKER:
25　Q.　We were talking about this purchase of the gas

Page 122

1　station by Mr. Promuto and your involvement in helping
2　him with that.　And you were telling me that customers
3　were paying cash.
4　A.　Or check.
5　Q.　Or check.　And your assumption is that
6　Mr. Promuto took all that money to the bank down the
7　road from the gas station?
8　A.　That's correct.
9　Q.　Because you'd been to that bank with him
10　before?
11　A.　That's correct.
12　Q.　You didn't get any money from this?
13　A.　Absolutely not.
14　Q.　Nothing?
15　A.　Absolutely not.
16　Q.　Not a dime?
17　A.　Not a dime.
18　Q.　Okay.　And you had -- were you pumping gas?
19　A.　No.　They pump their own.
20　Q.　Well, was you there taking the cash from the
21　people?
22　A.　No.
23　Q.　You didn't work that gas station?
24　A.　I did not take no cash from that gas station.
25　Q.　Did you work the gas station?

Page 123

1　A.　I -- make it in a different way, please.
2　Q.　Well, tell me what you did.
3　A.　I did -- I checked the tanks, checked the
4　electrical and things like that.　That's what I did.
5　Q.　If a customer came in and pumped his gas and
6　came in to pay for it did you take the money?
7　A.　Absolutely not.
8　Q.　You didn't run the cash register?
9　A.　No.
10　Q.　Nothing to do with that?
11　A.　No.
12　Q.　Who's Robert Couvillion, C-o-u-v-i-l-l-i-o-n?
13　A.　He's supposedly -- I'm only going by what I
14　was told -- supposedly be the head of security and
15　bodyguard for Ron and Paul at Phoenix.
16　Q.　Have you met him?
17　A.　Oh, yeah.
18　Q.　What was your interaction with him?
19　A.　What do you mean what was my interaction?
20　Q.　You met him.　What -- why did you meet him and
21　what -- what happened?
22　A.　Well, because he -- he was at the office -- or
23　supposedly -- and Ron's wife's bodyguard.
24　Q.　So that's -- but you just said hi to the guy
25　and that's it?

Page 124

1　A.　I didn't do any dealings with him.
2　Q.　No dealings with him?
3　A.　No.
4　Q.　No conversations with him --
5　A.　Oh, I had conversation.
6　Q.　-- about your background?
7　A.　Excuse me?
8　Q.　About your background?
9　A.　About my background?
10　Q.　Yes, sir.
11　A.　No.　It was between Paul and Ron.
12　Q.　You never talked to Bobby about it?
13　A.　No, I didn't.
14　Q.　What about Dawn Schlicher, who's that?
15　S-c-h-l-i-c-h-e-r?
16　　　MR. SCHNITTKE:　Is that a man, or a woman?
17　　　MR. BECKER:　It's a woman.　Dawn
18　Schlicher.
19　A.　Oh, Dawn works at Phoenix.
20　Q.　Yeah.　Who is she?
21　A.　She worked at Phoenix.
22　Q.　What interaction did you have with Dawn?
23　A.　What do you mean what interaction did I have
24　with Dawn?　I had no interaction.
25　Q.　No intersection with Dawn?

## Page 125

1    A.    She worked at Phoenix.

2    Q.    All right.

3    A.    She quit Phoenix because of whatever Phoenix

4    was doing.  She did payroll.

5    Q.    How do you know her?

6    A.    Because she worked at Phoenix.

7    Q.    All right.  Phoenix is a big place.  You know

8    everybody that works at Phoenix?

9    A.    Well, Pat at the front desk.  Ron sat in the

10   back.

11   Q.    All right.  Did Dawn ever give you any

12   information about any banking or credit information on

13   Phoenix?

14   A.    Never.

15   Q.    Never passed you any information?

16   A.    Absolutely not.

17   Q.    You never worked with Dawn to make

18   arrangements to obtain money from Phoenix or their bank

19   accounts?

20   A.    I'll --

21          MR. SCHNITTKE:  Before you answer that

22   question let me talk -- can I talk to him off the

23   record?

24          MR. BECKER:  Sure.

25          VIDEOGRAPHER:  We're going off the record

## Page 126

1    at 3:09:39.

2          - - -

3          Off the record.

4

5          VIDEOGRAPHER:  We're going back on the

6    record at 3:14:57.  Go right ahead.

7    BY MR. BECKER:

8    Q.    We were talking about Dawn Schlicher and what

9    you've been doing with Dawn.

10   A.    I believe you asked me if she gave me any

11   records or anything for Phoenix.

12   Q.    Yes.

13   A.    And the answer is no.  Before I answer --

14   answer anymore questions regarding Phoenix -- I'm not

15   going to answer anymore until Attorney Mike Fowler

16   calls me back.

17   Q.    Well, we'll put that on hold for now.

18          Let's talk about Colorado, in terms of the

19   payments that have been made out there.  You've paid

20   them, as I understand it, $250,000 since about

21   September of '07; correct?

22   A.    I didn't pay them.  My wife paid them.

23   Q.    Well, how did that occur?  What account did

24   she pay it out of and where did it go to?

25   A.    It went out of her account.

## Page 127

1    Q.    Which account?

2    A.    I don't know.  I -- I don't know what account

3    she took it out of.  It's her money.

4    Q.    All right.  Did she wire it?  Did she send

5    them a check?  Did she send --

6    A.    Oh, she --

7    Q.    -- cash?

8    A.    She -- it was a bank to bank.

9    Q.    So a bank to bank and from one -- which bank

10   does she bank at?

11   A.    Regions.

12   Q.    Regions.  All right.  So from Regions Bank a

13   wire goes to where?

14   A.    To the -- Eric.

15   Q.    Your lawyer in Colorado?

16   A.    Correct.

17   Q.    Why'd you do it that way?

18   A.    Because I had -- had to make 50,000 payments.

19   Q.    Well, why didn't you just pay it directly to

20   the clerk in Colorado?

21   A.    I don't know.

22   Q.    Well, you did that for the first four

23   transactions.  So the first $200,000, in $50,000

24   increments, you wired your -- there was a wire

25   transaction that went from -- you're saying -- your

## Page 128

1    wife's Regions' account to your Colorado lawyer, Eric

2    Knouse's account, and then Eric's account would wire it

3    to the clerk in Colorado; correct?

4    A.    If that's the way it went.

5    Q.    But then the last $50,000 payment you didn't

6    do it that way.  Why not?

7    A.    I don't know.

8    Q.    Where did it -- how did it occur the last

9    time?  Where did it go -- where did it come from and

10   where did it go to?

11   A.    It came from my wife.

12   Q.    All right.  Same Regions account?

13   A.    I would assume.

14   Q.    All right.  Where -- where did it go to?

15   A.    To wherever it was supposed to go to.

16   Q.    Why didn't it go to Eric's?

17   A.    I don't know that.

18   Q.    Well, who directed it?

19   A.    Excuse me?

20   Q.    Who made the decision on about where to send

21   it?

22   A.    I don't know.

23   Q.    People are just paying $50,000 on your behalf

24   and you don't know anything about it?

25   A.    Yeah, it was to reduce my -- the monies that I

| Page 129 | Page 131 |
|---|---|

**Page 129**

1 agreed to pay them.

2 Q. Oh, I understand. It's due -- it's to go to

3 pay the restitution of the $500,000 plus that you owe

4 out in Colorado. But you're telling me, as you sit

5 here today under oath, that a $50,000 payment went from

6 your wife's account and you don't know where it went or

7 why it went that way?

8 A. If that's the way we was directed to do it

9 that's the way we did it.

10 Q. Well, the first four payments went to your

11 lawyer. I --

12 A. Okay.

13 Q. -- want to know why the last one didn't go to

14 your lawyer.

15 A. I don't know why.

16 Q. Well, who made the decision?

17 A. I -- I don't know.

18 Q. When's your payments due?

19 A. I don't know that, either. Eric will call me

20 and tell me.

21 Q. You were in the courtroom when it was ordered;

22 right? The judge was talking to you; right?

23 A. I was in a courtroom?

24 Q. Yes, when you got sentenced.

25 A. I got sentenced?

**Page 131**

1 A. Okay.

2 Q. Did you pay your 25 -- or your $50,000 today?

3 A. There -- there's --

4    MR. SCHNITTKE: Tell him what happened.

5 It's not going to hurt you.

6 A. I don't owe them nothing.

7 Q. What do you mean you don't owe them nothing?

8 A. They was paid off.

9 Q. When?

10 A. Yesterday.

11 Q. How?

12 A. My wife paid them off.

13 Q. How?

14 A. What do you mean how?

15 Q. Where did the money come from?

16 A. From her.

17 Q. Where? From her Regions' account?

18 A. Yes.

19 Q. How much did she pay?

20 A. Whatever the balance was.

21 Q. Who did she pay it to?

22 A. To -- to the people.

23 Q. Who?

24 A. I -- I don't know. It was paid off.

25 Q. You got any documents to that affect?

**Page 130**

1 Q. Yes, sir, in Colorado.

2 A. Okay.

3 Q. I'm reading the Colorado minutes from that

4 transaction.

5 A. I didn't get sentenced. I got probation.

6 Q. That's part of your sentence. And you were

7 also ordered to pay restitution; right?

8 A. Well, you just said that I got sentenced.

9 Q. Sentenced. Your sentence was you --

10 A. I got probation.

11 Q. -- got jail time.

12 A. No, I didn't.

13 Q. Let me finish my question, okay.

14 They sentenced you to jail, but then they said

15 we won't send you to jail as long as you pay the

16 restitution and do the other things that we require.

17 A. That's correct.

18 Q. All right. And when they told you all that

19 they also told you that your payments were due on the

20 25th of each month; right?

21 A. I don't know what the dates was, no, because

22 Eric would call and say when a payment had to be made.

23 Q. Well, it says right here it's due on the 25th

24 of each month. And that's today; right? Today's

25 January 25th.

**Page 132**

1 A. I don't, but I'm sure that I can get some.

2 Q. You didn't bring any of those documents, even

3 though that's a debt that you owe; right? It's not

4 your wife's debt; right? You owe --

5 A. That's correct.

6 Q. -- that money.

7 And she paid it for you.

8 A. That's correct.

9 Q. Along with all these other payments.

10 A. Correct.

11 Q. And we've asked for those documents and you

12 didn't bring any of them.

13 A. Why would I get a document?

14 Q. Because you didn't -- because you're required

15 to, sir.

16 A. I said where -- where would I get the document

17 from?

18 Q. From your wife. The one that's paying the

19 $500,000 for you.

20 A. I understand that.

21 Q. Well, why didn't you bring it to me?

22 A. I didn't know I was supposed to bring that

23 document.

24 Q. We will reconvene this deposition then when

25 you have the records that we're entitled to see.

| Page 133 | Page 135 |
|---|---|

**Page 133**

1   A.   What's that mean?
2   Q.   That means we'll come back and do this again
3 when you bring me the records so I can look at them.
4   A.   Okay. If you get me a list of what to get.
5   Q.   I did give you a list.
6   A.   But I -- I -- I can't read. If --
7   Q.   Your lawyers can. Both of them. And they
8 both have it. And they've had it for quite a while.
9   A.   Okay, I'm unaware. I will show it -- if you
10 will give it to me I will have it faxed to you.
11   Q.   Your lawyer already has it. I don't need to
12 give it to you.
13   A.   Okay.
14   Q.   He's got it already.
15       Let's keep going. So you're telling me right
16 now that you no longer owe any money in restitution in
17 Colorado?
18   A.   That's correct.
19   Q.   You're still on probation?
20   A.   That's correct.
21   Q.   Who's your probation officer?
22   A.   I don't know yet. They haven't assigned it
23 yet.
24   Q.   You've been dealing with Mary Totho; right?
25   A.   Yes.

**Page 134**

1   Q.   All right. And you had an interview with her;
2 right?
3   A.   That's correct.
4   Q.   Why weren't you allowed to leave Colorado?
5   A.   What do you mean why wasn't I allowed?
6   Q.   Last week, you said you couldn't leave
7 Colorado. Why not?
8   A.   Because I had to have -- they couldn't give me
9 a travel permit until either -- I could either come
10 to -- for Ohio, to be in -- my probation, come to Ohio,
11 or stay in Colorado.
12   Q.   And Ohio rejected you; right?
13   A.   Ohio didn't accept me.
14   Q.   All right. So what's your status right now on
15 probation? Do you have to go back to Colorado?
16   A.   Yes.
17   Q.   When do you have to be back?
18   A.   As of right now I have to be back on this date
19 (indicating).
20   Q.   Which is?
21   A.   Here (indicating).
22   Q.   I'm looking at your travel permit. Says
23 you're leaving January the 28th, 2008, and you're
24 returning February 1st, 2008. So you're going back to
25 Colorado on February 1st --

**Page 135**

1   A.   I -- I have to.
2   Q.   -- by that date?
3   A.   Yes.
4   Q.   But usually -- they're going to let you do a
5 layover in Tampa, Florida. So you're going back home
6 first?
7   A.   That's correct.
8   Q.   Did you go home on the way here, or did you --
9 are you going home on the way back?
10   A.   I went home on the way up and I'm going home
11 on the way back.
12       MR. BECKER: Can we get a copy of that
13 later?
14       MR. SCHNITTKE: (Nods affirmatively.)
15       Can I have that? Better keep it out.
16       THE WITNESS: What's that.
17       MR. SCHNITTKE: I'll make -- I'll make a
18 copy for him.
19   Q.   Who's paying your cell phone bills?
20   A.   It's my wife's.
21   Q.   So the bills go to the house?
22   A.   That's correct.
23   Q.   What --
24   A.   I assume.
25   Q.   What bill -- what provider?

**Page 136**

1   A.   Nextel.
2   Q.   And how are you going to do the job in
3 Bellaire, Ohio if you're going to be in Colorado?
4   A.   Because Eric is filing a whatchamacallit --
5 some kind of paperwork for me to come to Ohio to do
6 this job, as it says on my paperwork, to make
7 restitution for Ohio and to get the bank paid.
8   Q.   So --
9   A.   That was the terms and conditions.
10   Q.   So the deal was, is as long as you pay off
11 everything you owed in Colorado they'd let you leave?
12   A.   That's not the deal, no.
13   Q.   I mean, why'd you pay them off?
14   A.   What do you mean why'd I pay them off?
15   Q.   Why'd you pay them all that money yesterday
16 instead of continuing to pay them $50,000 a month?
17   A.   Because I want to get everything behind me and
18 live a normal life again.
19   Q.   Why didn't you pay us?
20   A.   I'm going to. I'm trying -- I just asked
21 Mr. Danford, as he's been very cooperative, how the
22 breakdown was, and he was explaining it to me, and what
23 I need to do to get a piece of machinery back, and how
24 much that I could pay you and get moving forward. And
25 Mr. Danford's in the room right now and I've asked that

Page 137

1  multiple times.
2  Q.  Well --
3  A.  And that was the terms and conditions.
4  Q.  My point is -- my question is, you've owed
5  me -- my client this money for quite some time.  You've
6  not paid a dime on it.  And yet, you've paid -- coming
7  into today I thought you'd paid $250,000 to Colorado.
8  Now I understand you've paid probably over $500,000 to
9  Colorado.  And yet, you still haven't paid us a dime.
10  My question to you is, why would you pay
11  Colorado $250,000 yesterday, supposedly, or more, when
12  you could of just paid them $50,000 a month, like you
13  have been for the past four months?  Why'd you do that?
14  A.  Because I want to get everybody paid off.
15  Q.  It's not got anything to do with the fact that
16  that's how you can get released from staying in
17  Colorado?
18  A.  No.
19  Q.  Okay.
20  A.  Not to my knowledge.
21  Q.  So --
22  A.  I have to be back here on February 1st -- or
23  February something with Sam.
24  Q.  To be sentenced in the Franklin County, Ohio
25  case?

Page 138

1  A.  That's correct.
2  Q.  And then you have a trial in March in Licking
3  County, Ohio; right?
4  A.  That's correct.
5  Q.  So when are you going to pay us the $367,000
6  plus interest that you owe us because you want to get
7  all this behind you?
8  A.  I -- that's why I was asking Mr. Danford if he
9  would workout some kind of -- of arrangement so I can
10  get a machine --
11  Q.  Why don't --
12  A.  -- and get --
13  Q.  -- you just pay us cash like you did Colorado?
14  You paid Colorado $250,000 yesterday.  Why -- why can't
15  your wife just pay us?
16  A.  Because there's not that much left.
17  Q.  How much is left?
18  A.  I don't know exactly how much she has left.
19  Q.  Where's she getting the money?
20  A.  She makes pretty good money.
21  Q.  So she's getting it out of her earnings from
22  her businesses?
23  A.  And her -- she cashed some stock of hers.
24  Q.  Uh-huh.  Anyplace else?
25  A.  That's all I know of.

Page 139

1  Q.  Has she mortgaged the house that you're living
2  in?
3  A.  Her house already has a mortgage on it.
4  Q.  Did she add any other -- has she put a
5  mortgage on the house --
6  A.  Yes.
7  Q.  -- in addition --
8  A.  Yes.
9  Q.  -- since you've been married?
10  A.  Yes.
11  Q.  How much?
12  A.  No.  Since we've been married?
13  Q.  Yes.
14  A.  I don't know.  Yes, yes, there was.
15  Q.  How much?
16  A.  I'm not for sure.
17  Q.  When?
18  A.  I don't know the exact date of that, either.
19  Q.  Within the last couple months?  Within the
20  last year?
21  A.  It's been within the last year.
22  Q.  How many mortgages are on the house now?
23  A.  Two.
24  Q.  What's the total?
25  A.  I -- I don't know.

Page 140

1  Q.  What vehicles do you own?
2  A.  I don't own any.
3  Q.  Which does she own?
4  A.  She has a BMW.
5  Q.  What kind?
6  A.  What's that?
7  Q.  What kind?
8  A.  740.
9  Q.  What year?
10  A.  '94.
11  Q.  What else?
12  A.  Oh, wait, wait.  It -- it might be a 2004.
13  Q.  What else?
14  A.  A Kia.
15  Q.  Who drive that?
16  A.  Her daughter.
17  Q.  What else?
18  A.  Personal vehicles?
19  Q.  Any vehicles that she owns or her company
20  owns.
21  MR. SCHNITTKE:  Mr. Becker, I'm going to
22  object to her -- what she owns and what her company
23  owns.  She's not a defendant in this case.
24  MR. BECKER:  All right.
25  Q.  What car do you drive?

| Page 141 | Page 143 |
|---|---|
| 1 A. Whatever one I want to get in. | 1 apart of the situation in Licking County. |
| 2 Q. Then I want to know what -- | 2 MR. SCHNITTKE: Claiming the fifth on |
| 3 MR. SCHNITTKE: Okay. | 3 this? |
| 4 Q. -- all she owns. | 4 THE WITNESS: Yes. |
| 5 A. Okay. I mean, I drive -- I drive the BMW. | 5 Q. So something -- something out of the Corvette |
| 6 Q. What else do you drive? | 6 that you were driving has something to do with Licking |
| 7 A. The white pickup. | 7 County, the criminal charges that are pending against |
| 8 Q. What kind of white pickup? | 8 you? |
| 9 A. 2007. | 9 A. That's correct. |
| 10 Q. What kind? | 10 Q. What about the Tahoe -- |
| 11 A. Ford. | 11 A. Same thing. |
| 12 Q. Ford? | 12 Q. -- what'd you do with it? What'd you do with |
| 13 A. F-150. | 13 it? |
| 14 Q. What else do you drive? | 14 A. I'm -- I'm not -- I'll plead the fifth. |
| 15 A. That's pretty much it. | 15 Q. No, you don't get to plead the fifth on what |
| 16 Q. And your son drives a pickup up here? | 16 you did with it. |
| 17 A. Yes. | 17 A. Yes, I do. I'm not answering any question -- |
| 18 Q. What kind is that? | 18 I'll call Sam Shamansky. |
| 19 A. Ford F-250. | 19 Q. Call him up. |
| 20 Q. What year? | 20 A. Because I -- he told me not to answer no |
| 21 A. 2000 and -- I don't know what year -- the | 21 questions of that. |
| 22 ending of it is. | 22 MR. SCHNITTKE: Mr. Becker, I'm not |
| 23 Q. Does your son drive anything else? | 23 familiar with this. |
| 24 A. No. | 24 MR. BECKER: I understand. |
| 25 Q. What'd you do with the vehicles that you had | 25 THE WITNESS: Hi, this is Mike, and I'm in |

| Page 142 | Page 144 |
|---|---|
| 1 back in '06 that he was driving and you were driving? | 1 a deposition. Is Sam available real quick? All right, |
| 2 A. Which ones? | 2 thanks. |
| 3 Q. Which ones did you have? | 3 Sam, they're asking me questions about the |
| 4 A. I don't -- I don't know. If you ask -- if you | 4 Corvette and stuff and I'm here at the deposition, and |
| 5 tell me, I -- I'll ask. | 5 that's apart of the stuff in Licking County. |
| 6 Q. You don't know which vehicles you had in 2006 | 6 Okay. Are you asking where it is? |
| 7 before you met your current wife? | 7 MR. BECKER: No. I want to know what you |
| 8 A. The only two vehicles I had was the Corvette | 8 did with it. |
| 9 and the Tahoe. | 9 THE WITNESS: He wants -- he wants to know |
| 10 Q. What -- what year was the Corvette? | 10 what I did with it and -- yeah, it's gone. |
| 11 A. '0 -- they're both the same. I think it's '05 | 11 MR. BECKER: What'd you do with it? |
| 12 or so. I -- I don't know, just whatever -- | 12 THE WITNESS: It's gone. That's -- okay. |
| 13 Q. What'd you do with them? | 13 I gave it back. It went back to Jim -- well, I mean -- |
| 14 A. Trade -- the Corvette got traded in. | 14 okay. Okay. I -- I just wanted -- okay. Thanks, Sam. |
| 15 Q. What'd you get for it? | 15 Bye-bye. |
| 16 A. The payoff, which I think was like thirty | 16 Q. So where'd it go? |
| 17 some, 40,000. Whatever the payoff was. | 17 A. It went to -- it was traded in. |
| 18 Q. So you just gave the car back? | 18 Q. What'd you get for it? |
| 19 A. What's that? | 19 A. Whatever the payoff was. |
| 20 Q. You just gave them the car back in exchange | 20 Q. So that -- |
| 21 for not having to make any more payments? | 21 A. And I don't know what the payoff was. |
| 22 A. That's correct. | 22 Q. So you -- you gave the car back in exchange |
| 23 Q. Where'd you get the Corvette? | 23 for not having to make any further payments? |
| 24 A. Coughlin. That's apart of this -- I -- I'm | 24 A. No, I gave the car back, they paid it off. |
| 25 not answering anymore questions, that -- because that's | 25 And in -- in exchange Kate bought the 2007 pickup. |

Page 145

| | |
|---|---|
| 1 | Q. And put it in her name? |
| 2 | A. Her company. |
| 3 | Q. Which company? |
| 4 | A. Tristar. |
| 5 | Q. What'd you do with the boat that you had at |
| 6 | the lake house in Buckeye Lake? |
| 7 | A. What boat? |
| 8 | Q. That one (indicating). |
| 9 | A. That's my father's. |
| 10 | Q. Where's it at now? |
| 11 | A. It's in Florida. |
| 12 | Q. Your father's boat's in Florida. Where at in |
| 13 | Florida? |
| 14 | A. Clearwater, in storage. |
| 15 | Q. All right. |
| 16 | A. And it's not paid off yet. |
| 17 | Q. Where at? |
| 18 | A. In Clearwater. |
| 19 | Q. Where in Clearwater? Where's this -- what's |
| 20 | the name of the storage unit? Where's it at? |
| 21 | A. You Keep a Key, or whatever. |
| 22 | Q. You Keep the Key? |
| 23 | A. I don't know -- I don't know what the name of |
| 24 | it is. It's something storage. I can get you the name |
| 25 | of it if you need that. And if you write that down |

Page 146

| | |
|---|---|
| 1 | I'll get that for you. |
| 2 | Q. What else have you got stored there? |
| 3 | A. The boat. That's it. |
| 4 | Q. What happened to the -- the black vehicle in |
| 5 | the middle there? |
| 6 | A. That's the Tahoe. |
| 7 | Q. That's the one you -- the '05 that you gave |
| 8 | back that ended up Katie got the 2007 pickup for? |
| 9 | A. No. That was a Corvette. |
| 10 | Q. Well, I thought you said you got -- |
| 11 | A. No, no. You said the -- I told you the |
| 12 | Corvette was traded in and I got exactly what I owed on |
| 13 | it on a trade-in, and then Kate bought the 2007 pickup |
| 14 | truck. |
| 15 | Q. I thought she did that with the Tahoe? |
| 16 | A. No. The Tahoe I still have. |
| 17 | Q. Where's the Tahoe? |
| 18 | A. The Tahoe is in Columbus. |
| 19 | Q. Who's driving the Tahoe? |
| 20 | A. Vern. |
| 21 | Q. Who's title is it? |
| 22 | A. I'm sorry? |
| 23 | Q. Who's it titled in? Who owns it? |
| 24 | A. The bank. It's not paid off yet. |
| 25 | Q. Well, who's the title to the car? |

Page 147

| | |
|---|---|
| 1 | A. Either -- |
| 2 | Q. Whose name? |
| 3 | A. Probably American Aggregate or one -- whatever |
| 4 | that company name was. I don't know. |
| 5 | MR. BECKER: I want that vehicle. |
| 6 | MR. SCHNITTKE: The Tahoe? |
| 7 | MR. BECKER: Yeah. |
| 8 | A. You want what? |
| 9 | Q. I want the Tahoe. |
| 10 | A. It's not paid off. |
| 11 | Q. I don't care. I want the Tahoe. |
| 12 | A. Okay. Where do I take it to? |
| 13 | Q. I'll work it out with your counsel as soon as |
| 14 | we're done. |
| 15 | A. Okay. |
| 16 | Q. Anything else that you've got? |
| 17 | A. That's it. |
| 18 | Q. What about the houseboat that you had at one |
| 19 | time? Where'd that -- |
| 20 | A. What houseboat? |
| 21 | Q. Didn't you have a houseboat on the lake? |
| 22 | A. No. |
| 23 | Q. Okay. Have we talked about all of the |
| 24 | vehicles that you drive? |
| 25 | A. Yes. |

Page 148

| | |
|---|---|
| 1 | Q. And that your son drives? |
| 2 | A. I believe, yes. |
| 3 | Q. He's just got the pickup truck; right? |
| 4 | A. That's correct. |
| 5 | Q. How's that titled, the pickup truck that your |
| 6 | son drives? |
| 7 | A. Kate. |
| 8 | Q. Her personally, or one of her businesses? |
| 9 | A. It could be personally or business. |
| 10 | Q. You don't know which? |
| 11 | A. I don't know which. |
| 12 | Q. Do you know -- or do you owe money to Larry |
| 13 | Dimmit Cadillac? |
| 14 | A. Who? |
| 15 | Q. Larry Dimmit, D-i-m-m-i-t, Cadillac, in |
| 16 | Florida? |
| 17 | A. Not to my knowledge. |
| 18 | Q. What about to Rahdert, Steele, Bole & |
| 19 | Reynolds? R-a-h-d-e-r-t. Steele is S-t-e-e-l-e. Bole |
| 20 | is B-o-l-e. And Reynolds. |
| 21 | A. Who is that? |
| 22 | Q. Do you owe them money? |
| 23 | A. Who is it? What is it? |
| 24 | Q. They're in -- they're in -- I don't know. You |
| 25 | know anything about it? |

**Page 149**

1  A.   I -- I don't -- I don't know who it is,
2  either.
3  Q.   You wouldn't know why they've got a judgment
4  against you then?
5  A.   Who is it?
6  Q.   Rahdert, R-a-h-d-e-r-t, Steele, Bole &
7  Reynolds, PA.
8  A.   What's PA?
9  Q.   I don't know.  They claim you owe them $1,785,
10  and they have a judgment against you for that amount in
11  Pinellas County, Florida.
12  A.   For -- what is it?
13  Q.   $1,785.
14  A.   I don't know what it's for.
15  Q.   Who else do you owe money to?
16  A.   Tom Fitzgerald.
17  Q.   How much do you owe Tom Fitzgerald?
18  A.   A lot.
19  Q.   How much?
20  A.   I don't know.  I -- I -- I don't know how
21  much.
22  Q.   What do you owe him for?
23  A.   For the balance of Jiffy John.
24  Q.   So when you bought his business you still owe
25  him a balance on that?

**Page 150**

1  A.   Yes.
2  Q.   What else do you owe him?
3  A.   Back rent.
4  Q.   All right.  What else?
5  A.   And he loaned me money.
6  Q.   How much?
7  A.   Like twenty-some thousand, 25,000.  I don't
8  know what it --
9  Q.   All right.  What else?
10  A.   I think that's all.
11  Q.   What about the American Express that -- that
12  you used of his without his permission?
13  A.   That's not true.
14  Q.   You never used his American Express without
15  his permission?
16  A.   Without his permission?  I plead the fifth on
17  that.  That's in the case in Licking County.
18  Q.   Is the American Express that you used with
19  Fitzgerald the same one that you used in Mississippi or
20  Louisiana?
21  A.   No.
22  Q.   When's the last time you saw Tom Fitzgerald?
23  A.   It's been a while.
24  Q.   Months?  Years?
25  A.   It's been months, a lot of months.  Could have

**Page 151**

1  been a year.
2  Q.   What happened to the items that you were
3  storing at his facility on Mill Dam Road?
4  A.   That I was storing?
5  Q.   Yes.
6  A.   What do you mean?  It -- whatever was left
7  there is still there.
8  Q.   Well, there was a Mercedes convertible.  What
9  happened to that?
10  A.   I don't own that.
11  Q.   Whose was it?
12  A.   That's Tom's.  I don't own that backhoe,
13  either.
14  Q.   Who owns --
15  A.   You asked me who -- that's Tom's backhoe that
16  he had that -- way before I even bought the business.
17  Q.   All right.  So the backhoe was never yours?
18  A.   Nope.
19  Q.   And the Mercedes convertible was never yours?
20  A.   It was mine.  And way before this all happened
21  Tom got that.
22  Q.   Well how did he get it before this all
23  happened?  What do you mean?
24  A.   What do you mean what do I mean?  I -- I guess
25  I don't understand what you're saying.

**Page 152**

1  Q.   How did you -- where did you get the Mercedes?
2  A.   I got it at an auction.
3  Q.   All right.  And you titled it in your name,
4  right?
5  A.   Or a company's name that I had.
6  Q.   Then what'd you do with it?
7  A.   I took it to an auction.
8  Q.   All right.  What happened then?
9  A.   It only brought like $8500.
10  Q.   So what happened?
11  A.   And I brought it back.
12  Q.   All right.  So you didn't sell it at the
13  auction?
14  A.   I didn't sell it at the auction.
15  Q.   What'd you do with it?
16  A.   And Tom took some of the money off of the bill
17  for the Mercedes.  It has a busted trunk lid.
18  Q.   So did you give him the title?
19  A.   He's had the title.
20  Q.   In his name?
21  A.   I signed it when he told me to sign it.
22  Q.   When did you do that?
23  A.   That's been a long time ago.
24  Q.   Months?  Years?
25  A.   Years.

Page 153

1   Q.  What happened to the tractor depicted in that
2 photograph?
3   A.  That's not mine.
4   Q.  Whose is it?
5   A.  That belonged to -- I can't think of the guy's
6 name. He worked for me when I had Jiffy John.
7   Q.  That was never yours?
8   A.  No. I think that's a Peterbilt. That was
9 never mine.
10   Q.  In your earlier deposition you told us that
11 you sold the Jiffy John business to a lady in Columbus
12 or Chillicothe. You couldn't remember which.
13   A.  We didn't sell it. She was going to take it
14 over and run it.
15   Q.  Did she do that?
16   A.  They never did nothing. The commodes and
17 everything are still down at Tom's.
18   Q.  So you never got any money for her?
19   A.  I did not.
20   Q.  Do you hold any driver's license in any states
21 but Ohio?
22   A.  Huh?
23   Q.  Do you hold any driver's license in any state
24 but Ohio? You showed me your Ohio license.
25   A.  That's all I have.

Page 154

1   Q.  Do you have a CDL --
2   A.  I do.
3   Q.  -- commercial driver's license?
4   A.  Yes.
5   Q.  Do you have that with you?
6   A.  You just got -- I just gave them to you.
7   Q.  I didn't see a CDL.
8   A.  I have everything.
9   Q.  Look for it, because I didn't see it, and
10 maybe I missed it.
11   A.  I'm supposed to. I've had it since I first
12 got my driver's license.
13   Q.  That's your Ohio license.
14   A.  Yeah.
15   Q.  I'm asking you for a commercial driver's
16 license.
17   A.  That is it.
18   Q.  That -- that functions as a commercial
19 driver's license?
20   A.  Yeah. I can drive a tractor/trailer with
21 that.
22       MR. SCHNITTKE: Depends on the --
23   A.  And a motor vehicle.
24   Q.  You're right. The -- I didn't notice at the
25 top. It says commercial driver's license. That's

Page 155

1 fine.
2       Do you have any other driver's license?
3   A.  No. These are -- I can drive a
4 tractor/trailer with these.
5   Q.  I understand. I didn't see commercial
6 driver's license when I first looked at it.
7   A.  Oh. Okay.
8   Q.  I'm just asking whether you got any other
9 license in any other state?
10   A.  No.
11   Q.  You haven't lived in Ohio for several years.
12 Why, when you renewed your license in 2007, did you do
13 it in Ohio?
14   A.  I still have a -- I stay with my mom and dad.
15   Q.  But you're married. You live in Florida.
16   A.  But I'm allowed to live in more than one
17 place.
18   Q.  But your residence is in Florida; right? You
19 live with your wife?
20   A.  And I also can live with my mom.
21   Q.  You haven't lived in Ohio for several years
22 now; right?
23   A.  I still come back here.
24   Q.  Why did you, when you got a driver's license
25 in December of 2007, put it in Ohio?

Page 156

1   A.  Okay, you don't need to insult me.
2   Q.  I'm asking the question. Why didn't you do it
3 in Florida, where you live?
4   A.  You know why.
5   Q.  No, I don't.
6   A.  Yes, you do.
7   Q.  I have no idea, sir.
8   A.  Yes, you do. Same question you asked me at
9 Ben's, too.
10   Q.  I have no clue what you're talking about.
11 Tell me why, in December --
12   A.  Well, I'll --
13   Q.  -- of 2007 --
14   A.  -- refresh your memory.
15   Q.  Go ahead.
16   A.  Okay. You know I can't spell and I can't
17 read.
18   Q.  I know you claim that.
19   A.  Okay. Why didn't you, way before I even had
20 my fall, why didn't you get my school records?
21   Q.  What's that got to do with why you got a
22 license in Ohio in December --
23   A.  Because I --
24   Q.  -- of 2007?
25   A.  I don't think that I can -- I won't be able to

| Page 157 | Page 159 |
|---|---|

**Page 157**

1 read to pass the test. And I can drive and do whatever
2 I need to do, but I -- and you know that.
3 Q. That's your handwriting (indicating)?
4 A. It is.
5 Q. Did you sign that?
6 A. I did.
7 MR. BECKER: Let's mark that, please.
8 Exhibit 4.
9 A. And I believe he spelled that for me on the
10 telephone; is that correct? Is that the letter you --
11 that I had to write?
12 MR. SCHNITTKE: I can't answer your
13 questions.
14 THE WITNESS: But my attorney's told me
15 what to spell.
16 MR. SCHNITTKE: You want to mark this.
17 - - -
18 (Plaintiff's Exhibit 4 marked.)
19 - - -
20 MR. BECKER: Thank you.
21 Q. We've marked as Plaintiff's Exhibit 4 a note
22 that you just indicated is in your handwriting that you
23 signed to verify that you would be here in attendance
24 for the deposition today; correct?
25 A. Whatever -- when I was on the phone with Eric

**Page 158**

1 and -- that's what they told me to write.
2 Q. All right. Did you ever meet your current --
3 strike that.
4 Did you ever meet Katie Hettig before her
5 husband died?
6 A. Yes.
7 Q. Where did you meet her?
8 A. I met her -- we met in Florida.
9 Q. Where?
10 A. I don't remember where.
11 Q. How long ago?
12 A. It's been a long time ago.
13 Q. Well, did you -- after you met her did you
14 keep in contact with her?
15 A. No, we didn't.
16 Q. Who introduced you?
17 A. We met.
18 Q. How did you meet?
19 A. I believe it was on the beach.
20 Q. Where?
21 A. In Clearwater probably.
22 Q. Did you have a relationship with her at that
23 time?
24 MR. SCHNITTKE: I object. I don't know
25 what the relevance of this is.

**Page 159**

1 MR. BECKER: Well, if nothing else it goes
2 to credibility, because when I asked him earlier in the
3 deposition when he met Kathy Hettig (sic.) he told me
4 he met her in a store in Clearwater after September of
5 2006.
6 A. You didn't ask me if that was the first time I
7 met her.
8 Q. So I'm -- I'm clarifying. The first time you
9 now met her you're saying was in --
10 A. I don't know what year it was. And you asked
11 me if it was before -- when she -- her husband was
12 alive.
13 Q. Uh-huh.
14 A. That's not what the question you asked me that
15 I --
16 Q. And now --
17 A. -- remember.
18 Q. -- I'm asking you whether or not you had a
19 relationship with her at that time? Did you, or did
20 you not?
21 A. It's irrelevant.
22 MR. BECKER: You can either instruct him
23 to answer -- not to answer the question or you can
24 answer the question, sir; one of the two. That's your
25 choices.

**Page 160**

1 MR. SCHNITTKE: It's irrelevant.
2 A. I mean, it's irrelevant. It's --
3 Q. That doesn't -- you don't get to decide what's
4 relevant, sir.
5 MR. BECKER: You can either have your
6 client -- your -- your lawyer's either going to
7 instruct you not to answer the question or you're going
8 to answer it.
9 MR. SCHNITTKE: He's not answering that
10 question.
11 MR. BECKER: On what basis, sir?
12 MR. SCHNITTKE: On relevance.
13 MR. BECKER: Okay.
14 Q. I'm looking at an affidavit that was signed by
15 Eric Knouse on January the 22nd, 2008 that was
16 notarized, that states that George Michael Riley was
17 sentenced on December the 20th, 2007. You received a
18 sentence to probation that is required to pay a total
19 restitution of approximately $509,000, of which his
20 employer had already paid $150,000, and paid an
21 additional $50,000 on sentencing date. You agree with
22 that?
23 A. If that's what he said.
24 Q. Okay. So what -- which of your employers paid
25 the $150,000 on your behalf?

## Page 161

1    A.    It'd either be Blank Ink or Tristar.
2    Q.    And how long you been working for one of those
3    two?
4    A.    Four months, five months. I don't know. I --
5    I don't know the exact dates.
6    Q.    Okay. And where are the documents that would
7    verify that?
8    A.    That would verify what?
9    Q.    That you're working for the -- someone. I
10   want to know what --
11   A.    In exchange. It's pay my restitution.
12   Q.    Well, I -- there's got to be documents. If an
13   employer's going to hire you and you're going to work
14   for that employer there has to be documents to verify
15   that, sir. And those are the documents that we're
16   entitled to see.
17   A.    Okay. I didn't know that kind of document.
18   Q.    So we'll get those from you?
19   A.    Okay.
20   Q.    And we'll come back and ask you about those
21   when we get them.
22   A.    Okay.
23   Q.    Anybody else that you've worked for since
24   September of 2006 that we haven't talked about?
25   A.    Not to my knowledge.

## Page 162

1    Q.    Any other companies that you've started or
2    operated since September of 2006?
3    A.    Not to my knowledge.
4    Q.    What happened to United Waste Services, Inc.?
5    That was one of your companies.
6    A.    That's correct.
7    Q.    What happened to it?
8    A.    It's just there. Tom Fitzgerald's.
9    Q.    So nothing else -- that's not doing any
10   business?
11   A.    No.
12   Q.    What about Palm Beach Property Associates,
13   LLC?
14   A.    You got that.
15   Q.    Well, that was a company that you started;
16   right?
17   A.    Yes.
18   Q.    And the only asset that it had was the house;
19   is that right?
20   A.    No. We gave it to Mr. Danford.
21   Q.    I understand. The only asset that it had was
22   the house?
23   A.    I didn't have no assets.
24   Q.    So the only thing that Palm Beach Property
25   Associates, LLC --

## Page 163

1    A.    They never did no work.
2    Q.    But they had a house. And now that house has
3    been turned over to the bank; right?
4    A.    No.
5    Q.    What's not right about that?
6    A.    Palm Beach Properties --
7    Q.    Yes.
8    A.    -- was put together --
9    Q.    Yes.
10   A.    -- as I was instructed to do, so if something
11   would happen to me, as per whatchamacallit -- that
12   that's why that house went into Palm Beach Properties.
13   Ben called me up and said that Dad and I needed to sign
14   off on it. And that's what I did.
15   Q.    I just want to know whether Palm Beach
16   Properties --
17   A.    They never did work. It wasn't --
18   Q.    There's nothing --
19   A.    It wasn't like Continental Industries.
20   Q.    There's nothing else left of it; right? It
21   was just the house? It wasn't -- it didn't own
22   anything else?
23   A.    No. Never had a bank account. Nothing.
24   Q.    What about American Aggregates Corp. U.S.A.?
25   A.    No.

## Page 164

1    Q.    That's one of your companies?
2    A.    That is correct.
3    Q.    What'd you do with that one?
4    A.    Nothing.
5    Q.    Where's it at now?
6    A.    What do you mean?
7    Q.    What does it hold?
8    A.    I don't know. Nothing, to my knowledge.
9    Q.    What about Island Equipment Company Corp. of
10   U.S.A.? What does it -- what does it have?
11   A.    You got it.
12   Q.    What did it have?
13   A.    The crusher.
14   Q.    The crusher was it? The Hazemag?
15   A.    Yes.
16   Q.    So Island Equipment --
17   A.    Well, I meant the American Aggregate was the
18   Jumbo.
19   Q.    So American Aggregate has the Jumbo?
20   A.    I believe.
21   Q.    Which we do not have; correct?
22   A.    Yes, you do. That's -- that's down at Roger
23   Barrick's.
24   Q.    Well, that -- if it's at Barrick's I don't
25   have it, do I?

Page 165

| | |
|---|---|
| 1 | A. Yes, you do. |
| 2 | Q. Mr. Barrick has it; right? It's at his place. |
| 3 | A. Yeah, but nobody -- we -- we can't use it. |
| 4 | Q. He's not giving it to me, either, because you |
| 5 | owe him money for the storage on it. |
| 6 | All right. Now, Island Equipment Company, |
| 7 | what do they have? |
| 8 | A. You got it. |
| 9 | Q. That was the Hazemag? |
| 10 | A. That's correct. |
| 11 | Q. What happened to the screener? |
| 12 | A. You got the power screen. Yes, sir, because |
| 13 | whatchamacallit picked it up. |
| 14 | Q. So whatever they had -- |
| 15 | A. Then -- wait. Then whatchamacallit stole it. |
| 16 | They said they was picking it up, the towing company, |
| 17 | Ours Towing. |
| 18 | Q. Are you telling me that the -- the -- that |
| 19 | the -- |
| 20 | MR. BECKER: Where did it go? |
| 21 | MR. DANFORD: They're two different |
| 22 | crushers. You're talking about the -- or -- or the two |
| 23 | power screens. Talking about the power screen down in |
| 24 | Mississippi. |
| 25 | MR. BECKER: Yeah. |

Page 166

| | |
|---|---|
| 1 | A. There is no power screen in Mississippi. |
| 2 | Q. What happened to it? |
| 3 | A. There never was one. That's the honest -- |
| 4 | there -- there's -- there's a power screen that Ours |
| 5 | Towing has got. |
| 6 | MR. SCHNITTKE: Wait a minute. You may |
| 7 | want to take the fifth on this. |
| 8 | MR. DANFORD: It's got nothing to do with |
| 9 | Licking County. There was a -- there was a -- a power |
| 10 | screen that was in Steubenville. |
| 11 | - - - |
| 12 | Thereupon, Mr. Becker and his client are consulting with |
| 13 | one another. |
| 14 | - - - |
| 15 | Q. There was a power screen that was indoors at |
| 16 | Steubenville. |
| 17 | A. I -- I don't know anything about that. Let's |
| 18 | call them because it's not mine. I -- I don't know |
| 19 | what -- |
| 20 | MR. DANFORD: When we first saw the |
| 21 | Hazemag crusher -- |
| 22 | MR. BECKER: Uh-huh. |
| 23 | MR. DANFORD: -- it had been -- there had |
| 24 | been repair -- repair work done on it. Some guy was |
| 25 | waiting to get paid in Steubenville. Had to be almost |

Page 167

| | |
|---|---|
| 1 | a year and a half, two years ago. |
| 2 | MR. BECKER: Okay. |
| 3 | MR. DANFORD: And we took pictures of it, |
| 4 | the Hazemag. They drove us down to the river to an |
| 5 | indoor storage facility to show us the power screen, |
| 6 | which was a huge, long, power screen. He would not let |
| 7 | us take pictures of it down there. |
| 8 | MR. BECKER: All right. |
| 9 | MR. DANFORD: So that -- but he had worked |
| 10 | on both of them for you. |
| 11 | A. Okay, that I -- I'm not aware of. And whoever |
| 12 | said that -- you know what, if there's -- I had one |
| 13 | power screen -- |
| 14 | Q. Where is it? |
| 15 | A. -- that was at Shelly & Sands that the towing |
| 16 | company took. |
| 17 | Q. Which towing company? |
| 18 | A. Ours. It was called Ours Towing Company. |
| 19 | Q. Where? |
| 20 | A. In Newark. |
| 21 | MR. DANFORD: Somerset. We got that one. |
| 22 | MR. BECKER: Okay. That one you got. |
| 23 | A. Okay. The other -- |
| 24 | Q. That's the only one you've ever had? |
| 25 | A. The other power screen is -- is connected to |

Page 168

| | |
|---|---|
| 1 | the Jumbo crusher. It's in the crusher itself. It's |
| 2 | not like the Hazemag. There's only been one portable. |
| 3 | Q. And that's the one that is owned by American |
| 4 | Aggregates, which is currently in -- |
| 5 | A. Right. |
| 6 | Q. -- Belmont? |
| 7 | A. Yes. |
| 8 | MR. BECKER: All right. |
| 9 | MR. DANFORD: Ask questions that -- |
| 10 | because it apparently isn't a power screen. There was |
| 11 | two pieces of equipment that had repair work done on it |
| 12 | in Steubenville, Ohio. |
| 13 | MR. BECKER: All right. Let me stop this |
| 14 | one. |
| 15 | MR. DANFORD: One was a Hazemag and the |
| 16 | other one was some other -- |
| 17 | Q. What equipment did you have worked on in |
| 18 | Steubenville? |
| 19 | A. I never really -- the Hazemag was never worked |
| 20 | on in Hazemag -- in Steubenville, to -- to my |
| 21 | knowledge. |
| 22 | Q. What equipment was worked on in Steubenville |
| 23 | for you? |
| 24 | A. The Jumbo Eagle crusher that -- that's when |
| 25 | Roger helped me pay for that rotor. |

Page 169

1  Q.  That's the only equipment? There was two
2  pieces there that they saw.
3  A.  I don't know. I -- I don't know what you're
4  talking about. And that's -- that's -- that's the --
5  the god -- the -- the only thing that I have is the
6  power screen you got, the two crushers, the --
7      MR. DANFORD: This was across the county
8  line from Belmont county. So it wasn't all the way
9  north to Steubenville. Somebody repaired work --
10     THE WITNESS: I don't know.
11     MR. DANFORD: -- for you.
12     THE WITNESS: Mr. Danford, I -- I mean,
13  I'll tell you, if -- if you just -- I don't know what
14  it is, because I know what I have.
15  Q.  Well, is that --
16     MR. BECKER: Is that the same as this one?
17  Is this one different? Right.
18     MR. DANFORD: Different.
19  Q.  You said earlier today you were going to tell
20  us about assets owned by United Waste. What other
21  assets does United Waste have?
22  A.  That's all them commodes that -- that has --
23  Tom still owns some and I --
24  Q.  They're all sitting on the Mill Dam property?
25  A.  That's correct.

Page 170

1  Q.  What equipment did the gentleman in Newark
2  work on for you that you did not pay $4,280 for?
3  A.  Was -- it's the dozer that you got, I believe.
4  That -- because it had the --
5  Q.  What kind of dozer?
6  A.  That front end loader you've got. The --
7  he -- this -- the cab -- you can see the cab is hanging
8  out there. They had to put a torque converter in it.
9  Q.  Who was the gentleman --
10     MR. DANFORD: We don't have a dozer.
11     THE WITNESS: You -- you don't have the
12  front end loader?
13     MR. DANFORD: (Shakes head negatively.)
14     THE WITNESS: There is a front loader -- a
15  front end loader somewhere.
16  Q.  You don't know where it's at?
17  A.  I do not. I thought you got it. It was down
18  at Fitzgerald's. You'd have to move it with a
19  tractor/trailer.
20  Q.  What -- give me a description of it.
21  A.  It's huge. It's a 966.
22  Q.  966?
23  A.  I think it's a -- it's a 966.
24  Q.  And who was it owned by, which of your
25  companies?

Page 171

1  A.  I don't know. One of them.
2  Q.  And the last you saw it it was at
3  Fitzgerald's?
4  A.  That's correct.
5      MR. DANFORD: We may have that. There was
6  a small dozer.
7      THE WITNESS: That's Tom's. That
8  whatchamacallit's Tom's, too.
9  Q.  What?
10  A.  The digger, the small backhoe. I can't use
11  little equipment. All -- all that stuff was --
12  Q.  All right. This 966 dozer --
13  A.  The last place it's been that's -- there was a
14  problem with the torque converter. I had somebody come
15  out and fix it. They took the cab off of it and was
16  working on it, and that was the last I've seen of it.
17     MR. DANFORD: Yeah, we've got that.
18     MR. BECKER: Okay.
19  Q.  Fitzgerald Sanitation, is that company still
20  owned by you?
21  A.  That was just a name. I changed it to United
22  Waste.
23  Q.  All right. Jiffy John Portable Toilets?
24  A.  That was the same thing. Tom had the name of
25  Jiffy John, but I got the name of Jiffy John, changed

Page 172

1  it to United Waste.
2  Q.  RNF Company of Lansing, Inc.?
3  A.  That's been a long time ago.
4  Q.  Doesn't exist anymore?
5  A.  All them really don't exist anymore.
6  Q.  Have no assets?
7  A.  (Witness shakes head negatively.) Huh-uh.
8  Q.  Eagle Industries of Columbus, Inc.?
9  A.  Nope.
10  Q.  Has no assets?
11  A.  (Witness shakes head negatively.) No.
12  Q.  You need to say yes.
13      Black Diamond Demolition Limited?
14  A.  That company hasn't never done anything, but
15  it's going to.
16  Q.  What assets does it have?
17  A.  None.
18  Q.  Okay. Continental Industries, Inc., you've
19  told me everything about any assets?
20  A.  To the best of my knowledge, yes.
21  Q.  Any other companies that you have been called?
22  A.  I'm going to use Black Diamond.
23  Q.  Any other companies that you have created or
24  been apart of or owned or part ownership that we
25  haven't discussed?

## Page 173

1   A.   Not to my -- that's everything to my
2   knowledge.
3   Q.   You didn't create any companies in Louisiana?
4   A.   No, sir.
5   Q.   You didn't create any companies in
6   Mississippi?
7   A.   No, sir.
8   Q.   Why didn't you attend the deposition on
9   October 16th, 2007 in Colorado?
10   A.   What?
11   Q.   You were served -- your counsel was served in
12   Colorado with a notice for you to appear for a
13   deposition on October the 16th of 2007, and you failed
14   to appear.
15   A.   I -- I -- I need to call Eric, because I -- I
16   don't want to answer that until I call Eric.
17       MR. SCHNITTKE:   Hold on.  He's got some
18   other questions before you find out about that.
19   Q.   Did you ever sell the Eagle crusher power
20   screen and any other equipment?
21   A.   Did I ever sell --
22   Q.   Did you sell it?
23   A.   What are you talking about?
24   Q.   Well, there's an individual who's claiming
25   that you sold them the Eagle crusher and the power

## Page 174

1   screen and some other equipment.  And you --
2   A.   The Eagle's not paid off, if they mean that.
3   Q.   What do you mean by that?
4   A.   Because that -- the people I bought it from, I
5   still owe them money.
6   Q.   Who is that?
7   A.   Custom -- Custom Concrete.
8   Q.   Where are they at?
9   A.   Ben would have that.  I don't know.
10   Q.   Well, are they in Ohio?  Are they in Alaska?
11   A.   They're in Ohio.
12   Q.   When did you buy it?
13   A.   Oh, years ago.
14   Q.   How much did you pay for it?
15   A.   2 -- almost 300,000.
16   Q.   How much do you owe them?
17   A.   I don't know what the balance is now.
18   Q.   Well, $10?  $100?
19   A.   Oh, no.  It's in the thousands, but I don't
20   know how many.
21   Q.   Why didn't you pay him?
22   A.   I'm sorry?
23   Q.   Why didn't you pay him?
24   A.   You took the equipment.
25   Q.   So.  It doesn't mean you don't owe them the

## Page 175

1   money.
2   A.   I understand that.  I --
3   Q.   Why -- why didn't you pay them?
4   A.   They'll get paid.  I just got to get
5   everything done.  I got to get everything organized.
6   Q.   Who else do you owe money to?
7   A.   I don't know.  I'm sure there's a list.
8   Q.   Do you have a list somewhere that would
9   indicate all the people you owe money to?
10   A.   No.
11   Q.   Do you have any documents to indicate who you
12   owe money to?
13   A.   No.
14   Q.   Do you have any documents to indicate who owes
15   money to you that we haven't talked about?
16   A.   Just that one that I said I'd get you.
17   Q.   What happened to the two trucks that
18   Continental owed when we took your deposition last
19   time?  It was a -- a Ford F-350.  What happened to
20   that?
21   A.   A Ford F-350?
22   Q.   That's what you told me.
23   A.   That white flatbed?
24   Q.   I don't know, sir.  You told me that
25   Continental owed a Ford F-350.

## Page 176

1   A.   Say that 1970 model?
2   Q.   I don't know, sir.  I'm just asking what
3   happened to it.
4   A.   I don't know.  It could be down at Tom's.
5   Q.   No, no.  This was in Florida.
6   A.   In Florida?
7   Q.   Uh-huh.  What'd you do with it?
8   A.   F-350 in Florida?
9   Q.   That's what you told me in your deposition.
10   Can you show my counsel that --
11   Q.   Sure.
12   A.   -- where I said that?
13   Q.   Uh-huh.
14   A.   I don't --
15   Q.   We were discussing -- look like:  What
16   equipment does it have?  Continental, all right.  You
17   first described a U-haul truck.
18   A.   That's correct.
19   Q.   Where's that -- what happened to it?
20   A.   It's in whatchamacallit.
21   Q.   Where's whatchamacallit?
22   A.   It's in storage, but they probably took it for
23   the storage.  It's -- it's been --
24   Q.   Where?
25   A.   In -- I think it's in Georgia.

TAHYI VIDEO & COURT REPORTING, LTD.
(800) 526-6508  (740) 454-7157

| Page 177 | Page 179 |
|---|---|
| 1  Q. Where in Georgia? | 1  F-350. What'd you do with that? |
| 2  A. I don't -- I have to get you information. I | 2  A. I think that -- the Ford F-350 would have been |
| 3  don't know. | 3  the U-haul truck. |
| 4  Q. Why did you send it to Georgia? | 4  Q. No, that's two different -- two different |
| 5  A. I went up there to do a job. | 5  vehicles you described to us. |
| 6  Q. What job? | 6  MR. SCHNITTKE: That's what it looks like |
| 7  A. In Georgia. | 7  to me in the deposition. |
| 8  Q. What job in Georgia? | 8  A. Well, it said -- the F-350 -- |
| 9  A. On a asphalt job. | 9  Q. What's the -- |
| 10  Q. For who? | 10  A. And you said in Florida? |
| 11  A. I don't know the name of the company -- | 11  Q. I asked you what's the -- after we talked |
| 12  Q. When? | 12  about the U-haul, I said: What's the other truck that |
| 13  A. -- at this moment. | 13  it, being Continental, owns? And you said: It's a |
| 14  It's been a while ago. A year or so. | 14  Ford F-350. What year? I have no idea. What's the |
| 15  Q. Did you get paid? | 15  year of the U-haul? I couldn't answer that, either. |
| 16  A. Yeah. In exchange -- one of the machines blew | 16  Where are they located? Florida, Palm Harbor. One is. |
| 17  up and they put a new motor on it. | 17  Which one? The F-350. |
| 18  Q. So you got -- you didn't get any money, you | 18  A. That's the U-haul. The other one -- |
| 19  got services? | 19  Q. Where is the U-haul? I don't know where it |
| 20  A. That's correct. I got some money. I got | 20  could be right now. |
| 21  like -- I can't remember how much. | 21  A. Okay, that would have been a U-haul. That's |
| 22  Q. What'd you do with it? | 22  what I thought. The F-350 would have been a U-haul. |
| 23  A. Spent it. | 23  Q. No, you're talking about two different things |
| 24  Q. Did you get paid in cash, or did you get paid | 24  here. |
| 25  with check? | 25  A. No. |

| Page 178 | Page 180 |
|---|---|
| 1  A. I got paid by a check. | 1  Q. You're talking about the U-haul being one and |
| 2  Q. What'd you do with the check? Did you cash | 2  you're talking about the F-350 being -- |
| 3  it, or did you put it in the bank? | 3  A. The F-350 is a U-haul. |
| 4  A. I would probably put it in the bank. | 4  Q. Well, where's it at? |
| 5  Q. Which bank? | 5  A. Well, it's in a -- a tow yard. |
| 6  A. I don't know. | 6  Q. Where? |
| 7  Q. In Florida? | 7  A. Somewhere in Georgia or -- |
| 8  A. Probably. | 8  Q. We're talking about two separate vehicles |
| 9  Q. Do you have any documents? | 9  here. |
| 10  A. No. | 10  A. Well -- |
| 11  Q. Well, if you had a bank -- if you had a | 11  Q. You described two separate vehicles to me. I |
| 12  checking account or a savings account in Florida that | 12  want to know where they both are now. |
| 13  you deposited into what'd you do with -- | 13  A. I -- there's a flatbed that's in Ohio. |
| 14  A. I never -- | 14  Q. Where? |
| 15  Q. -- the records? | 15  A. It is down at Roger Barrick's. It's like an |
| 16  A. -- had a savings account. | 16  '80-some model. I don't know what year it is. It's |
| 17  Q. Well, what did you do with the records of | 17  sitting down there. |
| 18  the -- | 18  Q. All right. What -- what manufacturer? |
| 19  A. I don't know -- | 19  A. Ford. |
| 20  Q. -- banks -- | 20  Q. All right. |
| 21  A. -- where they're at. | 21  A. Same as the U-haul. |
| 22  Q. Who'd you give them to? | 22  Q. And the U-haul's in Georgia in a storage |
| 23  A. I didn't -- I -- I don't know. I didn't give | 23  facility? |
| 24  them to anybody. I don't know what I did with them. | 24  A. Not a storage. Yeah, a tow yard. |
| 25  Q. So we were then back -- back to the Ford | 25  Q. A tow yard. |

## Page 181

1      Any other vehicles?
2     A.   Not that I know of. Not that I can remember.
3  If you can --
4     Q.   Sir, the object of this isn't for me to have
5  to dig out and find things and then ask you where
6  they're at. The object is for you to tell me what you
7  own so I can determine where those assets are so I can
8  go get those assets.
9     A.   I'm trying to help you.
10      MR. SCHNITTKE: Mike, you know where the
11  tow yard is in Georgia?
12      THE WITNESS: I don't.
13      MR. SCHNITTKE: You have any idea where to
14  go get at it then?
15      THE WITNESS: They've had it for over a
16  year. I think -- I think they kept it. I -- I really
17  do because I haven't paid anything on it and it -- it
18  got towed off the interstate.
19     Q.   What's the job available in Bellaire? Tell me
20  about it.
21     A.   It's the railroad project for Roger.
22     Q.   More specific.
23     A.   That's -- that's what it is. It's specific.
24     Q.   What -- what would you be doing?
25     A.   Taking up the railroad ballast, crushing it,

## Page 182

1  screening it, and Roger would sell it -- would sell it
2  to one of his entities.
3     Q.   And how much is there?
4     A.   A lot. Couple million dollars.
5     Q.   All right. Where is the -- the line of the
6  railroad tract?
7     A.   What do you mean what --
8     Q.   Where is it?
9     A.   Oh. Roger owns it. Roger Barrick owns it.
10     Q.   I understand that but where --
11     A.   Oh, I guess --
12     Q.   -- is it?
13     A.   -- from Bellaire all the way up. I -- I --
14  I'll know more tomorrow, when I see it.
15     Q.   All right. You haven't seen it yet?
16     A.   That's correct.
17     Q.   You think it starts in Bellaire, Ohio and it
18  go goes someplace --
19     A.   I know it starts in Bellaire, because he told
20  me.
21     Q.   And how much -- does -- does Roger have a
22  contract?
23     A.   He will give me a contract.
24     Q.   No, does he have one now to do this? How --
25  how did you --

## Page 183

1     A.   He owns it.
2     Q.   He owns it. He owns the rail line?
3     A.   He owns the rail line. He owns it all.
4     Q.   All right. Who else is going to work on the
5  job besides you?
6     A.   Cody, his son. It only takes three people.
7     Q.   So the entire job is to take up the -- the
8  steel lines, or are they already gone?
9     A.   No, no. Nothing to do with that.
10     Q.   They're already gone?
11     A.   The stone.
12      I -- I don't know that. I --
13     Q.   Okay. So if -- if the steel line is still
14  there who has to take that up?
15     A.   Well, that's easy. I can flip that over with
16  a dozer.
17     Q.   All right. So that may -- that may be part of
18  the job, you just don't know yet?
19     A.   I don't know that yet.
20     Q.   How long's this going to take?
21     A.   About a year or so.
22     Q.   And how are you going to get paid?
23     A.   Roger will pay me by check.
24     Q.   My point is that Roger's company is going to
25  be paying you?

## Page 184

1     A.   That's correct, Black Diamond Demolition.
2     Q.   Why are you going to use Black Diamond?
3     A.   What's that?
4     Q.   Why are you going to use Black Diamond as the
5  company to do this job?
6     A.   Why am I going to use that company?
7     Q.   Why are you going to use that company? You
8  got like 20 companies that you could use. Why are you
9  using Black Diamond?
10     A.   I thought I was allowed.
11     Q.   I didn't say you weren't. I'm just wondering
12  why you chose that one --
13     A.   Well, because --
14     Q.   -- as opposed to --
15     A.   -- there's a demolition job in Kentucky that
16  I'm going to look at.
17     Q.   What's that got to do with Black Diamond?
18     A.   Because it's a -- it's called Black Diamond
19  Demolition and there's a demolition that needs to be
20  done in -- I thinks it's Louisville, Kentucky. On the
21  3rd I'm going to go look at it.
22     Q.   February 3rd?
23     A.   That's correct.
24     Q.   What kind of job?
25      MR. SCHNITTKE: How can you go back and

| | |
|---|---|
| **Page 185** | **Page 187** |

**Page 185**

1  look at that when you're going to be in Colorado?
2  THE WITNESS: No. Barrick's trying --
3  he's filed a motion with the court to give me more
4  days.
5  MR. SCHNITTKE: Okay.
6  THE COURT: It -- if I get these deals
7  with Roger and -- and show that what I'm doing is
8  supposed to be doing and do my -- then I can get more
9  days.
10  Q.  What's the job in Louisville?
11  A.  Demolition.
12  Q.  I know, but what do they -- what are you
13  demolishing?
14  A.  It's a building. And I haven't seen it yet.
15  Q.  What kind of building?
16  A.  I haven't seen it yet.
17  Q.  How'd you find out about it?
18  A.  Through an e-mail.
19  Q.  From?
20  A.  A demolition people -- or a -- a contractor.
21  Q.  So you're going to be a subcontractor on this
22  job, or are you going to be the one who does it?
23  A.  Oh, I'll do the work.
24  Q.  Whose the contract going to be with? The
25  company that owns the building, or somebody that's

**Page 186**

1  already agreed to tear it down?
2  A.  The -- the people that's going to build the
3  new building.
4  Q.  Okay. Who's that?
5  A.  I don't -- I got the e-mail from them.
6  They -- they sent it out to a lot of people. I -- I
7  got to go do the bid.
8  Q.  What's your e-mail account?
9  A.  Gmrileysr@bayo.com.
10  Q.  Getting close.
11  Q.  Where's Rose Ontko, O-n-t-k-o?
12  A.  Rose is moving to Columbus.
13  Q.  Where's she at now?
14  A.  She is in Clearwater, Florida.
15  Q.  She still living with you?
16  A.  No.
17  Q.  Where's she live?
18  A.  With Jacob Miller.
19  Q.  Who's that?
20  A.  A -- a guy that I know in Clearwater.
21  Q.  What's Mr. Miller do?
22  A.  Works. Him and his girlfriend work. And they
23  have a child. She helps take care of his baby.
24  Q.  All right. I was going to say, what -- why
25  does Rose live with him.

**Page 187**

1  Q.  What's the address?
2  A.  I don't know the exact address.
3  Q.  You are no longer supporting Rose?
4  A.  No.
5  Q.  You did at one time.
6  A.  I did. Rose did a lot for me.
7  Q.  When did you quit supporting Rose?
8  A.  It's been a while.
9  Q.  How long?
10  A.  I don't know. Months.
11  Q.  When's the last time she lived with you?
12  A.  Months.
13  Q.  Where was she living with you last? In Kate's
14  house?
15  A.  Not long. About two weeks. Not long at
16  Kate's.
17  Q.  Where else then?
18  A.  Tarpon.
19  Q.  You told me that Susan Schnitz, S-c-h-n-i-t-z,
20  no longer does your books. Who does your books now?
21  A.  Nobody.
22  Q.  Who does your wife's books?
23  A.  I don't know.
24  Q.  Did you get paid in full for the job you did
25  in Tampa when you tore the building down?

**Page 188**

1  A.  I did.
2  Q.  Do you have any of that money left?
3  A.  No.
4  Q.  Do you have any money anywhere?
5  A.  Nope.
6  Q.  You have any real estate?
7  A.  Do I have any what?
8  Q.  Real estate.
9  A.  Nope.
10  Q.  Stocks?
11  A.  Nope.
12  Q.  Bonds?
13  A.  Nope. Bond, yeah. I -- no, I'm off the bond.
14  They give it back to me. I'm done with that.
15  MR. SCHNITTKE: No, he's talking about
16  bonds.
17  MR. BECKER: Yeah.
18  MR. SCHNITTKE: Okay.
19  MR. BECKER: It's not worth the --
20  Q.  Any other --
21  A.  What does that mean?
22  Q.  I was asking you about whether you owned a
23  bond, not whether you were on a bond. I'm --
24  A.  I'm done with that bond.
25  Q.  I understand. There's a difference between

Page 189

1 what you might own and what you might be required to
2 perform.
3 A.    Okay.
4 Q.    There's two different types of bonds, and we
5 had a confusion about which it was.
6        You have nothing to do with Rock -- Rock
7 Concrete, LLC?
8 A.    I used to work for Rock Concrete when I was
9 16. I don't know where you get the Rock Concrete, LLC.
10 If it was LLC I don't know. That's been many years
11 ago.
12 Q.    Nothing since?
13 A.    Nope. He's died.
14 Q.    Who'd you buy the Hazemag crusher that was
15 stored in Mississippi from?
16 A.    A company out of -- I think it was from New
17 Jersey or somewhere. I -- I'm not for sure where it's
18 from.
19 Q.    Where was it when you bought it?
20 A.    What do you mean?
21 Q.    Where was it physically located when you
22 bought it? Was it Florida already, or did you have to
23 go to New Jersey and get it?
24 A.    There was a -- no, they delivered it to me.
25 Q.    They delivered it. How much did you pay for

Page 190

1 it?
2 A.    Over two hundred I believe.
3 Q.    Where'd you get the money?
4 A.    I was working up at -- in Pittsburgh. They
5 delivered it right to Pittsburgh, up to -- in -- I
6 can't think of the guy's name. I'll tell you here in a
7 second.
8 Q.    When was this?
9 A.    It's been a while.
10 Q.    Well, you didn't tell me about the Hazemag
11 crusher when I took your deposition in September of
12 '06?
13 A.    When?
14 Q.    September of '06.
15 A.    The Hazemag crusher didn't have anything to do
16 with that.
17 Q.    I asked you about all your assets back then.
18 You didn't tell me about that one. So you already had
19 it someplace at that time, is that what you're telling
20 me now?
21 A.    It was in Pittsburgh on that job.
22 Q.    Well, who owns it? Who owned it? Who owned
23 the Hazemag crusher, which of your companies?
24 A.    I think RNF Coal.
25 Q.    I never heard of RNF Coal. That's a company

Page 191

1 of yours?
2 A.    No.
3 Q.    Well, who --
4 A.    But I -- I mean, that's who I -- I think
5 that's who the purchaser was.
6 Q.    You bought it. You told me you bought it from
7 a guy in New Jersey for 200,000 bucks.
8 A.    I took the deal on the Hazemag and made
9 payments to another person.
10 Q.    All right. And who did you put the Hazemag --
11 who owned the Hazemag then when you bought it?
12 A.    I -- I don't know. I don't know what entity
13 or -- or how that worked. Alex Parish was who I was
14 working for.
15 Q.    How did it get from Pittsburgh to Florida?
16 A.    The truck.
17 Q.    You towed -- you towed it?
18 A.    I did not tow it.
19 Q.    Who did?
20 A.    Andy Hunter.
21 Q.    And how did it get from Florida to Louisiana?
22 A.    The truck.
23 Q.    When did you move it from Florida to Louisiana
24 or Mississippi?
25 A.    It wasn't that long ago. Months.

Page 192

1 Q.    And who was the last owner of the Hazemag
2 crusher? Whose name was it in?
3 A.    I don't know.
4 Q.    Well, it was yours.
5 A.    I -- I don't -- you asked me what name it was
6 in. I don't know. I -- I have no idea.
7 Q.    Where did the $200,000 come from, which
8 company that you used to buy it?
9 A.    I -- I don't -- I don't -- I don't know.
10 Q.    What was the name of the company that was
11 doing the work in Pittsburgh for Alex Parish?
12 A.    It might have been American Aggregate. It's
13 been a while ago.
14 Q.    What's it worth now, in the last -- in the
15 condition that you last saw it in what's it worth?
16 A.    I just had it painted, new belts put under it,
17 and they -- and the motor's not even six months old.
18 Q.    So what's it worth?
19 A.    Close to -- to two hundred.
20 Q.    All right. What about the trailer? It's in
21 pretty bad shape?
22 A.    What trailer? It don't take a trailer.
23 Q.    Whatever it sits on.
24 A.    It don't -- no, it's not.
25 Q.    It has wheels -- it's got -- it's got its own

## Page 193

1  wheels?

2  A.  Yes.

3  Q.  I don't know what these things are.  All I

4  know is that the wheels I saw --

5  A.  That was all sand -- scrape painted

6  it.  There's nothing wrong with that crusher.

7  Q.  The last time you saw it?

8  A.  That's -- that's -- that's what they was

9  doing, is -- getting it ready for that big project.

10  Q.  What's your definition of a bounced check?

11  You talked about that earlier.  Does that mean that

12  somebody stopped payment or that there was

13  non-sufficient funds?

14  A.  It means there was no money in the bank.

15  That's what I was always told.

16  Q.  Okay.  You don't know one way or another

17  whether they stopped payment on the check that they

18  sent you or whether there was just not sufficient funds

19  in the bank?

20  A.  They stopped payment on one check and the rest

21  of them bounced.

22  Q.  Why'd they stop payment?

23  A.  Because they didn't have the money and they

24  probably didn't want to bounce a check, I assume.  I

25  don't want to answer anything with Phoenix because I

## Page 194

1  have a -- an attorney in Louisiana on that.

2  Q.  Have you signed any contracts or agreements

3  since I took your deposition in September of 2006?

4  A.  I don't know.  I -- I -- I may have and I may

5  not have.  I don't know.

6  Q.  Well, what agreements would you have signed if

7  you signed one?

8  A.  I don't know.  '06 and today's a long -- a

9  long way apart.

10  Q.  Do you own the Forny's any money?

11  A.  I'm sorry?

12  Q.  The Forny's.  Do you know

13  A.  I don't --

14  Q.  Do you owe them

15  A.  That's in litigation in Licking County.

16  Q.  Well, do you owe them any money or not?

17  A.  And I'm not --

18  Q.  Have you sued you?

19  A.  I'm not -- I'm not answering that question.

20  Q.  Have they sued you?

21  A.  I'll call Sam.

22  MR. SCHNITTKE:  No, you just --

23  Q.  I just asked whether they've sued you.

24  A.  I'm not going to answer that question.  I

25  plead the fifth.

## Page 195

1  Q.  As to whether they've sued you or not?

2  A.  I don't know if they've sued me.

3  Q.  Are you facing any other lawsuits?

4  A.  I don't know.  I -- I -- I don't know.

5  Q.  What other lawyers do you have?

6  A.  Sam.

7  Q.  He's a criminal lawyer in Ohio; right?  Sam

8  Shamansky.

9  A.  Yes.

10  Q.  He's not doing any civil work for you, like

11  these guys?

12  A.  Right.  Sam.

13  Q.  All right.

14  Mike Fowler.

15  Q.  He's the one in Louisiana; right?

16  A.  Correct.

17  Q.  Is he representing you on any cases where

18  you've been sued in Louisiana, or just the one that he

19  filed on your behalf?

20  A.  Just whatever's going on in Louisiana.

21  Q.  All right.

22  A.  And I hired Steve for this.

23  Q.  All right.

24  A.  And --

25  Q.  You have Eric Knouse, who's a criminal lawyer

## Page 196

1  in Colorado?

2  A.  Yeah, Eric Knouse.

3  Q.  But he's just doing criminal cases for you;

4  right?

5  A.  I guess he's no longer an attorney for me now.

6  Q.  Whatever.  But he's not doing any civil cases

7  for you?

8  A.  Nope.

9  Q.  Anybody else?

10  A.  Not to my knowledge.

11  Q.  Where'd you get the money to pay your lawyers?

12  A.  Kate.  And I still owe Ben.

13  Q.  Do you have any current business relationships

14  with Vincent Promuto?

15  A.  Friendship.

16  Q.  That's it.  No business relationships?

17  A.  Nope.

18  Q.  He's not paying you anything?  You're not

19  doing any work for him?

20  A.  Nope.

21  Q.  Have you been to Costa Rica since September of

22  2006?

23  A.  Excuse me?

24  Q.  Have you been to Costa Rica since September of

25  2006?

| Page 197 |
|---|

1  A.  Costa Rica?

2  Q.  Yes.

3  A.  I have not been to Costa Rica.

4  Q.  **Never been to Costa Rica; right?**

5  A.  I went on a cruise once, but I don't know

6  where.

7  Q.  **When?**

8  A.  That was in -- that's been a while ago.

9  Q.  **Before September of 2006?**

10  A.  Before all this problems.

11  Q.  **Who's Tracie Domino?**

12  A.  Tracie Domino?

13  Q.  **She lived in Palm Harbor, Florida.**

14  A.  I don't know. Oh, that's the lady that I

15  rented the house from.

16  Q.  **Which one?**

17  A.  Palm Harbor.

18  Q.  **Did she live with you there?**

19  A.  No.

20  Q.  **You two didn't live together?**

21  A.  No.

22  Q.  **You have any dealings with Tracie since**

23  **September of 2006?**

24  A.  I just paid her rent until I couldn't pay no

25  more and left.

| Page 198 |
|---|

1  Q.  **Do you owe her any money?**

2  A.  I don't think so. I may. I don't think so.

3  Q.  **Who's David Hecker?**

4  A.  Who?

5  Q.  **David Hecker.**

6  A.  I don't know.

7  Q.  **He's the CFO of Retif Gas. Do you know him?**

8  A.  I do not know him.

9  Q.  **Do you know Retif Gas?**

10  A.  Retif Oil?

11  Q.  **Yeah.**

12  A.  Yeah.

13  Q.  **Who are they?**

14  A.  That's where Vince bought his fuel from.

15  Q.  **Does he owe them money?**

16  A.  I -- I don't handle Vince's debt.

17  Q.  **I didn't ask you if you did. I just want to**

18  **know if you know --**

19  A.  I don't know.

20  Q.  **-- if Vince owes him any money.**

21  A.  I don't know.

22  Q.  **After Vince bought the gas station and didn't**

23  **pay the individuals who delivered the fuel that you**

24  **were selling for cash only, you don't know anything**

25  **about that?**

| Page 199 |
|---|

1  A.  I don't believe Vince owes anybody -- Vince is

2  a multi, multi, multimillionaire.

3  Q.  **So you don't know anything about it?**

4  A.  No.

5  Q.  **When you stopped by the sheriff's officer in**

6  **Louisiana --**

7  A.  I don't want to discuss that. That's part of

8  the -- some situation that my attorney's handling in

9  Louisiana.

10  Q.  **What's the basis for not discussing it?**

11  A.  Because there's things that the attorneys

12  don't want -- and I -- I'm not going to discuss it. I

13  plead the fifth.

14  Q.  **Were any charges brought against you?**

15  A.  Where at?

16  Q.  **Louisiana.**

17  A.  Falsely. And I'm not going to discuss that

18  either. I plead the fifth.

19  Q.  **Have you ever carried an ID in the name of**

20  **Michael O'Riley?**

21  A.  Never.

22  Q.  **The eagle crusher that's located at Roger**

23  **Barrick's --**

24  A.  Yes.

25  Q.  **-- what's your summation of its value?**

| Page 200 |
|---|

1  A.  Let's see. Ninety -- it's been sitting for a

2  long time. I -- I need to go down and fire it up

3  and --

4  Q.  **Best estimate.**

5  A.  If you want me to do that.

6  Q.  **Best estimate. I mean, I -- is it worth**

7  **$10,00, or is it worth $100,000 plus, or --**

8  A.  A hundred fifty plus.

9  Q.  **Could be more, depending on the shape it's in?**

10  A.  Right. I mean, just because they look like

11  they're all rusted up, it -- that has nothing to do

12  with it.

13  Q.  **All right.**

14  MR. BECKER: Give me five minutes to talk

15  to my client. I think we're close to being done for

16  what we can do today without documents.

17  VIDEOGRAPHER: We're going off the record

18  at 4:27:59.

19  - - -

20  Off the record.

21  - - -

22  VIDEOGRAPHER: We're going back on the

23  record at 4:33:30. Go right ahead.

24  MR. BECKER: All right. For purposes of

25  today, given that we don't have the documents that were

**TAHYI VIDEO & COURT REPORTING, LTD.**
**(800) 526-6508  (740) 454-7157**

## Page 201

1 ordered by Judge Lewis to be produced, I think we
2 can -- we can conclude. We will reserve and keep this
3 deposition open once we're informed that the documents
4 that are available can be produced. And we can
5 reschedule this at a date and time to be agreed upon,
6 or at the order of the court if we can't agree.
7 Having said that, we'll close it for
8 today.
9 THE WITNESS: Wait a minute. I want to
10 say something for the record as well.
11 MR. SCHNITTKE: You want to talk to me
12 before you say something for the record?
13 THE WITNESS: Yes.
14 VIDEOGRAPHER: We're going off the record
15 at 4:34:04.
16 - - -
17 Off the record.
18 - - -
19 THE WITNESS: One other thing is, for the
20 record --
21 VIDEOGRAPHER: We're going back on the
22 record at 4:36:39. Go right ahead.
23 THE WITNESS: I also, for the -- for
24 the -- for the record, my medical for my head where I
25 had a head trauma and fell 17 feet is in here. And if

## Page 202

1 you want to make a copy of this. And it says all about
2 my brain damage and my microscopical bleeding from
3 Pittsburgh Hospital and whatever this other stuff says.
4 MR. BECKER: You can give it all to
5 counsel and then if we need it we can obtain it from
6 him.
7 BY MR. BECKER:
8 Q. Does you -- do you get Workers' Compensation
9 for that?
10 A. What do you mean?
11 Q. Do you get -- were you injured on the job when
12 that happened?
13 A. Yes.
14 Q. Do you get Workers' Compensation? Do they pay
15 your bills?
16 A. My medicine.
17 Q. What Workers' Compensation state pays that?
18 Which state were you injured in?
19 A. Ohio.
20 Q. Ohio. So what's your Workers' Comp. claim
21 number?
22 A. I don't have one.
23 Q. Well, who pays the medical? Who pays for that
24 prescription?
25 A. It's -- every time I pick it up it's free.

## Page 203

1 MR. SCHNITTKE: You got to have a claim
2 number --
3 Q. You got to have a claim number for somebody to
4 be paying --
5 A. Okay, that I don't know.
6 Q. Did you file a Workers' Comp. claim in Ohio?
7 A. No.
8 Q. Do you have any Social Security claims?
9 A. No. Yeah. I'm sorry, yes. There was at the
10 hospital when -- because I was paralyzed.
11 Q. Are you collecting Social Security?
12 A. No, I didn't take it.
13 Q. You don't get any benefits from anybody?
14 A. I didn't take it. I went back to work.
15 Q. All right.
16 MR. SCHNITTKE: Mr. Becker, apparently
17 when you did his deposition the last time -- you know,
18 I wasn't privy to this, and maybe Mr. Zacks was and
19 Mr. Shamansky -- was the statement to the effect that
20 this was not to be shared with any other attorney.
21 MR. BECKER: No, that was never an
22 agreement. Absolutely not. And I won't agree to that.
23 It's public -- public domain.
24 MR. SCHNITTKE: Okay. Well --
25 MR. BECKER: The -- the only agreement we

## Page 204

1 made was regarding his Social Security Number, as I
2 recall. He went off the record and gave it to us.
3 Other than that --
4 THE WITNESS: And my Social Security
5 Number still remains off the record; correct?
6 MR. BECKER: I don't know that we even --
7 I don't think I asked you that.
8 THE WITNESS: Yes, you did. You -- you
9 read it off.
10 MR. BECKER: I read it off. You're right.
11 THE WITNESS: And it's -- and it's in
12 these --
13 MR. BECKER: I'm not agreeing to anything.
14 THE WITNESS: Well, then we need to --
15 MR. SCHNITTKE: Okay.
16 MR. BECKER: File a motion with the court
17 if you want.
18 THE WITNESS: Okay.
19 MR. SCHNITTKE: Okay.
20 MR. BECKER: Okay. We're done for today?
21 THE WITNESS: Yes.
22 MR. BECKER: Do you want to explain
23 signature to him or do you want to --
24 VIDEOGRAPHER: Mr. Riley, you have the
25 right to video this videotaped deposition right now for

Page 205

1  its accuracy, you also have the right to read the
2  typewritten transcript when it's prepared, or you can
3  waive those rights.
4          THE WITNESS: I want them.
5          MR. SCHNITTKE: You want to read them?
6          THE WITNESS: Yes.
7          VIDEOGRAPHER: Do you -- will you -- do
8  you want to view the tape?
9          THE WITNESS: Yes.
10         VIDEOGRAPHER: You have -- it'll have to
11 be done right now.
12         THE WITNESS: That's fine.
13         MR. SCHNITTKE: Okay. I'm not going to
14 stick around and do that.
15         THE WITNESS: Okay.
16         MR. SCHNITTKE: I don't know if the
17 library will let you stick around to do that. We are
18 supposed to leave here at 5:00.
19         VIDEOGRAPHER: You -- if he'll waive it --
20         THE WITNESS: I -- I'll go somewhere else
21 and see it.
22         MR. BECKER: You're going have to pay him
23 for his time.
24         VIDEOGRAPHER: It'll have to be done right
25 here, right now.

Page 206

1          THE WITNESS: Okay.
2          MR. BECKER: I'm not paying for the
3  videographer.
4          VIDEOGRAPHER: And who's going to pay for
5  my time?
6          MR. BECKER: I will not pay for him to
7  review his -- his videotape.
8          THE WITNESS: How do I know what type was
9  in there prior to me coming?
10         MR. SCHNITTKE: Nothing. It'd be a virgin
11 tape starting out with, right, Terry?
12         VIDEOGRAPHER: That's correct.
13         THE WITNESS: Is that how it works?
14         MR. BECKER: That's correct.
15         THE WITNESS: Okay. That's fine.
16         VIDEOGRAPHER: Then you'll waive?
17         THE WITNESS: Yes, sir.
18         VIDEOGRAPHER: You -- and you'll read
19 the --
20         MR. SCHNITTKE: Yes.
21         VIDEOGRAPHER: -- typewritten?
22         Okay. Thank you very much.
23              - - -
24  (THE VIDEOTAPED DEPOSITION CONCLUDED AT 4:45 P.M.)
25              - - -

Page 207

1          State of Ohio
                              SS:
2  County of _____:
3          I, GEORGE M. RILEY, do hereby certify that I
4  have read the foregoing transcript of my
5  deposition given on January 25, 2008; that
6  together with the correction page attached hereto
7  noting changes in form or substance, if any, it
8  is true and accurate.
9          _____
              GEORGE M. RILEY
10
11         I do hereby certify that the foregoing
12 transcript of the deposition of GEORGE M. RILEY
13 was submitted to the witness for reading and
14 signing; that after he had stated to the
15 undersigned Notary Public that he had read and
16 examined his deposition, he signed the same in my
17 presence on the _____ day of
18 _____, 20__.
19         _____
20              NOTARY PUBLIC
21
22 My commission expires _____, ____.
23
24
25

Page 208

1  State Of Ohio     : C E R T I F I C A T E
   County Of Muskingum  :
2
3          I, Debbie M. Bobo, Registered Professional
   Reporter, Notary Public in and for the State of Ohio, duly
4  commissioned and qualified, do hereby certify that the
   within-named GEORGE M. RILEY was first duly sworn to
5  testify to the truth, the whole truth, and nothing but the
   truth in the cause aforesaid; that the testimony then given
6  was by me reduced to stenotype in the presence of said
   witness; that the foregoing is a true and correct
7  transcript of the testimony so given as aforesaid,
   transcribed from my stenographic notes upon a computer; and
8  that this deposition was taken at the time and place in the
   foregoing caption specified, and was completed without
9  adjournment.
10         I do further certify that I am not a relative,
   employee, or attorney of any of the parties hereto, and
11 further that I am not a relative or employee of any
   attorney or counsel employed by the parties hereto, or
12 financially interested in the action. I am not, nor is the
   court reporting firm with which I am affiliated, under a
13 contract as defined in Civil Rule 28(D).
14         In witness whereof, I have hereunto set my hand
   and affixed my seal of office at Zanesville, Ohio, on this
15 13th day of February, 2008.
16
17 My Commission Expires     DEBBIE M. BOBO, RPR
   December 2, 2012        NOTARY PUBLIC, STATE OF OHIO
18
19
20
21
22
23
24
25